

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 24 2012

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**LITTLE ROCK DIVISION**

JAMES W. McCORMACK, CLERK
By:_____
DEP. CLERK

**BRIAN SCHWAB, D.O.**                                                    **PLAINTIFF**

**v.**                              **CASE NO. 4:11-CV-11 BSM**

**UNIVERSITY OF ARKANSAS, et al.**                            **DEFENDANTS**


## TABLE OF CONTENTS FOR
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Exhibit A      Excerpts of Brian Schwab Deposition

Exhibit A-1    Schwab's Intern Contract with St. John's Episcopal Hospital dated April 8, 2010

Exhibit A-2    Schwab's Competency Evaluation from St. John's Hospital for July, 2010

Exhibit A-3    Schwab's Information Services Rules and Regulations for Episcopal Health
               Services dated June 18, 2010

Exhibit A-4    Schwab's Medical Records for ADHD dated November 2007 through April 15,
               2009

Exhibit A-5    Schwab's UAMS Practitioner Health Questionnaire dated April 5, 2009

Exhibit A-6    Schwab's UAMS Resident Agreement of Appointment

Exhibit A-7    UAMS Housestaff Medical History

Exhibit B      Napolitano Declaration

Exhibit B-1    Schwab's Semi-annual PGY-1 Evaluation of January 15, 2010

Exhibit B-2    Termination Letter of March 18, 2010 from Napolitano to Schwab

Exhibit B-3    Letter of April 7, 2010 from Hoggard to Napolitano

Exhibit B-4    Napolitano Hand-written Notes Regarding Schwab

Exhibit B-5    Napolitano Notes of April 15, 2010 Meeting with Schwab

Exhibit B-6    Certified Letter of April 20, 2010 from Napolitano to Schwab

Exhibit B-7     Cardiology Rotation Evaluation of February 2010

Exhibit C       Jaffar Declaration

Exhibit C-1     Jaffar Notes of November 16, 2009 Meeting with Schwab

Exhibit C-2     Family Medicine Rotation/Ezell Evaluation of September 2009

Exhibit D       Fiser Declaration

Exhibit D-1     Faxed Letter of April 28, 2010 from Hoggard to Fiser

Exhibit D-2     Letter of June 1, 2010 from Fiser to Schwab

Exhibit D-3     List of Documents Submitted on Behalf of Schwab for Grievance Hearing

Exhibit D-4     Internet Article from HelpGuide.org on Adult ADD/ADHD

Exhibit D-5     EEOC Enforcement Guidance

Exhibit D-6     Letter of June 17, 2010 from Rudnicki to Fiser

Exhibit D-7     Letter of June 30, 2010 from Fiser to Schwab and Napolitano

Exhibit D-8     Letter of July 9, 2010 from Hoggard to Fiser

Exhibit D-9     Letter of July 13, 2010 from Fiser to Hoggard

Exhibit D-10    Faxed Letter of July 26, 2010 from Schwab to Fiser

Exhibit D-11    Letter of July 26, 2010 from Fiser to Schwab

Exhibit E       Clardy Declaration

Exhibit E-1     GME Policy 1.410 – Adjudication of Resident Grievances

Exhibit E-2     GME Policy 1.420 – Academic and Other Disciplinary Actions

Exhibit E-3     [no Exhibit E-3 exists; see Exhibit E-8]

Exhibit E-4     E-mail of July 22, 2010 from Hagemeier to Hoggard

Exhibit E-5     Letter of July 26, 2010 from Hagemeier to Hoggard

Exhibit E-6     Letter of July 2, 2010 from Hoggard to Hagemeier

Exhibit E-7      E-mail communication dated July 6, 2010 between Hoggard and Hagemeier

Exhibit E-8      Letter of July 7, 2010 Hagemeier to Hoggard

Exhibit E-9      E-mail communication dated July 16, 2010 from Hoggard to Hagemeier

Exhibit E-10    Draft E-Mail of July 23, 2010 between Clardy and Hagemeier

Exhibit F        Declaration of Timothy Martin

Exhibit F-1      Copy of Clinical Competency Committee Meeting Minutes of March 10, 2010

Exhibit G        Declaration of Ann Mancino

Exhibit G-1      Surgery Rotation Evaluation of January 2010

Exhibit H        Declaration of Dr. Clifton Parnell

Exhibit I        Declaration of Kimberly Moseley

Exhibit J        Declaration of Lawrence Kim

Exhibit K        Affidavit of Melony Clark

                Exhibit 1-A to Clark Affidavit:      Computer Input Information Given by Schwab on June 23, 2009

                Exhibit 1-B to Clark Affidavit:      Medical Record Created from Computer Input

Exhibit L        Affidavit of Louise Allison

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**BRIAN SCHWAB, D.O.,**                                          **PLAINTIFF,**

### CASE NO. 4:11-cv-00011-BSM

**UNIVERSITY OF ARKANSAS, ET AL.,**                       **DEFENDANTS.**

### CERTIFICATE OF SERVICE

I, Mark A. Hagemeier, certify that on April 24, 2012, I electronically filed the

Motion for Summary Judgment, as well as the Brief in Support of Motion for Summary

Judgment, using the CM/ECF system.  However, problems occurred during filing of

Exhibits to the Brief.  Herewith is a copy of all Exhibits referenced in the Brief and in the

Table of Contents that was attached to the filed Brief.  These Exhibits are being filed

manually and a copy has been sent to opposing counsel as follows:

> Denise Reid Hoggard, Esq.
> Chisenhall, Nestrud & Julian, P.A.
> 400 West Capitol Avenue, Suite 2840
> Little Rock, Arkansas  72201-3415

> Respectfully submitted,

> By:   /s/ MARK A. HAGEMEIER
> Associate General Counsel
> University of Arkansas
>       for Medical Sciences
> 4301 West Markham, Slot 860
> Little Rock, AR  72205
> (501) 686-7608
> E-mail:  mhagemeier@uams.edu

> ATTORNEY FOR DEFENDANTS

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

15

1    A    As far as I know.

2    Q    As far as you know?

3    A    Right.

4    Q    Okay.  All right.  I'm going to hand you what we're going to

5    mark as Exhibit 2 to your deposition.

6              (Whereupon, the St. John's Intern Contract was marked

7         as Deposition Exhibit 2 and is attached at Tab 2.)

8    MR. HAGEMEIER: (Continuing)

9    Q    This is your current -- this was the contract you signed for

10   your intern year at St. John's, right?

11   A    I have to go through this, I'm sorry.

12   Q    Okay, sure, absolutely.

13   A    It appears so.  I didn't have a chance to read through the

14   whole thing, but it looks exactly like my contract would have

15   been.

16   Q    Okay.  And does that appear to be your signature on the

17   final page of that document?

18   A    Yes, it does.

19   Q    Okay.  And when did you sign that document, sir?

20   A    It appears that I dated it -- let me go back to the last

21   page -- on I believe 4-8, but there's also another date above

22   that.  I don't know if it says 4-4.  I'm not clear.  I can't

23   really read the handwriting.

24   Q    Okay.  At least from the document does it appear that you

25   either signed it on April the 4th of 2010 or April the 8th of

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

16

1   2010?

2   A   Yes, I would say that's correct.

3   Q   Is that fair?

4   A   Yes.

5   Q   Okay.  And you contracted, according to this document, on

6   the very first page under Section A, to start that internship

7   year July the 1st of 2010?

8   A   Yes.

9   Q   And continue through June 30th of 2011?

10   A   Yes.

11   Q   And you were going to get paid for that intern year the sum

12   of $52,697.00?

13   A   Yes.

14   Q   And did that happen?

15   A   Yes.

16   Q   And this is the program that you just talked to me about

17   that after you finished this year, which I would understand was

18   June 30th of 2011, that rolled into the family practice residency

19   that you're in now?

20   A   You're correct.

21   Q   Okay.  Where were you when you signed this document?

22   A   I was in the hospital with the program director.

23   Q   So you were actually in New York state.

24   A   I'm not remembering.

25   Q   Okay.

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

26

1    Q    How many trips back to Rockaway, New York did you make

2    between your termination at UAMS and your beginning your

3    residency program there in July of 2010?

4    A    I'm not sure.

5    Q    Okay.

6    A    I can't give you a date.  I don't remember exactly how many

7    times I went there.  I remember still being in Arkansas until the

8    end of my lease and then having to move to Pennsylvania, and then

9    I think I commuted frequently to New York whenever they needed

10   something from me, so I don't know how many times I saw them.

11   Q    Okay.

12   A    I can't really answer that question.

13   Q    Okay.  And you do not recall if you were there in Rockaway

14   when you signed this or not?

15   A    No, I don't know if this was a -- if they faxed this to me

16   or if I was there in person.  I'm not sure.

17   Q    Okay.  I don't want to lose you.

18   A    Uh-huh.

19   Q    I'm turning the sheet of music, all right?

20        I want to talk to you a little bit about your ADHD diagnosis

21   in medical school.

22   A    Okay.

23   Q    And as I understood some Answers to Interrogatories, we can

24   pull them out and you can just confirm them, you did not get seen

25   for ADHD in college.

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

27

1   A   That is correct.

2   Q   And that was Muhlenberg College?

3   A   Yes.

4   Q   And you received an ADHD diagnosis in your third year of

5   your D.O. medical program?

6   A   I believe so.

7   Q   Okay.  And that was under a *Doctor Mark?

8   A   Yes.

9   Q   And where did you attend your D.O. program?

10  A   Philadelphia College of Osteopathic Medicine.

11  Q   Okay.  Was Doctor Mark a physician on the staff of

12  Philadelphia College?

13  A   Yes.

14  Q   Okay.

15  A   He was the one teaching psychiatry.

16  Q   Oh, okay.  I'm going to mark what we will call Exhibit 5 to

17  your deposition.

18          (Whereupon, the Fax with Records from Philadelphia

19      College of Osteopathic Medicine was marked as Deposition

20      Exhibit 5 and is attached at Tab 5.)

21  MR. HAGEMEIER: (Continuing)

22  Q   And if you'll look through that, have you ever seen those

23  records from Doctor Mark before?

24  A   No, I have not.

25  Q   Okay.  Let me tell you, I thought my handwriting was bad,

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

28

1    this guy takes the cake, and I'm not even going to try to have us

2    decipher his hieroglyphics, okay, other than a few dates, and you

3    can tell me if they appear to be correct to you.

4        It appears to me -- Did you see anybody before Doctor Mark

5    for --

6    A    For ADHD?

7    Q    Yes, sir.

8    A    I don't believe so.

9    Q    Okay.  And it looks to me from these records that they start

10   in November of 2007, and I am looking at Bates-stamped page 47 of

11   Exhibit Number 5.

12   A    I don't remember when I first started talking to Doctor

13   Mark.  It might have been before that, I don't know.

14   Q    And I'm not trying to, it just appears from this record that

15   --

16   A    From this record, but I don't know if I had any verbal

17   conversations with the man.  He was a member of the faculty.  I

18   don't know if this is the first time I met him.

19   Q    Okay.  How did your going to see him in the first place come

20   about?

21   A    As I was mentioning during my hearing --

22   Q    Yes, sir.

23   A    -- I believe it was either during a family practice or an

24   internal medicine rotation, and I believe it was early on in my

25   third year of medical school.  It was during rounds; one of the

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

29

1   attendings who knew me from before realized that I wasn't

2   focusing on rounds and suggested I was having an issue, that

3   perhaps I should go see a psychiatrist, which I didn't realize

4   was an issue, and that's what led me to him.

5   Q   Okay.  You said he knew -- as I understood your answer, you

6   said that he knew me from before.

7   A   Right.

8   Q   From before?

9   A   I don't remember which faculty member.  I believe it was --

10   I don't know.  If don't know if it was -- cause I went to

11   Muhlenberg College, and I believe this was when I was at St.

12   Luke's, which is also in Bethlehem or Allentown, so I might have

13   met him when I was in college doing a shadowing program or

14   something like that, sir.

15   Q   Okay.

16   A   I'm not, I'm not sure who was the specific physician, but I

17   remember somebody sitting me down and saying, "I know who you

18   are, you're not acting like who you are."

19   Q   Okay, okay.  So just to be fair, somebody who had had some

20   prior contact with you before who now you were doing rounds with

21   in medical school said, "Hey, you seem not to be yourself, maybe

22   you should go see someone"?

23   A   That's a fair assessment.

24   Q   Is that fair?

25   A   Yes.

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

30

1    Q    Okay.  And you went to see Doctor Mark it looks like about

2    quarterly, maybe three times a year, at least from these records.

3        I see nothing that I can read, so let me jump to the fact

4    that I see over on Bates-stamped page 48 it appears that you --

5    When did you graduate from medical school?

6    A    I believe the end of May or June of --

7    Q    '09?

8    A    I don't know if it was '09.  I believe it was '09.

9    Q    I'm not trying to trick you.

10   A    No, I know you're not trying to trick me, I'm just trying to

11   remember.

12   Q    Because you would have come to UAMS right --

13   A    Exactly, whenever that was.

14   Q    Right afterwards, okay.

15   A    So I'm assuming it was in '09.

16   Q    And I can tell you that I do know that you started at UAMS

17   in the summer of '09.

18   A    Okay.

19   Q    So working backwards --

20   A    Then it is.

21   Q    -- you graduated in May or June of '09.

22   A    Okay, thank you, sir.

23   Q    Sure.  So it looks to me that on Bates-stamped page 48 that

24   on October the 8th of 2008 Doctor Mark writes, and you tell me if

25   this appears to be what it says to you, "Doing well, applying

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

31

1    for" -- and I think that's -- "anesthesiology residency.  Does

2    well with Adderall.  This will" -- I couldn't tell you what that

3    says for the life of me.

4    A    I think it says "continue."

5    Q    Oh, "This will be continued"?

6    A    I think that's what he's writing.

7    Q    That's as good a guess as I can get for it.  Then you see

8    him about three months later, January the 14th, and he writes,

9    "Doing well on rotation."

10   A    I think it says --

11   Q    Wait a minute.

12   A    "Does not need much to be changed," or something like that,

13   sir.

14   Q    Okay.  And, "Maybe needs to be continued" also?

15   A    Uh-huh.

16   Q    All right.  And then the last time you see him is, the note

17   is, "Accepted anesthesiology, Little Rock, Arkansas."

18   A    Uh-huh.

19   Q    Okay.  And did you have Doctor Mark inform anyone at UAMS of

20   his treatment of you while you were at Philadelphia College?

21   A    I did not ask him to call UAMS.

22   Q    Okay.  And you don't know if he did or not?  I mean, so

23   there would be no reason that I would have, I suppose if you

24   hadn't asked him to, right?

25   A    I don't know.

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

32

1    Q    You don't know, okay.  And the last time you saw Doctor Mark

2    was in?

3    A    I believe before I graduated.

4    Q    April of '09.  That would be right before you graduated.

5    A    I might have seen him more informally afterwards.

6    Q    Okay.

7    A    He was a member of staff, and so I would bump into him and

8    he would clearly ask me, "How is everything going?" or  something

9    like that.  It didn't always have to be a session, to be fair.

10   Q    Okay.  I have seen your transcript from college, but I don't

11   have it with me.  You graduated I believe with honors or maybe

12   high honors or highest honors?

13   A    I don't -- I believe so.  I think either in the top fifth or

14   second top fifth, something like that.  Very well.

15   Q    Very well.  And you graduated from medical school.

16   A    Also with honors.

17   Q    Okay.  How did the Adderall affect you?

18   A    From what -- I noticed right away when the other medical

19   students, it's what they reported to me.  I don't know the

20   feeling that there is something different.

21   Q    Okay.

22   A    It's what other people report to me.

23   Q    Sure.

24   A    And they say that, "You seem to be less jittery," that I

25   appear to be more focused and more job-oriented, more task-

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

33

1    oriented, and that I don't look lost.

2    Q    Okay.  Did you continue to take the Adderall throughout the

3    time you were at UAMS?

4    A    Whatever Doctor Carter put me on, so I believe it was

5    Adderall.

6    Q    Okay.

7    A    Adderall, yes.

8    Q    Okay, I'm shifting again.

9    A    Uh-huh.

10   Q    You graduated from medical school in late May or June of

11   2009, and obviously before that ended you started looking at

12   programs, residency programs, right?

13   A    Uh-huh.

14   Q    Can you tell me a little bit how you decided on Little Rock,

15   Arkansas?

16   A    No problem.  It actually began very informally.  I was

17   driving to see my friend who lives in Little Rock, Arkansas, and

18   I e-mailed the program just to say, "By the way, I applied to

19   your program, I'm driving through, is there any way I could see

20   your institution if I'm already going to be in town?"  And I

21   think they saw an interest because I was showing an interest.

22   And then I got an interview at the program, and from there I got

23   to see the program and what I was interested in.  I don't know if

24   you want me to expand upon what I liked about the program or --

25   Q    Well, I would, and I'd also like to know who did you

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

34

1    interview with?

2    A    I don't remember.  I believe I was three people.

3    Q    Three people in the Anesthesiology Department?

4    A    Yes.

5    Q    Okay.  It wasn't Doctor Napolitano?

6    A    I don't know.

7    Q    Okay.

8    A    I don't know if I interviewed with him.  You'd have to ask

9    him.

10    Q    Okay.  And you don't know if it was Doctor Jaffar?  You just

11    don't have any recollection of it?

12    A    No.  I went on a lot of interviews.

13    Q    Okay.

14    A    I don't remember exactly who I interviewed with.  I'm sorry,

15    sir.

16    Q    No, that's fine.

17        What made you think you'd like to come to Little Rock?

18    A    I saw the hospital and it was clearly one of the nicest

19    hospitals I've seen.

20    Q    The new one?

21    A    Yes.

22    Q    Okay.

23    A    Yes.

24    Q    I was going to say, you must have been here early or later.

25    A    Yes.  In addition to just being a new facility, it had

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

35

1    multiple levels of residency.  They had fellowship programs

2    involved, they had multiple disciplinaries.  I believe it's a

3    trauma center.  It was one of the best programs you could

4    probably get into in the country.  I mean, being in this

5    hospital, it's one of the major hospitals in the entire state, if

6    not the major hospital in this state.

7    Q    Yeah, big training institution.

8    A    Exactly, sir.

9    Q    Okay.  And so you started to apply?

10   A    Uh-huh.

11   Q    And the interview that you talked about, was that -- do you

12   have a time frame for that?

13   A    It was probably between -- I don't remember when the

14   interviews were.  It was either late, beginning fourth year

15   medical school or late third year medical school, I'm not sure.

16   I don't really remember.

17   Q    So the trip out here to visit your friend was actually at

18   the early part, either the end of your third year or the early

19   part of your fourth year?

20   A    It was before I was offered an interview.

21   Q    Okay.  I'm going to hand you what we'll mark as Exhibit 6 to

22   your deposition.

23          (Whereupon, the UAMS Practitioner Health Questionnaire

24          of 4-5-09 was marked as Deposition Exhibit 6 and is attached

25          at Tab 6.)

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

36

1   MR. HAGEMEIER: (Continuing)

2   Q   And this is a questionnaire that you sent to UAMS, right?

3   A   Uh-huh.

4   Q   You have to say yes or no.

5   A   Oh, yes.

6   Q   Okay.  And it looks like it's dated April 5, 2009?

7   A   Yes.

8   Q   Do you know if you were -- were you already accepted at this

9   point in time?

10  A   Yes.

11  Q   All right.  Do you know when you got accepted?

12  A   It would have to be before this date.  I don't remember when

13  Match Date was.

14  Q   Is Match Date usually about spring break, March somewhere?

15  A   Yes.

16  Q   Okay.  And so that's a yearly thing, right?

17  A   Yes, it's always the same time.

18  Q   Okay.  And I may be assuming something, so I want you to

19  straighten me out.  Prior to your showing up for the summer,

20  there's like a three-day Housestaff orientation at UAMS that all

21  new residents go through.  Do you remember that, before you

22  actually start any rotation?

23  A   I remember there was some sort of introduction orientation,

24  but I don't remember how long it was or anything.

25  Q   Okay, that's fine.  Had you met Doctor Jaffar or Doctor

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

37

1 Napolitano that you can recall prior to actually moving down and

2 showing up to Little Rock?

3 A   If I didn't meet them in my interview, then no.

4 Q   Okay.  And obviously in this Exhibit Number 6 you indicated

5 that you didn't have any kind of health impairments that would

6 affect your ability to perform professional and staff duties

7 fully, right?

8 A   I checked "No."

9 Q   Okay.  And in that interview did you indicate you had ADHD

10 to anybody?

11 A   No.

12 Q   All right.

13 A   I believe it's also illegal to ask somebody that question.

14 Q   Right.  So you weren't volunteering it and they didn't ask?

15 A   Correct.

16 Q   All right.  I'm going to hand you what we'll mark as Exhibit

17 Number 7.

18       (Whereupon, the UAMS Resident Agreement of Appointment

19    was marked as Deposition Exhibit 7 and is attached at Tab

20    7.)

21 MR. HAGEMEIER: (Continuing)

22 Q   This is what purports to be the contract that you signed for

23 your first year of residency at UAMS, is that correct, sir?

24 A   Yes.

25 Q   And that contract is between you and the University of

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

38

1    Arkansas, correct, if you'll look at that first line?

2    A   Yes.

3    Q   And for that first year it was your understanding that you

4    would be paid $45,000 and change for your year as a resident?

5    That's under paragraph 5 of that document Number 7.

6    A   I don't see, but most likely that sounds right.

7    Q   First page, paragraph 5.

8    A   Yes.

9    Q   Forty-five thousand three hundred and fifty-six dollars

10   ($45,356.00).

11   A   Yes, that is correct.

12   Q   Would you have any reason to doubt me if I told you that

13   that amount in the next year's contract, the contract for 2010-

14   2011, would have gone up to about 46,000 and change?

15   A   I don't know.

16   Q   Okay. I noticed that your contract at St. John's is about

17   52,000 and change. Is there some kind of -- I thought that was a

18   federal mandated amount. Do you know why one is different from

19   the other?

20   A   I don't.

21   Q   Okay. Let me hand you what we will mark as Exhibit Number

22   8.

23            (Whereupon, the UAMS Housestaff Medical History was

24        marked as Deposition Exhibit 8 and is attached at Tab 8.)

25   MR. HAGEMEIER: (Continuing)

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

39

1  Q  You said in your grievance hearing that you filled out some

2  kind of medical evaluation form upon your coming here. Does

3  Exhibit Number 8 appear to be that document, or do you know?

4  A  I don't know.

5  Q  Okay. My understanding from your testimony at the grievance

6  hearing was that you filled out some kind of a document, is that

7  right?

8  A  Yes.

9  Q  Okay. And was that during that Housestaff orientation in

10  the summer of 2009, or do you know?

11  A  I believe it was in the packet that we were sent with

12  everything else in early April. I don't know if it was during

13  the orientation, sir. I think I mailed it in.

14  Q  Okay. So let me just make sure I'm tracking you. To the

15  best of your recollection, whatever form was sent out was in some

16  sort of an income residency packet?

17  A  I believe that's so. I don't know if there was also another

18  form that was sent during orientation, though.

19  Q  Okay.

20  A  But I remember filling out a medical questionnaire during

21  the packet.

22  Q  Okay. And did you turn that in via mail, via fax, or in

23  person when you showed up at the UAMS campus, or do you know?

24  A  I don't know for sure, but I'd say it was most likely mail.

25  Q  Okay. Do you know how that got processed?

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

40

1    A    I don't know.

2    Q    Okay.  When you were in processing as a resident, did you

3    inform anybody, "You know, I need an accommodation for ADHD"?

4    A    When?

5    Q    When you were incoming as a new resident in the summer of

6    2009?

7    A    No, not at that time.

8    Q    Okay.  And again, that medical history form, you have no

9    idea how that gets processed or utilized internally at UAMS at

10   all?

11   A    From my best understanding, it would go to Health Employees

12   Information or Health Records or something like this.

13   Q    Okay.  But you don't know how it's utilized, that's your

14   assumption, right?

15   A    That is correct.

16   Q    Okay.

17   A    But it would go to the health employee information database

18   of some sort.

19   Q    Okay.  All right.

20          MR. HAGEMEIER:  I tell you what, let's take a little

21      break and let me get reorganized for the next little set.

22          MS. HOGGARD:  Okay.

23                  (Break)

24   MR. HAGEMEIER: (Continuing)

25   Q    And we're back on the record, Doctor Schwab.  Any answer

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

41

1   that you would like to change or elaborate on from the first 45

2   minutes of your deposition?

3   A    The only question that I kind of want to clarify is when you

4   asked me what do I think happened with my medical information.

5   Q    Yes, sir.

6   A    I just, I think it's a reasonable approach, it's a

7   reasonable expectation, I should say first, but it would be to

8   the medical institution, and then it should be accessible to

9   whoever was working with me or in charge of me to have also that

10  access to that information.  I think that would be reasonable,

11  sir.

12  Q    Okay.  And so let me recapitulate it in my terms.  And I'm

13  actually going to -- I think you said that very same statement a

14  number of different ways at your grievance hearing, is that

15  correct?

16  A    I believe so.

17  Q    And so we're right on the same page literally.  I'm going to

18  -- I have copied the first 60 or so pages of that hearing just so

19  we can both look off of it.  Obviously that wasn't sworn

20  testimony and there wasn't a court reporter there, but you

21  understood it was being taped for the grievance hearing purposes,

22  right?

23  A    Yes.

24  Q    Okay.  So I would like you to take a look at page 24, Doctor

25  Schwab.  I'll try to find it for you. (Handing document to

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

42

1    witness)

2    A    Yes, sir.

3    Q    Halfway down the page where there's a paragraph break you

4    stated, "They" -- which based upon this where we are in the

5    transcript I would assume would be either Napolitano, Jaffar or

6    UAMS --

7    A    That's correct.

8    Q    -- "...were aware of my diagnosis by virtue of having

9    completed the medical history that UAMS had me fill out upon

10   entry of the program."  Is that what you said?

11   A    Yes, that's what the sentence says.

12   Q    And that's basically what you are telling me right now as we

13   start this deposition again, right, that based upon your filling

14   out that questionnaire, your assumption would be that people

15   would have access to that medical information?

16   A    That's a reasonable assumption in my mind.

17   Q    Okay.  If you would turn on that to page 34, and it is front

18   and back, where the first paragraph break is about a third of the

19   way down the page, that transcript states where you were

20   testifying:

21         "In other institutions where I've been, when you reveal

22   it on your employee history" -- and by "it" you're saying I

23   believe your ADHD diagnosis -- "that information is shared

24   with the appropriate individuals.  I did not have to

25   broadcast my disability.  Accordingly, I expected UAMS to

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

43

1    share the information, to share information as was
2    appropriate to individuals in the program."  We're missing
3    an "n" there.  "As we sit here today, I do not know if they
4    did that or whether my program directors knew.
5        "I knew that on March 18th when we would work out a
6    remediation program, I saw it as an opportunity to get work
7    in helping with me."
8    A    That is what it says.
9    Q    Okay.  And can you explain, again, by that testimony before
10   the grievance hearing, what I understood you to say that day was,
11   "I disclosed through some kind of medical questionnaire that I
12   had ADHD, and I expected that information to be shared with my
13   program directors," or, "They had access to that information and
14   they could have looked it up."
15   A    Which question are you asking me?
16   Q    That was an either/or.  It was kind of, I took that as -- Is
17   my understanding of your testimony fair, that what you've said
18   when you first came into the room, what we first read on page 24,
19   what we've read on page 34, is that you filled out some kind of
20   medical questionnaire and sent that in when you became a
21   resident?
22   A    Yes.
23   Q    And that you don't know how that information got processed
24   or what they did with that form, but your assumption is that it
25   should have been in process at UAMS and that that medical history

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

44

1   should have been made available to people who were wanting to

2   look at it?

3   A    That seems like a reasonable scenario.

4   Q    Okay.  So other than your filling out that form in the

5   summer of 2009, did you at any point in time say to Doctor

6   Napolitano or Doctor Jaffar in any of your meetings, "Hey, I

7   don't know if you know," or something along these lines, "Hey, I

8   don't know if you've checked my medical history or not, but I

9   have ADHD and I need an accommodation"?

10   A    At what point?

11   Q    At any point between the time you came in in, let's call it

12   July 1 of 2009, to the point where you were terminated.

13   A    No, I did not.  But to be fair also, I only met with them

14   maybe two times.

15   Q    I agree a hundred percent, and we're going to talk about

16   that.

17       Okay, I'd also like you to look, and you're going to have to

18   read with me, because this is on page 285 and I didn't provide

19   you that.  You don't have it, so we're going to have to kind of

20   read off this together, and I apologize.

21       This is your summation at the end of your hearing, and I'm

22   just going to -- Read along with me and tell me if I've quoted

23   this right at least.

24            MS. HOGGARD:  What page is it?

25            MR. HAGEMEIER:  Page 285.

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

45

1          THE WITNESS: Go ahead, sir.

2    MR. HAGEMEIER: (Continuing)

3    Q   It's the second paragraph break that starts with "I", second

4    sentence:

5          "I didn't talk about my ADHD because there wasn't an

6          evaluation to show that this might have been a significant

7          issue.  As you see, prior to my termination there really

8          wasn't an evaluation where I should say, 'You know what,

9          guys, I should tell you I have ADHD.' Frankly, I thought my

10         program directors knew when I put it on my medical history

11         form.  That document was shredded.  That's the reason I

12         think that form is not provided today."

13   A    That is what the --

14   Q    And again, that's just a recapitulation for the fourth time

15   of your position that they should have been able to access this

16   information?

17   A    Yes.

18   Q    Okay.  Did you get assigned an e-mail account at UAMS?

19   A    Yes.

20   Q    Okay.  And could you communicate with program directors,

21   other students via e-mail?

22   A    Yes.

23   Q    Okay.  All right.  I don't want to lose you, so I'm going to

24   tell you that right up front.  Between your entry into the

25   program in July of 2009 --

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

46

1   A    Uh-huh.

2   Q    -- until you met with Doctor Jaffar in mid-November of 2009,

3   did you have any kind of meetings or one-on-one conversations

4   with either Doctor Jaffar or Doctor Napolitano?

5   A    No.

6   Q    All right.  Had they -- did you guys have like a breakfast

7   or a lunch or anything where it's like, "Hey, these are the

8   program directors, if you need anything, here are the guys"?

9   A    I don't remember one.

10  Q    Okay.  All right.  Who did you understand was your contact

11  person in anesthesiology if you had an issue, any kind of issue

12  as a resident, who were you supposed to contact?

13  A    My program directors.

14  Q    Okay, and that would have been Napolitano and Jaffar?

15  A    Yes.

16  Q    Do you know are they sort of coterminous?  I mean, is it

17  sort of the Napolitano/Jaffar show?  I mean, are they sort of,

18  both of them, if you have a problem you can contact either one of

19  them, or is that your understanding?

20  A    That's my understanding.

21  Q    Okay.  You went through a series of rotations in August,

22  September, October, November and you went through them and there

23  didn't seem to be any problem, right, to your understanding?

24  A    To my understanding.

25  Q    Okay.  And then you had a meeting with Doctor Jaffar on

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

47

1   November the 16th.

2   A   I'd have to go by -- I don't know the date, but I had a

3   meeting with him in November.

4   Q   Okay.  I think that's true.  I'm not trying to trick you in

5   any way.

6   A   No, no --

7   Q   Do you recall a mid-November meeting?

8   A   -- I don't want to misspeak.

9   Q   So you had one meeting with Doctor Jaffar in mid-November of

10   2009?

11   A   Yes.

12   Q   And where did that take place?

13   A   In the VA.

14   Q   In the VA.  Where at the VA?

15   A   Part of it was in the cafeteria, and then part of it was I

16   believe in one of the offices near the SICU.

17   Q   Okay.  About how long was it?

18   A   I'm not sure.  It was over a lunch period.

19   Q   Okay.  I mean, so 15 to 30 minutes, is that fair? Relatively

20   short?

21   A   I don't know.  It might have been longer, it might have been

22   shorter.  It was not shorter than 15 minutes because we clearly

23   ate.  I'm assuming it was at least 30 minutes maybe to 45, sir.

24   Q   Okay.  How would you describe Doctor Jaffar's demeanor at

25   that meeting?

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

48

1    A    Very cordial.

2    Q    It was not a meeting about ADA issues, was it?

3    A    I don't understand.

4    Q    I mean, the issue of ADHD or disability or an accommodation

5    was not addressed at that meeting, correct?

6    A    I don't know, sir.

7    Q    Okay. You made notes of that meeting, correct?

8    A    Yes.

9    Q    Can you tell me when you made those notes?

10   A    I believe I made those in preparation for our hearing. I'm

11   not sure when exactly that they were done.

12   Q    All right. I'm going to hand you what we're going to mark

13   as Exhibit Number 9 to your deposition. You'll have to share

14   that with you counsel, I'm sorry.

15          (Whereupon, the November Meeting Notes were marked as

16      Deposition Exhibit 9 and attached at Tab 9.)

17   MR. HAGEMEIER: (Continuing)

18   Q    And Document Number 9 is what, sir?

19   A    Is this Document Number 9?

20   Q    Yes, sir.

21   A    It's entitled "Meeting in November."

22   Q    Okay. And this was given to me this morning, or actually it

23   was e-mailed to me last night, I couldn't read it on my

24   Blackberry because I'm getting blind, but this is your notes of

25   the meeting with Doctor Jaffar in mid-November, correct?

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

54

1    Q    That's the reason you make medical notes, right?

2    A    Yes, sir.

3    Q    And I've been taking depositions with one lawyer way too

4    often lately.  He says -- and it's not Denise -- he says that if

5    it's not written down, it didn't really happen.  Is that kind of

6    the way it is in medicine, if it's not written down in the

7    record, nobody is going to ever be able to tell that?

8    A    Right.

9    Q    Okay.  Would you describe Doctor Jaffar as kind of a quiet

10   guy, is that fair?

11   A    I don't really know him.

12   Q    Okay.  All right.  Let me ask you a couple of other

13   questions.  I'm circling back to Doctor Mark a little bit here.

14   On page 56 of that transcript, I'm going back to Doctor Mark is

15   your treating physician in Pennsylvania.  You were asking some --

16   you were answering some questions of Doctor Rudnicki, R-U-D-N-I-

17   C-K-I, and I think it's a she.

18        She asked you, "And did the psychiatrist" -- we're talking

19   about Doctor Marks here -- "suggest you follow up with the

20   psychiatrist here" -- that would be in Arkansas -- "or did he not

21   specify?"  And your response was, "No, he didn't.  He saw that I

22   was doing well in my third and fourth year rotations --"  That

23   would be of medical school, right?

24   A    Yes, sir.

25   Q    " -- and said," and I'm assuming you're attributing this to

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

55

1    Doctor Marks, some kind of paraphrase here, "You seem to be doing

2    well, continue what's going on.  If you seem like you're having

3    any flares, please let somebody know."

4    A    That's what's in the transcript.

5    Q    And what I heard, and you tell me if this is a fair

6    statement of what you're saying here, is that Doctor Mark told

7    you, "You seem to be fine, you don't need any kind of

8    accommodations for your third and fourth year rotations other

9    than the Adderall that were prescribed for you.  Continue with

10   that, and if you have any flare-ups when you go on, make sure you

11   let somebody know," is that fair?

12   A    I think that's fair, and it's also reflected in his notes.

13   Q    Absolutely.

14   A    I think that he was saying that I was doing well.

15   Q    Okay.  You may have answered this.  Did he recommend that

16   you tell somebody upfront at UAMS, "Hey, I've got ADHD and you

17   might want to look out for this"?

18   A    We did not have that conversation.

19   Q    Okay.

20   A    He seemed to be very supportive that I was doing well.

21   Q    So is it fair to say that in Doctor -- in your interaction

22   with Doctor Mark, he had you on a prescription regimen that

23   seemed to be taking care of your issues?

24   A    Correct.

25   Q    Because between medical school and undergraduate school, but

HENDRIX REPORTING SERVICE
501-372-2748

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

56

1    for the taking of the Adderall, you seemed to be doing

2    marvelously as far as academics.

3    A    Yes.

4    Q    All right.  That meeting with Doctor Jaffar, as far as I

5    understand it, there was no meeting minutes that ever took place;

6    you didn't sign anything after that meeting, right?

7    A    Correct, there was no documents.

8    Q    And so two months pass, and in January of 2010 you begin a

9    surgery rotation, right?

10   A    Yes, in January.

11   Q    That was over at the VA?

12   A    Yes.

13   Q    Like all of your other rotations, you had never met any of

14   these doctors before, right?

15   A    Correct, except for Doctor Kim.

16   Q    Except for Doctor Kim.  How did you know Doctor Kim?

17   A    Through surgery/oncology.  I had him as an attending.

18   Q    Okay.  And just like your -- Other than Doctor Kim, you

19   didn't know any of the other surgeons, right?

20   A    No.  I knew the third-year medical, the third-year resident.

21   Q    Who was?

22   A    I can't remember.  I know he's -- like he went to Florida

23   University because he always had this like scrub cap.  But I also

24   worked with him in surgery/oncology.

25   Q    Okay.  And just like in your other rotations, and as you've

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

57

1  testified in your grievance hearing, you did not show up the

2  first day with those folks in surgery and say, "Hey, by the way,

3  I have ADHD, you might want to watch what I'm doing," right?

4  A   Correct.

5  Q   And you testified in your grievance, and if I paraphrase,

6  you tell me if I'm wrong, it was, I think you said something

7  like, "They were yelling at everybody."  It was -- I sort of came

8  across from your testimony it was an equal opportunity -- you

9  didn't feel picked upon, it was just that was the way it was,

10 they were loud, boisterous, yelling. Is that fair?

11 A   Those aren't my words, but yes, I think it's a fair

12 assessment.

13 Q   Okay.  And so this meeting that you had with Doctor Jaffar

14 and Doctor Napolitano on January the 15th of 2010 was a, your

15 first meeting with the two of them together since you had come to

16 UAMS, right?

17 A   That is correct.

18 Q   It was your semi-annual review, right?

19 A   Yes.

20 Q   And where did you-all meet?

21 A   It was one of their offices.  I'm not sure if it was in the

22 VA or UAMS.

23 Q   Okay.  Can you tell me about how long it lasted?

24 A   I believe it was about 20 to 25 minutes long.

25 Q   Okay.  What was the atmosphere?

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

58

1    A    Again, very cordial.

2    Q    Informative?  They wanted to get information from you, they

3    were going to give you information, they wanted to judge how you

4    were doing?

5    A    I wouldn't even say that, no.

6    Q    Okay.

7    A    It was more friendly.

8    Q    Cordial?

9    A    Yes.

10   Q    Okay.  So I'm going to hand you what we're going to mark as

11   Exhibit Number 10.

12              (Whereupon, the UAMS Anesthesiology Residency Program

13       Semiannual PGY-1 Evaluation of 1-15-10 was marked as

14       Deposition Exhibit 10 and is attached at Tab 10.)

15   MR. HAGEMEIER: (Continuing)

16   Q    And this is -- purportedly bears your signature down at the

17   bottom, correct?

18   A    Yes.

19   Q    So this is, I read that as January the 15th of 2010,

20   correct?

21   A    Yes.

22   Q    Was this document filled out when you signed it and you had

23   a chance to look at it, or did you sign it and then they filled

24   it out?

25   A    I believe they filled it out and then I signed it.

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

59

1    Q    Okay. So --

2    A    I don't remember exactly, but I can't imagine them not doing

3    it in front of me.

4    Q    Okay. And do you know whose handwriting this is on this?

5    A    I don't.

6    Q    Okay. You don't know if it's Doctor Jaffar or Doctor

7    Napolitano?

8    A    I don't.

9    Q    Anybody else there?

10   A    In the meeting?

11   Q    Besides the three of you.

12   A    No.

13   Q    Okay. So in this 20 to 25 minute conversation at one of

14   their offices, tell me what you recall of that meeting.

15   A    That we initially talked about how everything was going for

16   the last six months.

17   Q    Okay.

18   A    They were being very supportive, they were saying everything

19   seems to be looking very good. Again, they were being very --

20   they were like, "Everything seems to be going well. Everything -

21   - we're very proud of you," like very happy, very -- and then

22   they were asking if I have any concerns or any problems, and then

23   I talked about what was going on with the surgery issue.

24        And as I was saying in the court, I was saying again how I

25   felt overwhelmed, how I was getting yelled at all the time, and

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

60

1    how I wasn't doing well. And then they gave me their advice,

2    which was basically just to continue to work hard, and then that

3    was it.

4    Q    And so is it fair to say that at this point in time you're

5    having a discussion about academics: "Hey, I'm in this rotation,

6    man, and, you know, I seem to be getting off to a slow start,

7    they're hollering and yelling, I don't feel like I'm doing that

8    well. What's your suggestion, you know, just barrel on through?"

9    Is that fair?

10   A    I never said the words "slow start" or anything like that.

11   I mean, what I was saying was that I was feeling overwhelmed and

12   I was looking for help, and I clearly asked for help.

13   Q    Right.

14   A    And I said that they were constantly yelling and they -- I

15   even gave an example, and I think it was in my transcript about

16   an example of how I would participate in rounds and they wouldn't

17   want my involvement at all in patient care. And again, they were

18   just being supportive and saying, "Don't worry about it, we

19   haven't heard anything from them and the month is halfway over,

20   continue working hard and everything will be fine."

21   Q    Okay. And so the conversation was not, "Hey, I don't know

22   if you guys know this or not, but I do have ADHD and this

23   program, these guys in surgery are making me have a flare-up"?

24   That was not a part of the conversation, correct?

25   A    I wouldn't word it that way, sir. I would say that I was


BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

1    feeling -- I was clearly demonstrating that I was overworked and

2    overwhelmed and fatigued, and that was how I was saying I was

3    having a flare-up.

4        I didn't use the words, "I have a flare-up," but I clearly

5    stated symptoms that a person who is familiar with ADHD would

6    know that this is affecting me.

7    Q    And it's your assumption, one, that they knew you had ADHD,

8    right?

9    A    Yes.

10   Q    Number two, that your words, "I'm overwhelmed, I'm a

11   resident in anesthesiology and surgery, I'm overwhelmed, and I'm

12   fatigued, I'd like some help."  In your mind, that equates to,

13   "You should know I have ADHD and I'm looking for an

14   accommodation," is that true, sir?

15   A    I feel as if those words are enough, should provoke them

16   from at least talking to my program -- to the people I was

17   working with or at least investigating if I do have a medical

18   history.  I think then it was incumbent upon them that I was

19   clearly demonstrating complaints and they should have acted

20   somewhere about that.

21   Q    You testified earlier that if they had inquired when they

22   were interviewing you about your ADHD, that would be illegal.

23   That was your term, they couldn't do that, right?

24   A    I actually don't know the law, but I believe you're not

25   allowed to ask about a disability in an interview setting.

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

62

1    Q    Okay.

2    A    I'm not a legal expert, though.

3    Q    Okay.  Those were your words, though, right?

4    A    Yes.  But as I was saying, I might not be accurate.  I'm not

5    a legal expert, and I'm not sure exactly, but I believe so.

6    Q    Okay.  And now that you had the job, did you think it was

7    legal for them to start to say, "Well, Brian, you're overwhelmed.

8    Is that because it's your ADHD?"

9    A    Yes.

10   Q    Okay.  That's what you think should have happened?

11   A    I feel that they should have targeted questioning that might

12   have been about that.  Instead they targeted questioning

13   involving depression and drugs and alcohol.

14   Q    Okay.

15   A    When I never had an issue with either of those.  But if they

16   knew my medical history, I believe, I feel if I just had the

17   ability to see my evaluations and had a conversation with them --

18   Q    Uh-huh.

19   A    -- it would have all came out and we would not have been

20   having this conversation at all.

21   Q    And so all what would have come out?

22   A    The fact that I have ADHD and we were going to work on it.

23   If you look through the evaluations, it's really apparent that

24   it's an appearance of disinterest, lack of focus, lack of not

25   being attentive.  I didn't know these were the issues.  Like I

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

63

1    was saying before, I didn't know I was having a flare-up at the

2    time.

3    Q    Okay.  But they as anesthesiologists should have known.

4    That's your contention?

5    A    My contention is they should have -- either the hospital

6    should have let them know my medical history, or they should have

7    investigated exactly what was going on in that program and then

8    talked to me about what was going on.  They should have

9    investigated with the surgeons, got the report that I had the

10   appearance of disinterest, just sat down and told me that was

11   really the issue, and then clearly I would have talked about

12   ADHD.  They didn't do that.

13   Q    Okay.  And your statement in this January 15th of 2010

14   meeting of, "I'm overwhelmed and I'm fatigued," their response to

15   that, as your program directors, was, and I may be paraphrasing,

16   so correct if I'm wrong, you know, sort of, "Keep your head down,

17   you're halfway through, work on through it."

18   A    Yes.

19   Q    Okay.  So their response to me seems to be coming from a,

20   "Hey, this is the best way to survive this particular rotation."

21   Is that --

22   A    I think that's fair.  They were also giving personal stories

23   how they were also getting yelled at by surgeons.

24   Q    Okay.  So they were actually in this meeting, as I

25   understand, sort of confirming, 'Hey, this is the way surgeons' -

931c4abf-7cec-4407-b918-6a68d3ecf209

64

1  - I was going to use the pun "operate," but that seems

2  inappropriate.  You know, 'This is the way surgeons behave.'

3  A   I think --

4  Q   "Even we remember that," is that true?

5  A   I think that's what they were thinking, but I'm not sure.

6  Q   Okay.  That's what they were thinking, that is, surgeons

7  yell and it's a rough rotation for residents, is that what you're

8  saying?

9        THE WITNESS:  Can I take a break, sir?

10        MR. HAGEMEIER:  Absolutely.

11              (Break)

12  MR. HAGEMEIER: (Continuing)

13  Q   Okay, Doctor Schwab.

14  A   Yes.

15  Q   I am looking at Exhibit 10, which is the record of that

16  January 15th meeting between you, Doctor Jaffar and Doctor

17  Napolitano.  And what I note in here under the Concerns and

18  Comments, and tell me if I'm reading this correctly.  It appeared

19  during part of the conversation your concern or comment was,

20  "Only on surgical service that have been very busy."  Is that

21  what that --

22  A   Yes.

23  Q   "-- but work hours are okay."

24  A   Yes, at that point.

25  Q   And you appear or at least your recollection is after this

1   this, here's the way you do it"?

2   A   No, they were not dodging.

3   Q   Okay.  If you'll look at Exhibit 13, Doctor Schwab, do you

4   contend that any of the procedures in -- I'm going to call this

5   thing 1.410, all right, because that's the number of this

6   particular policy.

7   A   Is that this?

8   Q   Exhibit Number 13.

9   A   I'm sorry, I don't have numbers on mine.

10  Q   It is going to be that one.

11      Are you contending that your post-termination grievance

12  procedures as outlined in 1.410 were deficient?

13  A   No.

14  Q   Okay.  So let's just confirm this.  You got an initial step

15  at resolution, which is called Step I under the Procedure, and

16  that was the meeting between Doctors Napolitano, Jaffar and

17  Martin.

18  A   I actually don't believe that was an initial resolution of

19  grievance.  I believe that was after my termination and they had

20  already made up their mind.  There was no communication or

21  dialogue.  I think it was more of a formality of just to go

22  through the step rather than actually identifying that there was

23  a problem as it was laid out here.  I don't know if you

24  understand what I'm saying, sir.

25  Q   Nope.

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

141

1    A    What I read did not appear to be what he was saying.  I

2    think you just wrote that I would be considered eligible just

3    like any other resident would be considered.

4    Q    Do you know any other resident who was not promoted from

5    their PGY-1 to PGY-2 year?

6    A    Yes.

7    Q    Who?

8    A    Not at UAMS, sir.

9    Q    Oh, I'm sorry, that's a very, very good clarifier, Doctor

10   Schwab.  At UAMS did you know anybody who was not promoted from

11   PGY-1 to PGY-2?

12   A    I don't know if they kept everybody that year.  I was

13   terminated before.

14   Q    Okay.  So you --

15   A    So I don't know who the class was, I don't know.

16   Q    All right.  You don't know, all right.  And so she sends

17   that to me July the 16th, I send a response on July the 22nd.

18   We'll mark it as Exhibit 35.

19         (Whereupon, the E-Mail of 7-22-10 from Mark Hagemeier

20       to Denise Hoggard was marked as Deposition Exhibit 35 and

21       attached at Tab 35.)

22   MR. HAGEMEIER: (Continuing)

23   Q    Did she forward a copy of this on to you, or do you know?

24   A    I think she did.  I'm not sure, sir.

25   Q    Okay.  So still again at this point in time we're having a

931c4abf-7cec-4407-b918-6a68d3ecf209

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

142

1   conversation going between you to Ms. Hoggard, Ms. Hoggard to

2   Mark Hagemeier, Mark Hagemeier is having to talk to his clients,

3   then he gets back to Ms. Hoggard who gets back to you, right?

4   That's the way the communication is still flowing at this point

5   in time, right?

6   A   Yes.

7   Q   Okay.  You'll see on that e-mail that that got sent out at

8   approximately 12:30 on Thursday, July the 22nd.  I don't know

9   when you got a copy of this, but you'll see that I said, "I will

10  try to get you a lengthier response to your e-mail by COB" -- for

11  me is close of business -- "today, I think."  And, "Basically, we

12  will follow the ACGME guidelines.  Obviously, there may be some

13  need for schedule modifications, but we will try to keep this to

14  a minimum."  This is not in any way supposed to be a lengthy

15  expose from me.  Do you agree with that?

16  A   No.  I don't know what she wrote to you before.  I wish I

17  had the forward.  I don't know if she was like saying, "This is

18  the accommodation we have," and you were responding to it or --

19  Q   Okay.

20  A   I just don't know the reference, I'm sorry.

21  Q   Okay.  Well, let's take a look at her July 16th e-mail

22  that's marked Exhibit 34.

23  A   So this is your response to this, sir?

24  Q   Well, my question is do you know of any other e-mail that

25  you got?

931c4abf-7cec-4407-b918-6a68d3ecf209



EPISCOPAL HEALTH SERVICES INC.

## ST. JOHN'S EPISCOPAL HOSPITAL *SOUTH SHORE*

327 Beach 19th Street, Far Rockaway, New York 11691   •   (718) 869-7815

---

**INTERN CONTRACT**
Program No.   125953
Resident's AOA No.  167817
Year of Training     1
City & State: Far Rockaway, New York

This Contract, is executed between
St. John's Episcopal Hospital, South Shore
(hereafter called the "Institution" and

**Brian Richard Schwab, DO**
(hereafter called the "Intern").

### WITNESSETH:

WHEREAS, the Institution has been approved by the American Osteopathic Association
(hereafter called the "AOA") for a postdoctoral training program of interns and has, as a
condition for the continued maintenance of such approval, agreed to abide by the intern training
standards, rules and regulations, of the AOA, and

WHEREAS, the Intern has made application to the Institution for appointment to serve as an
intern in an AOA-approved intern-training program, and said application has been accepted by
the Institution's governing board,

NOW, THEREFORE, in consideration of the above and of their mutual promises contained
herein, the Institution and the Intern agree as follows:

A.     THE INSTITUTION AGREES:
1.       To appoint the Intern into its intern training program for a period of time not less than
twelve (12) months, beginning July 1, 2010, and ending on June 30, 2011.

2.       To provide training for the Intern by providing an educational program in accordance
with AOA standards for internship training.

3.       To define the duties of the Intern.

4.       To clearly delineate policies and procedures for evaluation of intern performance,
including provisions for promotion, demotion, retention, and dismissal.  Such defined procedures
shall allow for due process.  Such policies shall also include requirements concerning work hour
limits in clinical activity and a notice that moonlighting for interns is strictly prohibited.

5.       To pay the Intern a stipend of $ <u>52,697.00/YR</u>.

6.       To furnish the Intern with a letter listing all benefits that will be provided by the
Institution to the Intern including, but not limited to, health insurance and professional liability
insurance.

7.       To furnish the Intern with a written copy of the Institution's education program which
will serve as a guide for intern training.

<u>EXHIBIT  A-1</u>          DEF0153

8.     To present or cause to be presented to the Intern a certificate of intern training upon satisfactory completion of the Institution's internship educational program.

9.     To refrain from asking or otherwise requiring the Intern to sign a non-competition agreement.

10.    To have a written policy that addresses closure of the training program and reduction in approved internship and/or residency positions.

11.    To immediately notify the Intern, the AOA, and the OPTI, of a decision or need to close a program or reduce the number of approved positions, and, if the Intern is enrolled in the program, to make every attempt to permit the Intern to complete his or her training prior to such an action.

12.    To provide the Intern with two months severance in the event that the Institution is unable to permit the Intern to complete his or her training prior to the closure of the program.

B.     THE INTERN AGREES:

1.     To serve as an Intern during the entire period specified in Paragraph A.1. of this contract.

2.     To perform all duties assigned by the Institution to him/her of his/her ability, to maintain standards of professional competence as determined by the Institution, and to conduct himself/herself in a professional manner at all times.

3.     To observe all rules and regulations of the institution pertaining to interns.

4.     To engage during the entire term of the internship only in such activities of a professional nature as are approved by the Institution and the AOA.   Such activities shall include compliance with institutional and AOA work hour policies to include all policies prohibiting moonlighting.

5.     To refrain during the entire term of the internship from engaging or participating in any nonprofessional activities which would interfere with the Intern's effective performance of this contract.

C.     THE PARTIES FURTHER AGREE:

1.     That the Intern and the Institution are the only parties to this agreement.

2.     That this contract may be terminated at any time by a Written Release by Mutual Consent.  In the event of such termination, the Institution shall determine the amount of credit, if any, toward satisfying AOA intern education requirements to be awarded the Intern.

3.     That upon successful completion of the Internship year, the institution shall appoint the Intern and Intern shall accept a position in its residency program in the field of **Not known at this time.**

DEF0154

4.  That if the Intern by action or inaction commits or allows to occur any action or course of action, which the Institution reasonably believes involved moral turpitude or is contrary to the interests or patient care or the general welfare of the Institution, the Institution may terminate the Intern's service without prior notice, and the Intern will not be issued another AOA Internship Contract for a program approved by the AOA for a period of one year from the date of termination, unless sooner exonerated.

5.  That if the Intern fails to pursue satisfactorily the Institution's educational and clinical program, the Program Director/Director of Medical Education shall provide the Intern with no less than thirty (30) days prior written notice that the Intern will be placed on probationary status. Thereafter, if the identified deficiencies are not corrected, the Institution may terminate its relationship with the Intern.

6.  That if the Institution loses its approval for intern training during the period of this contract, on the effective date of loss of such approval, the Intern shall have the option to be released from this contract and shall not be prohibited from immediately entering another Institution approved by the AOA for intern training.  Also, effective on the date of loss of approval, the Institution shall terminate the internship training program, at which time the Intern shall be granted credit for that portion of the internship completed and released there from.

7.  That, an intern who unilaterally breaches this contract may not participate in another AOA program from a period of one year from the date of contract termination.

8.  That the Institution and the Intern shall immediately notify the Council on Postdoctoral Training of the AOA in writing in the event of a breach or unilateral termination of this contract by either party or of the termination of this agreement by written release by mutual consent.  In the event of mutual release, it shall be the duty of the Institution to send a signed copy of the release to the Council on Postdoctoral Training of the AOA.

9.  That this contract incorporates by reference "Policies and Procedures for Intern Training" of the AOA to the extent that the "Policies and Procedures for Intern Training" relate to the obligations of the parties hereto and do not conflict with the terms of this contract.

DEF0155

IN WITNESS WHEREOF, this agreement has been executed by the parties hereto, to be effective as of the date of execution by the Institution.

**Institution:**   St. John's Episcopal, South Shore

_Brian Schwab_                                    By: _[signature]_
Brian Richard Schwab, DO                          Sheldon Sirota, Director of Medical Education

Date: _9/1/10_                                    Date: _[signature]_

Date: _4/8/10_                                     By: _[signature]_
                                                  John Gupta, Chief Executive Officer

**ADDENDUM:**
 Dr. Schwab's primary interest is in Anesthesia.  After he has completed the 2010-2011 Traditional Internship ye
he will be considered for the Family Practice Residency Program, if he requests.

**Written Release by Mutual Consent.**

(This proviso to be filled in only in the case of a Written Release by Mutual Consent)

Effective Date: _____, 20 _____.

Intern: _____
            (Signature)                              (Date Signed)

Institution:  By _____
            (Signature)                              (Date Signed)

Name of Institution: _____          NOTE: Please keep original signed
                                                   Copy of contract in your institution
Witness: _____           files. DO NOT RETURN TO AOA.
            (Signature)

*Contract Intern SJEH*

-3-

DEF0156

# ST. JOHN'S EPISCOPAL HOSPITAL, SOUTH SHORE

## Osteopathic Programs

### ATTENDING CORE COMPETENCY EVALUATION OF INTERN
### (To be completed by Attending)

Intern Name: _Brian Schwal_           Rotation Dates: _7/1 - 7/30/10_

Evaluators Name: _Allan Oether W_           Service: _Ambulatory clinic_
           **Please Print Name**

Site of Evaluation: _347 Beach 54th St Averne NY 11692_

| Exceptional | Very Good | Average | Below Average | Unsatisfactory | Not Observed |
|:---:|:---:|:---:|:---:|:---:|:---:|
| 5 | 4 | 3 | 2 | 1 | 0 |

| I. | ATTITUDES/PROFESSIONALISM | | | | | | |
|---|---|:---:|:---:|:---:|:---:|:---:|:---:|
| 1. | Well-groomed and professional appearance. | (5) | 4 | 3 | 2 | 1 | 0 |
| 2. | Punctual. | (5) | 4 | 3 | 2 | 1 | 0 |
| 3. | Observant of established protocol, yet flexible and adaptable. | (5) | 4 | 3 | 2 | 1 | 0 |
| 4. | Cooperates with professionals and staff. | (5) | 4 | 3 | 2 | 1 | 0 |
| **II.** | **PROGRAM STRUCTURE** | | | | | | |
| 5. | Longitudinal care supplied. | (5) | 4 | 3 | 2 | 1 | 0 |
| 6. | Assigned responsibility performed. | (5) | 4 | 3 | 2 | 1 | 0 |
| 7. | Complete follow-up of patient. | (5) | 4 | 3 | 2 | 1 | 0 |
| 8. | Educational assignments performed. | (5) | 4 | 3 | 2 | 1 | 0 |
| **III.** | **MEDICAL KNOWLEDGE / EDUCATION ACTIVITIES** | | | | | | |
| 9. | Demonstrates competency in his/her understanding and application of clinical medicine to patient care. | (5) | 4 | 3 | 2 | 1 | 0 |
| 10. | Understands and applies the foundations of clinical and behavioral medicine appropriate to his/her discipline. | (5) | 4 | 3 | 2 | 1 | 0 |
| 11. | Demonstrates knowledge of the disorders relevant to this service. | (5) | 4 | 3 | 2 | 1 | 0 |
| 12. | Demonstrates adequate knowledge of the pathophysiology of related disorders. | (5) | 4 | 3 | 2 | 1 | 0 |
| 13. | Understands the principles of pharmacology related to acute and chronic diseases. | (5) | 4 | 3 | 2 | 1 | 0 |
| 14. | Demonstrates initiative for self-learning (e.g., through readings, professional contacts, audiovisual). | (5) | 4 | 3 | 2 | 1 | 0 |
| 15. | Attends available educational presentations. | (5) | 4 | 3 | 2 | 1 | 0 |
| 16. | Demonstrates understanding of various testing modalities related to the diagnosis of the patient. | 5 | 4 | 3 | 2 | 1 | 0 |

**EXHIBIT A-2**

DEF0069

| IV. | CLINICAL SKILLS | | | | | | |
|---|---|---|---|---|---|---|---|
| | 17. Formulates appropriate differential diagnosis. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 18. Delivers a clear and well-structured case presentation. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 19. Writes a clear history and physical. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 20. Writes clear progress notes. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 21. Formulates and writes clear, concise orders. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 22. Applies Osteopathic principles and practices when appropriate. | 5 | 4 | 3 | 2 | 1 | 0 |
| V. | PATIENT CARE | | | | | | |
| | 23. Considers a wide range of factors in assessing patients' problems and concerns (including h & p, existing patient records). | 5 | 4 | 3 | 2 | 1 | 0 |
| | 24. Requests appropriate diagnostic tests and consultative services. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 25. Adequately assesses pertinent risk factors and implements interventions to minimize risk. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 26. Efficiently arrives at an appropriate diagnosis. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 27. Develops and implements and effective treatment plan. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 28. Provides health care services consistent with osteopathic philosophy including preventative medicine and health promotion in accordance with current scientific evidence. | 5 | 4 | 3 | 2 | 1 | 0 |
| VI. | INTERPERSONAL AND COMMUNICATION SKILLS | | | | | | |
| | 29. Skillful at interviewing patients. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 30. Demonstrates awareness of patients' feelings and problems. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 31. Demonstrates cultural competency in his/her patient interactions. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 32. Demonstrates ability to involve patients and families in decision-making process. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 33. Provides proper emotional support to patients and families. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 34. Communicates effectively with other professionals. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 35. Elicits medical information effectively. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 36. Provides clear instructions to patients. | 5 | 4 | 3 | 2 | 1 | 0 |
| VII. | PROFESSIONALISM | | | | | | |
| | 37. Demonstrates respect for his/her patients and families. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 38. Advocates for the primacy of his/her patient's welfare and autonomy. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 39. Adheres to ethical principles in the practice of Medicine. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 40. Demonstrates the ability to relate and accept patients with a variety of values, lifestyles and disabilities. | 5 | 4 | 3 | 2 | 1 | 0 |
| VIII. | PRACTICE-BASED LEARNING AND IMPROVEMENT | | | | | | |
| | 41. Actively seeks opportunities to learn. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 42. Utilizes reliable and current information in diagnosis and treatment of patients. | 5 | 4 | 3 | 2 | 1 | 0 |
| | 43. Applies the principles of evidence-based medicine in the diagnosis and treatment of patients. | 5 | 4 | 3 | 2 | 1 | 0 |

DEF0070

| | | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|
| | 44. Understands research methods, medical informatics and the application of technology as applied to medicine. | (5) | 4 | 3 | 2 | 1 | 0 |
| **IX.** | **SYSTEM-BASED PRACTICE** | | | | | | |
| | 45. Understands national and local health care delivery systems and their effect on patient care and professional practice. | (5) | 4 | 3 | 2 | 1 | 0 |
| | 46. Directs patients to the appropriate level of care across the continuum. | (5) | 4 | 3 | 2 | 1 | 0 |
| | 47. Advocates for quality health care on behalf of his/her patients. | (5) | 4 | 3 | 2 | 1 | 0 |
| **X.** | **OSTEOPATHIC PHILOSOPHY AND OMM** | | | | | | |
| | 48. Demonstrates competency in his/her understanding and application of OMT. | (5) | 4 | 3 | 2 | 1 | 0 |
| | 49. Integrates Osteopathic concepts and OMT into the medical care he/she provides to patients as appropriate. | (5) | 4 | 3 | 2 | 1 | 0 |
| | 50. Understands and integrates Osteopathic Principles and Philosophy into all clinical and patient care activities. | (5) | 4 | 3 | 2 | 1 | 0 |
| | 51. Treats each person as a whole person integrating mind, body and spirit. | (5) | 4 | 3 | 2 | 1 | 0 |
| | 52. Utilizes the relationship between structure and function in his/her treatment of patients to enhance wellness. | (5) | 4 | 3 | 2 | 1 | 0 |
| **XI.** | **OVERALL** | | | | | | |
| | 53. Overall rating of Resident's professional growth. | (5) | 4 | 3 | 2 | 1 | 0 |
| | 54. Has this evaluation been reviewed with the Resident? (Circle one) a. Yes  b. No (circled) | | | | | | |

**ADDITIONAL COMMENTS:**

*H. Team Player and Leader - Shows Confidence.
+ trust. - Great People Skills -
Excellent basic science skills.*

**Signatures:** *[signature]*

Evaluator _____   Date 7/28/10

*[signature]*

Resident _____   Date 7/30/10

DEF0071

# ST. JOHN'S EPISCOPAL HOSPITAL, SOUTH SHORE

## Osteopathic Residency Programs

### EVALUATION OF ROTATION
### (To be completed by Intern)

At the close of each rotation, please complete this form and submit it to the Department of Medical Education.

Resident Name: _Brian Schwab_  Rotation Dates: _7/1 - 7/30/10_

Preceptor Name:: _Allan Detreiler_  Service: _Ambulatory Medicine_
**Print Name**

INSTRUCTIONS:

Please circle the most appropriate number which corresponds to your perception of each item using the rating scale below.

| Strongly Agree | Agree | Neutral or N/A | Disagree | Strongly Disagree |
|:---:|:---:|:---:|:---:|:---:|
| 5 | 4 | 3 | 2 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 1. | Clinical instructor was creative and/or innovative with respect to teaching style. | 5 | 4 | 3 | 2 | 1 |
| 2. | Clinical instructor was clear and easy to understand. | 5 | 4 | 3 | 2 | 1 |
| 3. | If I was confused about a topic or issue, I felt no hesitation to approach this instructor with my questions. | 5 | 4 | 3 | 2 | 1 |
| 4. | I felt free to express my disagreements with the clinical instructor. | 5 | 4 | 3 | 2 | 1 |
| 5. | The instructor provided on-going, timely, constructive feedback on my performance of clinical skills. | 5 | 4 | 3 | 2 | 1 |
| 6. | The clinical instructor showed competence in either effectively managing or effectively referring patients with psychological problems. | 5 | 4 | 3 | 2 | 1 |
| 7. | The clinical instructor showed competence in patient management or effectively referring patients for specialty consultation. | 5 | 4 | 3 | 2 | 1 |
| 8. | The clinical instructor showed competence in requesting appropriate diagnostic studies. | 5 | 4 | 3 | 2 | 1 |
| 9. | The clinical instructor showed awareness of cost consciousness with regard to patient care. | 5 | 4 | 3 | 2 | 1 |
| 10. | I had ample opportunity to observe the clinical instructor in patient management. | 5 | 4 | 3 | 2 | 1 |
| 11. | The clinical instructor was a role model as an effective interviewer. | 5 | 4 | 3 | 2 | 1 |

Page 1 of 2

DEF0072

| | | | | | |
|---|---|---|---|---|---|
| 12. The clinical instructor observed me conduct patient interviews. | 5 | 4 | 3 | 2 | 1 |
| 13. The clinical instructor observed me in total patient management. | 5 | 4 | 3 | 2 | 1 |
| 14. The clinical instructor provided constructive feedback on my interviewing, communication, and problem solving skills. | 5 | 4 | 3 | 2 | 1 |

**COMMENTS:** (On any aspect of the program, specify faculty, etc.)



This was a great rotation. I was allowed independence and was trusted to help form patient management decisions. Great to work with. This was the first time I felt like I was allowed to be a physician. I was also provided insight on billing practices and insurance reimbursement rent which I had not known before. Again, great rotation.

Signature of SMD _____   Date  18/11/10

DEF0073

## Intern Log – Ambulatory Rotations

Name: Brian Schul    Date: 7 / 1 / 10    Rotation: Ambulatory Peds
Location: 54th Beach

| | Date | Medical Record # | Seen Before? | Diagnosis | Procedure(s) |
|---|---|---|---|---|---|
| 1 | 7/23 | RG | N | HTN, Hyperlipid | |
| 2 | 7/23 | GS | N | Hypothyroidism | |
| 3 | 7/26 | SS | N | Pharyng, NS | |
| 4 | 7/26 | KS | n | Asthma | |
| 5 | 7/26 | NM | N | Asthma, DM2 | |
| 6 | 7/26 | HM | N | Sinusitis | |
| 7 | 7/27 | MS | N | Back pain | |
| 8 | 7/27 | HV | N | Back pain | |
| 9 | 7/27 | SF | N | Dyspnea | |
| 10 | 7/27 | RM | N | Hypothyroidism | |
| 11 | 7/28 | JB | N | HTN, Hyperlipidemia | |
| 12 | 7/28 | AV | N | b/L ankle pain | |
| 13 | 7/28 | SN | N | Pharyngitis | |
| 14 | 7/28 | SM | N | Asthma, HTN | |
| 15 | 7/29 | AW | N | Asthma | |
| 16 | 7/29 | KW | N | Skin rash | |
| 17 | 7/29 | kW | N | Asthma | |
| 18 | 7/29 | SA | N | Sore throat | |
| 19 | 7/29 | RM | N | New fplt ck prenatal | |
| 20 | 7/30 | DB | N | Herpes type 1 | |
| 21 | 7/30 | YR | N | HTN, Hyperlipidemia | |
| 22 | 7/30 | BF | N | Fatigue | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |

Supervisor: _____    Date: 7-30-10

SOUTH SHORE FAMILY ... MEDICAL ASSOC., P.C.
DR. ALLAN S. DETWEILER
342 BEACH 54TH STREET
ARVERNE, N.Y. 11692
(718) 634-5448

DEF0077

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

11

DEPOSITION EXHIBIT 4

Episcopal Health Services, Inc.

Information Services Rules & Regulations

(4 pages)

<u>EXHIBIT  A-3</u>



**EPISCOPAL HEALTH SERVICES INC.**
700 Hicksville Road, Ste. 210, Bethpage, NY 11714
(516)349-4600

## INFORMATION SERVICES RULES & REGULATIONS

I, the undersigned, acknowledge receipt of these Information Services (IS) rules and regulations and understand that:

1.  My IS User Login Name and Password is the equivalent of my signature.

2.  I will not disclose any of my IS User Login Names and/or Passwords to anyone.

3.  I will not attempt to learn another user's IS User Login Name and Password.

4.  I will not attempt to access information by using an IS User Login Name and Password other than my own.

5.  I will not attempt to access any unauthorized information via my IS User Login Name and Password.

6.  If I have reason to believe that the confidentiality of my IS User Login Name and Password has been compromised, I will contact the Information Services HelpDesk at (516)349-4629 immediately so that the password can be deleted and a temporary password assigned to me; which I will then reset immediately.

7.  My IS User Login Name and Password will be deleted from the system as soon as I terminate my employment or association with Episcopal Health Services. * Access is deactivated when employee is On Leave.

8.  I understand that all hardware, software, and computer-related equipment are the property of EHS and are accessible by any EHS IS personnel at any time.

9.  Per HIPAA regulations, I will not use my computer to violate any person's privacy, confidential information of any type, or information that compromises internal business.

10.  I acknowledge receipt of instructions and/or equipment for HIPAA compliance appropriate to my job description and will conform to EHS policy regarding the use of such instructions and/or equipment.

11.  Per HIPAA regulations, I will not jeopardize the physical security of any patient information, either deliberately or through negligence.

Accessing any information without authorization and without a professional need for such information is a breach of the person's rights of confidentiality. Such activity is also deemed to be professional misconduct which could result in the revocation of a license to practice.

Duplication of software without authorization of the manufacturer is a violation of state and federal laws punishable by fine or imprisonment. Installation of any software or changes to configuration on PC's is only to be done by EHS IS personnel in accordance with HIPAA regulations and EHS policies and procedures.

➤ I understand that if I violate any of the above statements I will be subject to disciplinary action in accordance with Human Resources policy.

DEPARTMENT/SITE

DATE

EMPLOYEE NAME (please print)

*SIGNATURE OF EMPLOYEE

HR REPRESENTATIVE SIGNATURE

DEF0143

**St. John**s **Episcopal Hospital**

327 Beach 19th Street, Far Rockaway, NY 11691 • 718 869-7000

I HAVE RECEIVED A COPY OF THE FOLLOWING LETTER:

AIG CLAIM SERVICES, INC. AND METRACOMP, INC.
EMPLOYEE GUIDE TO THE NEW YORK
WORKERS' COMPENSATION PREFERRED PROVIDER ORGANIZATION (PPO) ARRANGEMENT

6-18-10
**DATE**

**SIGNATURE**

**PRINT NAME**

Episcopal Health Services, Inc.

DEF0144

# EPISCOPAL HEALTH SERVICES INC.
## ST. JOHN'S EPISCOPAL HOSPITAL, SOUTH SHORE

### Language Roster

St. John's Episcopal Hospital, South Shore Division, is committed to providing quality care to all our patients regardless of their race, national origin or handicap status. To assist us in our goal, employees who speak a foreign language or who sign (for the hearing impaired) may be asked to assist by interpreting for patients and/or visitors who do not speak English or who are deaf.

If you are willing to volunteer as an interpreter, please indicate below the foreign language(s) you speak *fluently* or if you sign:

FOREIGN LANGUAGES: _____ None _____

_____

_____

SIGN LANGUAGE: _____ Yes _____X_____ No

Your signature below indicates your willingness to be listed in our Language Roster.

Brian Schul                                                          6-18-10
**EMPLOYEE NAME**                    **SIGNATURE**                **DATE**
**(Please Print)**

DEF0151

# CO..SUMER AUTHORIZATION

I understand that an investigative report may be generated on me that may include information as to my character, general reputation, personal haracteristics, or mode of living; work habits, performance or experience, along with reasons for termination of past employment/professional license or redentials; education; financial/credit history; or criminal/civil/driving record history. I understand that General Information Services, Inc., on behalf of ___S___ may be requesting information from public and private sources about any of the information noted earlier in this paragraph in connection with __HS__ consideration of me for employment, promotion or position re-assignment or contract now, or at any time during my tenure with __EHS__ , and give my full consent for this information to be obtained.

. IF APPLICABLE, medical and worker's compensation information will only be requested in compliance with the Federal Americans with Disabilities .ct (ADA) and/or any other applicable state laws. According to the Fair Credit Reporting Act (FCRA, Public Law 91-508, Title VI), I am entitled to now if the considerations for which I am applying are denied because of information obtained from a consumer reporting agency. If so, I will be notified nd be given the name of the agency providing that report.

I. I acknowledge that a telephonic facsimile (FAX) or photographic copy of this release shall be as valid as the original. This release is valid for most deral, state and county agencies.

/. I understand that if I am a resident of Minnesota/Oklahoma (only) I may obtain a copy of the report ordered, and now indicate my desire to do so y checking this box □.

. I hereby authorize, without reservation, any financial institution, law enforcement agency, information service bureau, school, employer or insurance ompany contacted by General Information Services, Inc. to furnish the information described in Section I.

I. Communications with General Information Services, Inc. should be directed to PO Box 353, Chapin SC  29036 or (877) 590-4012.

## CANDIDATE COMPLETE THE FOLLOWING:

_____          6/18/0
**Signature**                              **Today's Date**

Bron Schul
**Please print full name**

ie following information is required by law enforcement agencies and other entities for positive identification purposes when checking public records. It confidential and will not be used for any other purposes.

12/29/1987                          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
**Month, Day and Year of Birth**    **Social Security Number**

154 Municpl Rd                      Lehighton  PA    18235
**Home Address**                    **City**   **State**  **Zip**

26 271 356                          Bron C Schul
**Driver's License Number and State**   **Name as it appears on License**

ive you ever been convicted of a crime? X No __ Yes   If yes, please provide city and
te of conviction and details of conviction.

_____

_____

R CREDIT REPORTING ACT NOTICE:
coordiance with the Fair Credit Reporting Act (FCRA, Public Law 91-508, Title VI), this information may only be used to verify a statement(s) made by an individual in connection with legitimate business needs. The ih of information available varies from state to state . Status of updates are available on request. Although every effort has been made to assure accuracy, General Information Services, Inc. cannot act as guarantor of ionation accuracy or completeness. Final verification of an individual's identity and proper use of report contents are the user's responsibility. General Information Services, Inc.'s policy requires purchasers of these nts to have signed a Service Agreement. This assures General Information Services, Inc. that users are familiar with and will abide by their obligations, as stated in the FCRA, to the individuals named in these reports. If ration contained in this report is responsible for the suspension or termination of an employee or the application process, have the Candidate/employee contact General Information Services, Inc.

## NOTICE TO CALIFORNIA CANDIDATES

ou have a right to obtain a copy of any consumer report or investigative consumer report obtained by (INSERT COMPANY NAME) by checking the ox provided below. The report will be provided to you within three (3) business days after we receive the requested reports related to the matter vestigated.

☑ I request to receive a free copy of this report by checking this box.

nder section 1786.22 of the California Civil Code, you may view the file maintained on you by GIS during normal business hours. You inu also obtain a copy of this file upon submitting proper identification and paying the costs of duplication services, by appearing at GIS in n or by mail. You may also receive a summary of the file by telephone. The agency is required to have personnel available to explain ... file to you and the agency must explain to you any coded information appearing in your file. If you appear in person, a person of your oice may accompany you, provided that this person furnishes proper identification.

DEF0152

Brian Schwab 09 (24) 029.82

11-7-07 - [illegible]

[several lines of illegible handwriting]

ASPS 25 + 24

Strattera 40 61

11-14-07 [illegible handwriting]

1-9-08 [illegible handwriting]

5-14-08 [illegible handwriting]

7-30-08 [illegible handwriting]

EXHIBIT A-4

[illegible] on [illegible] [illegible] out 5-
adderall will be continued

10-8-08- doing well - applying for [illegible]
residency -
does well with adderall - this will
be continued

1-14-09 doing well on rotation - [illegible] [illegible]
[illegible] meds to be continued
4-15-09 accepted [illegible] - [illegible] [illegible] Arkansas

Brian Schwab          1-9-08

Ritalin SR 20
#30
↑ Am

Brian Schwab          11-14-07

Ritalin 10 mg
#60
↑ BiD

BM 8583141

Brian Schwab          7-30-08

Adderall XR 10 mg
#30
↑ Am

BM 8583141

Brian Schwab          5-14-08

Adderall XR 10 mg
#30
↑ Am

Brian Schwab    11-8-08

adderall XR 10 mg
#30
+ #

Brian Schwab    10-8-08

adderall XR 10 mg
#30
+ #

Dm 858314l

Brian Schwab    1-15-09

adderall extended release 10 mg
#30
+ #

Dm 858314l

Brian Schwab    1-14-09

adderall tab 10 mg
#30
+ #

**University of Arkansas for Medical Sciences**
*Practitioner Health Questionnaire*
(to be completed by resident physician)

## THIS IS A CONFIDENTIAL QUESTIONNAIRE

Name (print): Brian Schuied

Department: Anesth

**Check the appropriate response:** | | Yes | No

1. Are you aware of, or have there been any health impairments that might affect your ability to perform professional and staff duties fully? ___ X

2. Have you ever had an alcohol, drug or other substance use of abuse problem? ___ X

3. Has your license to practice medicine in any jurisdiction ever been limited, suspended, or revoked; or your employment suspended or terminated due to any substance use or abuse problems? ___ X

4. Has your DEA number to prescribe controlled substances ever been limited, suspended, or revoked? ___ X

5. Have you ever been arrested for DWI or DUI? ___ X

6. Have you ever been charged with any other infraction involving alcohol, drugs, or other substances: on how many occasions? _____ ___ X

7. Have you ever been treated for alcohol, drug or substance abuse problems? Give name of the institution(s), date and length of stay. ___ X

8. Are you currently being or have you ever been monitored by a Medical Staff Health Committee (or any similar body) in any state?   If yes, give state and dates ___ X

If you answered yes to any of the questions on this page, please provide a detailed explanation in the space below. This form will be forwarded in strictest confidence to the chair of the Medical Staff Health Committee and to your program director.

The answers and explanations I have provided are accurate and complete to the best of my knowledge and belief.

_____   4/3/09
Signature                            Date

*Place in the envelope marked "Confidential", seal and return.*

H:\GME\GME\POLICY\Physicians Health Committee\Medquest.doc

**EXHIBIT A-5**          DEF 0329

University of Arkansas for Medical Sciences
Little Rock, Arkansas

## RESIDENT AGREEMENT of APPOINTMENT

Agreement made this 24th day of March , 2009 by and between the University of Arkansas for the University of Arkansas for Medical Sciences ("UAMS") and Dr. Brian Schwab . ("Resident").

In consideration of the promises, conditions, and undertakings hereinafter contained, the parties agree as follows;

I.     Resident is hereby appointed to a position as Resident in Anesthesiology for a period beginning  July 1, 2009  and ending June 30, 2010 . UAMS, through this appointment, agrees to provide:

   1.    Supervised instruction and experience in keeping with the standards established by the Accreditation Council for Graduate Medical Education and the American Board of Medical Specialties with the understanding that the hours of duty and the content of the educational phase of the residency, including the duration and sequence of assignments to clinical, laboratory or ambulatory care facilities are determined by the Program Director. In addition, the Program Director will determine the length and scheduling of vacation periods. Information concerning vacation time will to made available to the resident at the beginning of the academic year.

   2.    A total of five (5) laboratory coats during the entire training period; no laundry services are provided.

   3.    Food and call rooms while performing in-house call;

   4.    Professional liability insurance coverage and legal defense protection against awards, including "tail coverage", will be provided in an amount and with coverage to be determined by UAMS for acts or omissions of the Resident in the scope and course of his or her duties hereunder and the provisions applicable to such coverage are contained in the insurance contract;

   5.    A stipend of $45,356 for the year of this contract; For returning residents, failure to complete Annual GME Survey and/or web based courses could revert stipend to last year's value.

   6.    A. Medical, Dental, Basic Life, and Basic Long Term Disability insurance coverage as described in the UAMS Office of Human Resources Benefits for Housestaff document included with this agreement.  Medical insurance takes effect the first day of the training program, provided the Resident submits the required enrollment forms to Human Resources within their first 31 days of initial appointment to the training program.

          B. Basic Housestaff Long Term Disability insurance coverage.  The Resident shall participate and shall enroll at the time of registration and appointment to the training program.

   7.    Professional, parental, and sick leave as specified in the policies of the Graduate Medical Education Committee and contained in the College of Medicine Resident Handbook;

   8.    Access to counseling, medical, and psychological support services in accordance with the provisions of, and subject to the limitations of, the UAMS Medical Benefit Plan, the UAMS Employee Assistance Program, and the UAMS Employee Health/Student Preventive Health Services.  Questions concerning such services should be directed to the Program Director, the Associate Dean for Graduate Medical Education of the College of Medicine or the UAMS Office of Human Resources.

   9.    A certificate for the appropriate period of satisfactory Residency performance;

   10.   The Resident will be accorded due process consistent with applicable policies and procedures of UAMS, the College of Medicine and the Department in which the Resident is appointed.  These policies and procedures include: grievance, promotion/non-promotion, work environment, and harassment are included with this agreement.

II.    The Resident, through this appointment, agrees or understands:

   1.    That this appointment is conditioned upon successfully passing a pre-employment drug screen in accordance with the UAMS Drug Testing Policy (Policy 3.1.14). Further, initial appointments are conditioned upon completion of a satisfactory criminal background check and authorization by the relevant residency program.  In cases where employment may have been initiated prior to the criminal background check, the University reserves the right to determine the residents' suitability for continued employment.

   2.    To accept the provisions described above and set forth hereinafter;

   3.    To complete and return all forms in the registration packet prior to the appointment period;

4.  To comply with all terms and conditions of appointment and all policies of UAMS, the College of Medicine, the Graduate Medical Education Committee and any facility or department to which Resident is assigned or in which Resident is working. All policies of the Graduate Medical Education Committee contained in the College of Medicine Resident Handbook, including the policies on physician impairment and substance abuse, evaluation and promotion, duty hours, moonlighting, other professional activities outside the program, sick leave, vacation, parental leave, accommodation for disabilities, are included with this agreement;

5.  To comply with the College of Medicine's and the program's duty hour policies and accurately report duty hours;

6.  To complete all medical records according to the Rules and Regulations of the participating hospitals;

7.  To complete the Annual Graduate Medical Education Survey and assigned web-based educational modules;

8.  To participate in providing appropriate medical care for all assigned patients;

9.  Not to accept fees from patients;

10. Not to engage in employment outside the residency program without the written approval of the Program Director.

11. That this agreement may be terminated for cause in accordance with the procedures set out in the policies of the Graduate Medical Education Committee of the College of Medicine as may be changed or supplemented from time to time by the Graduate Medical Education Committee. Any such changes or supplements during the period of this agreement shall become effective when promulgated or adopted by the Graduate Medical Education Committee and when notice thereof has been furnished the Resident;

12. That he/she is free of any conflicting obligation(s) during the period of appointment;

13. That the appointment herein is for the period indicated and on the terms and conditions set forth hereinabove and any subsequent appointment for additional periods of residency education are wholly within the discretion of the Program Director and/or the Chairman of the resident's program. In the event Resident is not to be appointed for a subsequent period, Resident will be furnished written notice of non-reappointment at least four (4) months prior to the expiration of the period of this appointment, provided, however, that in no event shall the failure to furnish such notice operate to extend this appointment or to confer any rights upon the resident to a subsequent appointment.

14. To conduct himself/herself in accordance with the laws and regulations that applies to compliance matters and to report any information of possible wrongdoings, errors or violations of the law to the FGP compliance Officer.

III.  Licensure.  Resident represents that he or she has been awarded the M.D. degree and has completed, or will complete, the requirements for licensure in Arkansas.  If Resident is unable to affirm the foregoing, reasons therefore are stated in a written attachment to this Agreement.

IV.  Entire Agreement – Arkansas Law Controls.  This Agreement is executed in the State of Arkansas and shall be interpreted in accordance with Arkansas law.  This agreement shall not be amended, changed or modified except by an Agreement in writing signed by all parties.

IN WITNESS WHEREOF, the parties have executed this agreement on the date and year first above written.

UNIVERSITY OF ARKANSAS FOR THE
UNIVERSITY OF ARKANSAS FOR
MEDICAL SCIENCES                                                RESIDENT


Dean for Graduate Medical Education                             Resident
Date: 7-1-09                                                    Date: 5/21/07


Residency Program Director
Date: 3/24/09

# UAMS HOUSESTAFF MEDICAL HISTORY

Employee name: _____

Social Security Number _____ - _____ - _____   Date of Birth _____

Sex: _____ Female _____ Male _____   Race _____

Home Address: _____

City _____ State _____ Zip _____

Home Phone _____ Work Phone _____

Department _____

**The following is required for employment. All required testing and vaccinations will be provided for you free of charge if needed by Student Employee Health.**

   1. **PPD Skin Test: Tuberculin Purified Protein Derivative**

   Have you ever had a positive tuberculin skin test? _____
   (If yes, send documentation, reaction, follow-up and the results of any chest x-rays along with this form)
   Where you born in the United States _____ (If no list the Country) _____

   Have you had a TB skin test in the past 12 months? _____
   (If yes, please send date placed, date read, results and the signature of the person that read the test)

   2. **Measles (Rubeola) and Rubella:** Have you had an MMR (Measles, Mumps, Rubella) 2 MMR'S as a child or 1 as an adult? _____ if yes, send documentation.

   3. **Varicella (Chicken Pox)** Have you had the disease: _____
   Have you had the vaccine or titer? _____ if yes, send documentation.

   Have you taken care of, or been in close contact with anyone with the disease?

**The following is recommended but not required for employment. Services will be provided by Student Employee Health.**

   1. **Tetanus:** Date of last vaccination _____

   2. **Hep B:** Have you had the series or titers in the past? 1 _____ 2 _____ 3 _____

**EXHIBIT A-7**

# UAMS HOUSESTAFF SCREENING FORM

Date of Exam_____

Name_____ DOB_____

## IMMUNIZATIONS AND VARICELLA HISTORY

(Check if needed or record date if proof provided)

- MMR Vaccination date:_____  Titer Date/results_____
- Tetanus or Tdap date:_____
- Hep B: 1_____ 2_____3_____
- Hep B: Titer dates/results_____
- Varicella: History of Disease: Yes/no (Circle)
- Varicella: Titer dates/results_____
- Varicella: Vaccination date_____

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Yes/no (circle one) Does employee know the essential physical requirements of the job for which they have been hired? _____

Yes/no (circle one) Does employee have any concerns regarding their ability to perform the essential duties? _____

Yes/no does the employee need any special accommodations to perform their job? _____

If yes, explain_____

Does the Employee Smoke? _____

Any known allergies to drugs, food or latex? _____

**ORDERS**

| | | | |
|---|---|---|---|
| **MMR** | Site_____ | Date_____ |
| **Hep B** | Site_____ | Date_____ |
| **Tdap** | Site_____ | Date_____ |
| **PPD/Health Card** | Site_____ | Date_____ |

DEF 0260

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

BRIAN SCHWAB, D.O.,                                    PLAINTIFF,

V.                        CASE NO. 4:11-cv-00011-BSM


UNIVERSITY OF ARKANSAS, ET AL.,                       DEFENDANTS.


## DECLARATION OF CHARLES NAPOLITANO, M.D.

1.    My name is Charles Napolitano.  I am a Professor in Anesthesiology at the University of

      Arkansas for Medical Sciences.  I received my undergraduate degree from Brown

      University in Biomedical Sciences, a Ph.D. in Physiology from Wake Forest Bowman

      Gray School of Medicine.  I received my medical degree from Bowman Gray in 1990.  I

      became an assistant professor at UAMS in 1996.  I was promoted to an associate

      professor in 2002 and a full professor in 2008.  My specialty is Cardiac Anesthesiology.

2.    In 2001, I became the Co-Residency Program Director along with Dr. Muhammad Jaffar.

      Thus, I have been involved in resident education since 2001.

3.    UAMS is the State's only teaching hospital.  One of the Graduate Medical Education

      Residency Programs offered at UAMS is in Anesthesiology.  An Anesthesiology

      residency includes four years of post-medical school education.  The first year of an

      Anesthesiology residency, or the intern year, is designated the PGY-1 year.  The final

      year is designated as the PGY-4 year.

4.    Medical students who wish to apply for the UAMS Anesthesiology Residency Program

      do so through a national matching system that is conducted in March of each year.

---

Declaration of Charles Napolitano            **EXHIBIT  B**                        Page  1

Generally, UAMS accepts 14 new PGY-1/intern students each year.  These interns enter the Anesthesiology Residency Program each summer.  All incoming Anesthesiology residents that begin a normal Graduate Medical Education cycle begin their training at UAMS in the summer of each year.  In late June of each year, a three-day orientation program is conducted at UAMS.

5.    The first year of the Anesthesiology Residency Program consists of 12 one-month rotations through a variety of specialties in which Anesthesiologists are utilized.  These one-month rotations include, but are not limited to, general surgery, family medicine, cardiology, etc.  At the end of each one-month rotation, the intern is evaluated by his attending physician or physicians in that rotation.  During the next three years, residents receive core training in the specialty of Anesthesiology, starting with those aspects of General Anesthesia and progressing to the subspecialty areas of Anesthesiology which build upon those skills and knowledge obtained in earlier resident experiences.

6.    I do not recall specifically interviewing Dr. Schwab, and I do not recall meeting him with specificity during the summer orientation sessions.

7.    My first clear recollection of meeting Dr. Schwab was on January 15, 2010.  During this meeting, Dr. Jaffar and I conducted our semi-annual PGY-1 evaluation with Dr. Schwab. I have attached to this Declaration as Exhibit B-1, a true and correct copy of the semi-annual PGY-1 evaluation form that Dr. Jaffar completed and which I signed on January 15, 2010 at the conclusion of the evaluation.  The only concern noted on the form is that Dr. Schwab's surgical service rotation at the V.A., which he was currently serving during the month of January, 2010, was very busy.  The comments also state that the "work hours are OK."  During this semi-annual evaluation, Dr. Schwab asked for help, but I

took this request to be help in an academic sense with regard to his surgical service

rotation.  At no time during our semi-annual evaluation did Dr. Schwab indicate to me or

Dr. Jaffar that he had been diagnosed with ADHD, and Dr. Schwab did not ask for any

form of accommodation for his ADHD.

8.      In late February 2010, I spoke with Dr. Lawrence Kim, one of the surgeons that worked

with Dr. Schwab during his V.A. surgical rotation in January.  Dr. Kim indicated he was

concerned about Dr. Schwab's attitude, disinterest, knowledge and apathy.  After Dr.

Kim visited me, on or about February 22 and 23, 2010, I spoke with other doctors who

had worked with Dr. Schwab on the V.A. surgical service, specifically Drs. Mancino,

Parnell, and Copeland.[1]

9.      I have attached to this Declaration as Exhibit B-4, a true and correct copy of my notes

made at the time I spoke with these physicians.  The telephone notes indicate:

> Mancino:       "only resident I have failed . . ."  _____  No reaction to hearing this
> information info.
>
> Parnell:       "I have never witnessed a resident with such disregard for a
> rotation . . .."
>
> Chief Resident:       ". . . disregard for attendings . . . (was given hints as to
> attending's favorite pimp topics . . . but he never took advantage of them)

After speaking with the surgeons involved in Dr. Schwab's January V.A. surgery

rotation, Dr. Jaffar and I received a copy of Schwab's January surgery evaluation.

(Exhibit G-1.)  The evaluation raised such concerns that Dr. Jaffar and I wanted to talk to

Dr. Schwab; we also wanted to discuss this situation with the Anesthesiology Clinical

---

[1] Dr. Daniel Copeland was the Chief Resident.

Competency Committee, an oversight group of anesthesiologist educators. We also

received at this time information on Schwab's February rotation in cardiology under Dr.

Rajesh Sachdeva, a cardiologist with the John L. McClellan V.A. Hospital in Little Rock.

Dr. Sachdeva's evaluation of Dr. Schwab is attached to this Declaration as Exhibit B-7.

This document is made and kept in the ordinary course and scope of business at UAMS.

10.   Dr. Jaffar and I met with Dr. Schwab on March 10, 2010. We notified Dr. Schwab of his

failure on general surgery. (Exhibit B-4, page 4.) I relayed my discussions with Drs.

Kim, Parnell, Mancino and Copeland. I proposed an immediate remediation plan of zero

tolerance or Dr. Schwab would be dropped from the program. I also indicated that Dr.

Jaffar and I would present the situation to the Clinical Competency Committee later that

day. I asked Dr. Schwab at this time if there were any personal issues that needed to be

addressed or did he desire to leave Arkansas, and he denied this. During the March 10,

2010 meeting, Dr. Schwab neither indicated that he had an ADHD diagnosis, nor did he

request a reasonable accommodation for ADHD.

11.   On March 10, 2010, Dr. Jaffar and I met with the Clinical Competency Committee.

(Exhibit F-1.) Those Minutes indicate that ten Anesthesiologists were present at the

meeting, either in person or via telephone. The Committee discussed possible action

plans, but the Committee voted unanimously to terminate Schwab's position

immediately.

12.   On March 18, 2010, Dr. Jaffar and I informed Dr. Schwab through a letter that his

residency was terminated based upon the decision of the Clinical Competency Committee

and their review of the evaluations from V.A. general surgery and V.A. cardiology  I

have attached to this Declaration as Exhibit B-2, a true and correct copy of the letter given to Dr. Schwab at the time of his termination.

13.    Under UAMS Graduate Medical Education Policy 1.420, a resident may be immediately dismissed without prior notification in instances of "patient endangerment." Based upon the information received from the V.A. surgery rotation and the V.A. cardiology rotation, it was under this provision that the Clinical Competency Committee, Dr. Jaffar, and I made the decision to terminate Dr. Schwab. ( Exhibit E-2.)

14.    On April 7, 2010, I received a letter from Dr. Schwab's attorney that he was appealing his dismissal. I have attached to this Declaration as Exhibit B-3, a true and correct copy of the letter I received from Denise Hoggard on April 7, 2010. Nowhere in that letter does Schwab's counsel indicate that Schwab has ADHD or is requesting an accommodation for ADHD.

15.    Pursuant to GME Policy 1.410, Dr. Martin, Dr. Jaffar, and I met with Dr. Schwab on April 15, 2010 as an initial attempt to resolve his grievance. I have attached to this Declaration as Exhibit B-5, a true and correct copy of these notes of our April 15, 2010 meeting with Dr. Schwab. At no time during the meeting did Dr. Schwab indicate that he had a diagnosis of ADHD, nor did he request an accommodation for ADHD.

16.    After our meeting with Dr. Schwab on April 15, 2010, I sent Dr. Schwab a letter on April 20, 2010. I have attached to this Declaration as Exhibit B-6, a true and correct copy of the certified letter of April 20, 2010 that I sent Dr. Schwab. Dr. Schwab then appealed his dismissal to Dr. Fiser. (Exhibit D-1.)

17.     I participated in the grievance hearing and presented the evidence for Dr. Schwab's termination at the June 16, 2010 grievance hearing.  During the hearing, I heard for the first time that Dr. Schwab had a diagnosis of ADHD.

18.     The grievance panel decided by a vote of 4 to 2 that we had not followed GME Policy 1.420.  (Exhibit D-6.)  Dr. Fiser upheld the grievance panel's decision.  (Exhibit D-7.)

19.     I called Dr. Schwab upon the receipt of Dr. Fiser's decision and pursuant to a conversation I had with Dr. Clardy to determine whether or not Dr. Schwab intended to return to the Anesthesiology Program at UAMS.  I do not recall the date of this telephone conversation.  Based upon Dean Fiser's June 30, 2010, letter I indicated to Dr. Schwab that we would allow him to return on probation to finish the required amount of training to receive credit for his PGY-1 year.  At that time, I did not know under what conditions, if any, Dr. Schwab might advance to the PGY-2 year, as that issue was not addressed in Dr. Fiser's June 30 letter.

20.     On July 6, 2010, I became aware that Dr. Schwab, through his lawyer, requested a reasonable accommodation for his disability during his completion of his PGY-1 year. (Exhibit E-6.)

21.     On July 6, 2010, I also became aware of an e-mail that Hoggard sent to Hagemeier with some specific questions regarding Schwab's return to his PGY-1 year.  (Exhibit E-7.) Due to the receipt of Hoggard's July 2 letter and her July 6 e-mail, Drs. Clardy, Jaffar and I conducted a telephone conversation with Dr. Schwab and his counsel on July 6, 2010. UAMS counsel, Mark Hagemeier, recapitulated that telephone conversation in a July 7, 2010 letter.  (Exhibit E-3.)  On July 26, 2010, I received information that Dr. Schwab decided to not return to the UAMS Anesthesiology Program. (Exhibits D-10; D-11.)

22.    I hereby declare that the preceding is true and correct to the best of my knowledge.

FURTHER SAYETH THE DECLARANT NOT.

_Charles Napolitano_ _____    04/23/2012 _____
Charles Napolitano, M.D.                         Date

**UAMS Anesthesiology Residency Program**
**SEMIANNUAL PGY1 EVALUATION FORM**

Every 6 months, each resident is required to meet with her/his faculty advisor ("preceptor") for a semiannual evaluation, to review the resident's progress in the program.
After meeting with your advisee in your semiannual meeting please return this form to the Residency Office (Slot # 515) by January 15th and June 15th.
Thank you.

**Resident:** Brian Schwab, D.O.          **Period:** 1st 6 months (June –December 2009)

**Faculty Advisor/Preceptor:** Charles Napolitano, M.D. and Muhammad Jaffar, M.D.
Please check all that apply:

___✓___ I have met with Dr. *Schwab* _____ during this period for his/her semiannual evaluation, to discuss her/his progress in the program.
_____ I have reviewed the evaluations and other documentation sent to me by the Residency Office.

Concerns/comments: *only on Surgical Service that have been very busy. but Work. Hours are ok.*

_____ I have reviewed the educational goals and objectives for this resident's PGY-level.

This resident:
_____ has met these educational goals and objectives
_____ is making good progress toward meeting these goals and objectives
_____ is having difficulty meeting these goals and objectives
_____ Specific goals as yet unmet:

_____

_____

_____

___NA___ This resident needs remediation and/or extra assistance in the following areas:

*Has taken Step iii in December and waiting for results. No Issues of Concern besides one episode.*

**Resident Signature:** _____   Date: __1/15/10__
**Faculty Signature:** *CA Napolitano*   Date: __1/15/10__
*Muhammad Jaffar*

**EXHIBIT B-1**

DEF 0373



# UAMS

## COLLEGE OF MEDICINE
### DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

March 18, 2010

Brian Schwab, DO
PGY-1 House Staff

Dear Dr. Schwab:

On Wednesday March 10, 2010, Dr. Jaffar and I met with you to discuss performance-related issues that had occurred during your most recent General Surgery rotation at CAVHS. Following that meeting, further documentation was received from the General Surgery staff as well as the VA Cardiology staff. The Clinical Competence Committee of the Department of Anesthesiology met to review evaluations from your VA General Surgery rotation, evaluations from your VA Cardiology rotation, as well as evaluations from previous rotations. Although Dr. Jaffar and I presented a possible remediation program to the Clinical Competence Committee, the Committee decided, based upon further discussion and review of your academic performance during the 2009-2010 year to date, to terminate your appointment. The Committee's decision stems from your behavior noted by attending staff and physicians: a display of disinterest in learning, a lack of empathy for patients and their families, and a disrespectful attitude toward faculty-attending physicians. All of these demonstrable behaviors fail to meet the ACGME Competencies of professionalism, patient care, and medical knowledge. Based upon the Clinical Competence Committee's review, its decision to terminate your appointment for cause is effective immediately.

Under the UAMS's institutional policy for "dismissal," the condition under which a resident leaves a program dictates whether or not academic credit may be awarded upon dismissal. As the Committee is terminating your residency for poor academic performance reasons, I can award you no credit for your academic work here at UAMS during the past year.

We regret to inform you of this decision by the Committee, but the decision was made in the interests of the Department of Anesthesiology, the medical profession and patient care.

Sincerely,

Charles A. Napolitano, MD, PhD
Professor and Program Director
Department of Anesthesiology

Muhammad Jaffar, MD, FACC
Professor and Residency Director
Chairman, Clinical Competence Committee
Department of Anesthesiology

Received by:    Brian Schwab, DO                    Date

**EXHIBIT B-2**

DEF 0289

April 7, 2009

*Via Hand-Delivery*
Dr. Napolitano
UAMS

      Re:    **Dr. Brian Schwab**

Dear Dr. Napolitano:

I am writing to you on behalf of Dr. Brian Schwab regarding his recent dismissal from the UAMS Residency Program in Anesthesiology pursuant to Step I under the University Grievance Policy, 1.410.  Dr. Schwab's record does not merit the Clinical Competency Committee's immediate dismissal of Dr. Schwab from the program.  Instead, in dismissing Dr. Schwab for insufficient academic performance, the Committee failed to follow the procedures mandated for dismissal in the University's policies.  As a result of the Committee's actions, Dr. Schwab faces irreparable harm to his educational development and his career.  I ask that you revisit this decision and reinstate Dr. Schwab to his position in the program.

The Committee's immediate dismissal of Dr. Schwab without the required dismissal procedures is not supported by the record in this case.  According to Policy No. 1.420 of the Graduate Medical Education Committee, immediate dismissal is only warranted in very limited circumstances of "gross misconduct" including theft of money or property, physical violence, or being under the influence of alcohol or controlled substances while on duty.  GME Policy 1.420.  Dr. Schwab committed none of these violations.  Instead, the Committee's stated reason for dismissal was poor academic performance in the surgery and cardiology rotations.

The Committee's dismissal of Dr. Schwab for unsatisfactory academic performance violates the University's mandatory policy and cannot stand.  According to GME Policy 1.420, where dismissal is based on unsatisfactory performance, the Committee is required to first inform the resident of the unsatisfactory performance and a timeframe within which the resident will be given a chance to resolve the issue before dismissal will be instated:

<div align="right">

**EXHIBIT B-3**

</div>

DEF 0325

Dr. Napolitano
April 7, 2010
Page – 2

When performance or conduct is considered sufficiently unsatisfactory that dismissal is being considered, the Program Director shall notify the resident with a <u>written statement</u> to include:

    a.    reasons for the proposed action,

    b.    the appropriate measures and timeframe for satisfactory resolution of the problem(s).

GME Policy 1.420 (emphasis in original). Notably, the requirement that the Committee provide the resident with written notification and an opportunity to improve his performance *before* dismissal is mandatory and is not subject to the Committee's discretion.

In this case, Dr. Schwab was not provided with the requisite written notification nor was he given any opportunity for improvement before the Committee dismissed him from the program. Indeed, the Committee's letter to Dr. Schwab identifies that he was first informed that his academic performance was in question on March 10, 2010, a mere eight days before the Committee sent the letter of formal dismissal. No written statement resulted from the March 10, 2010 meeting and no measures or timeframe for resolution of the problem was offered to Dr. Schwab. The Committee's failure to provide Dr. Schwab with notice and an opportunity to respond to the charges before terminating him from his contractual position with UAMS violated his due process rights.

Furthermore, Dr. Schwab's academic performance did not merit dismissal. According to the Committee, Dr. Schwab's termination was based on "a display of disinterest in learning, a lack of empathy for patients and their families, and a disrespectful attitude toward faculty-attending physicians." However, these comments all came from one evaluation of Dr. Schwab from his Surgery rotation. Prior to the surgery rotation, Dr. Schwab had received numerous favorable reviews from his other rotations, including, "Pleasant, cooperative, interested in learning" from the August MICU rotation, "clearly an intelligent and caring physician" from Dr. Ezell's September rotation, "Kind caring willing member of the healthcare team" from his October evaluation, and "Dr. Schwab quickly learned the terminology of the subspecialty and expanded his focused clinical histories and examinations as to pulmonary diseases from his November rotation. Furthermore, the Committee did not solicit any information from Dr. Schwab's current attending physician to inquire as to his performance on this rotation. The Committee's failure to give Dr. Schwab appropriate notice and opportunity to respond or improve his performance is in violation of University policies, UAMS's contractual rights, UAMS's academic responsibilities and Dr. Schwab's due process rights.

DEF 0326

Dr. Napolitano
April 7, 2010
Page – 3

Finally, as a result of the Committee's decision, Dr. Schwab faces severe and irreparable harm to his educational development and his career. In addition to the loss of his compensation for his residency work, Dr. Schwab may not be able to resume his medical training for over a year's time. The timing of the Committee's decision ensures that Dr. Schwab will not be able to transfer to another anesthesiology without spending a significant period of time out of the medical profession. Dr. Schwab had already been offered and accepted a renewal on his contract, less than two months before the Committee's dismissal. As a result of his renewal, Dr. Schwab had not investigated the possibility of transferring to any other medical program and was relying on the University's representations that it would continue his employment in the UAMS residency program. Furthermore, because the Committee's dismissal occurred after the cutoff date for matching with other residency programs, Dr. Schwab was denied the opportunity to transfer to another program to minimize the damage to his educational development and medical career. Consequently, as a result of the Committee's dismissal of Dr. Schwab, Dr. Schwab faces the prospect of spending over a year outside of a residency program.

Because the Committee violated Dr. Schwab's rights to notice and an opportunity to respond to and correct any perceived insufficiencies in his academic performance, and as a result of the Committee's summary dismissal of Dr. Schwab, Dr. Schwab now faces significant economic and educational harm.

In compliance with the UAMS grievance procedure, please accept this letter as Step I to appeal the dismissal. Further, if you deem this letter inadequate to meet the UAMS appeal procedure, please let me know so I can timely and properly address any deficiency. Finally, if you would benefit from additional information or statements, please let me know and I will be happy to comply with your requests if possible to do so.

Sincerely,

CHISENHALL, NESTRUD & JULIAN, P.A.

COPY

Denise Reid Hoggard

DRH/hgm
cc:    Dr. Brian Schwab

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu

**UAMS**
COLLEGE OF MEDICINE
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

1/15/10 — Brian met with Jeffer
        & re... for Bi-annual PGY-1
        review
  • Brian noted she start in
    Surgery rotation

**EXHIBIT B-4**

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu

**UAMS**
**COLLEGE OF MEDICINE**
DEPARTMENT OF ANESTHISIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

20/0

Following visit by Dr. Larry Kim
concern: my PGY-1 (Brian Schub)
c/o attitude, disrespect, knowledge...
apathy ("I will look it up — std answer)
I spoke to Drs. Morsuna, Parnell
& Chief Resident :

(2/22-23 "interviews)
Morsuna: "only resident I have failed...
need no reaction to hearing this info.

Parnell: "I have never witnessed a
resident with such disregard for a
rotation...

Chief Resident: ... disregard for
attendings...
(...was given hints as to attendings
favorite prep topics ... but he
never took advantage of them.)

University of Arkansas for Medical Sciences
4301 W. Markham St., #515
Little Rock, Arkansas 72205

DEF 0380

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia


**UAMS**
COLLEGE OF MEDICINE
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu

3/10/10 @ 12:10 hr

- Dr. [illegible] & I met with Bryan Schmid
- [illegible] him at the GS eval for VA
  per attending concern of us
  L- told if his failing

- discussed my [illegible] with GS faculty
  (Kim, Penull, Mason & ?chief resident),
  relayed specific incidents (e.g., Penull
  SOT comment) which Dr. Schmid did
  not remember!

- proposed an [illegible] remediation plan
  at zero tolerance else dismissal
  that I would present to the CCC
  later today
      L- his goal/goal for [illegible] the
        department & me and [illegible]
        that no further [illegible] comment
        will follow

  (told him he should have come to us if [illegible])    need for help
  - we asked if there were issues (personal)
    or desire to leave AR — denied                      "^

  - (stated there it was a busy month & thus he)
    had problems toward G's

DEF 0378

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu



**UAMS**
**COLLEGE OF MEDICINE**
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

3/3/10 –

Meet with Mark Hagemeier

"clear cut"

· Failed rotations (outside objectives)
· unprofessional behavior

[ Do Not Review ]

✱ will meet with departmental CCC
next week ( 3/10/10 )

DEF 0379

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu

**UAMS**
COLLEGE OF MEDICINE
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

3/18/10 @ 1330

Called Eric Delgiacco
(VAMSO Director)
— to inform him of Brian Schuster
re decision to terminate
for cause

---

Delgiacco stated that Brian was
having a good month (?),
was told by Brian that he was
on "secret probation",
noted that he appeared "disheveled"
at times "like he had ETOH on"
(no smell of ETOH noted)

---

I told him that Monday Coverage
would occur; Eric said today &
rest of week was ok.

**University of Arkansas for Medical Sciences**
4301 W. Markham St., #515
Little Rock, Arkansas 72205

April 16, 2010

My "bullet point" account of the April 15th meeting with Brian Schwab, DO:

- I had a relaxed conversation with Brian prior to the arrival of Drs. Martin and Jaffar. We spoke about the pollen/weather in LR, his travels home to Pennsylvania (outside Philadelphia), my home town in RI and the recent floods...
- At the start of the meeting I asked Brian what were his goals for this meeting since he has grieved our decision of termination. He stated that he wanted reinstatement and a chance to prove himself...given he was not given due process ("only knew of a problem on March 8th when Jaffar and I met with him").
- I explained that following a review of his evaluations/ interviews with the evaluators who confirmed their assessments/appraisals that we had decided to offer him the option of resigning; an option that would give him better opportunity for future employment; and that his resignation letter (dated March 18, 2010) would replace the March 18th letter of termination.
- Brian stated that such a letter would be no better than the other..."it would still lose my year of eligibility...and that other Program Directors had told him that this type of action was unprecedented...no due process."
- The conversation by me and Jaffar then revolved around the fact that he had been told of issues since the Fall either via evaluation/rotation feedback...and that Jaffar's meeting with him in the fall, our January mid-year meeting addressed the issues of his lack of interest. I admitted that at those times we did not appreciate the magnitude of the problem but that he did not tell us of the ongoing problems he was still having during his month in Surgery....
- Brian tried to dismiss the January Surgery events as non-events, weigh any issue with Cardiology to being sick one day, and...
- I repeated somewhere that the behavior displayed during the Surgery rotation despite the feedback given to him by the attending/upper level residents was disturbing, "unprecedented" in our 10 years residency directors, and not in line with that of a physician and anesthesiologist....that we are receiving "second hand" information as opposed to working with him directly as a CA-1 in our service but that he still is a physician ...and we need to protect our patients, him, and or profession/department. Brian acknowledged our issues...
- At the end of the meeting time I asked Dr. Martin if he wanted to add anything and he said that as one of 5 members of the CCC residing at ACH who were read his evaluations over speaker phone all saw "red flags" and issues for immediate termination for the sake of patient care and the profession; he stated that medical education, especially for anesthesia training is expensive and that we need to identify those who are not appropriate as early as possible.
- Brian seemed to agree with all our points except that none were applicable to him (he clearly does not see a problem in himself).
- I closed the meeting confirming that he refuses our offer and that the grieving process will continue....Brian agreed.
- I shook Brian's hand (his hand was very warm compared to mine) and he left.


Charles A. Napolitano, MD, PhD
Professor and Program Director of Anesthesiology

**EXHIBIT B-5**

**UAMS**

COLLEGE OF M
DEPARTMENT OF ANES
UNIVERSITY OF ARKANSAS FOR MEC

OFFICIAL USE

| Postage | $ | 61 |
| Certified Fee | | 280 |
| Return Receipt Fee (Endorsement Required) | | 230 |
| Restricted Delivery Fee (Endorsement Required) | | 450 |
| Total Postage & Fees | $ | 10.2 |

Sent To  *Brian Schwab D.O.*
Street, Apt. No.; or PO Box No.  *820 N. Spruce Apt #A*
City, State, ZIP+4  *L.R. AR  72205*

7009  0820  0000  2213  6844

April 20, 2010
**Via USPS-Restricted Delivery**

Brian Schwab, D.O.
820 N. Spruce
Apt A
Little Rock, AR  72205

Re:  Initial Attempt of Resolution at Grievance

Dear Dr. Schwab:

I am writing this letter to confirm your position following the meeting between you, me, Dr. Muhammad Jaffar and Dr. Timothy Martin on Thursday, April 15, 2010. The meeting was held pursuant to GMEC Policy No. 1.410, Adjudication of Resident Grievances. Specifically, the meeting was our initial attempt to resolve your grievance filed under Step I of Policy 1.410.

At our meeting, I reviewed the chronology of events and meetings that led up to your most recent evaluations from your January surgery rotation at the Veteran's Administration. Drs. Jaffar, Martin and I offered to have you submit a letter of resignation, post-dated March 18, 2010, to submit in lieu of your letter of termination presented to you by me on that date. You rejected our offer to submit a letter of resignation and indicated that you would continue the grievance process with the desired outcome of reinstatement into the Anesthesiology Residency Program with a trial/probationary period. Should my understanding of your rejection of our offer to submit a resignation letter be in error, please notify me immediately by either email or letter.

As we have failed to resolve your grievance at Step I of Policy No. 1.410, you may file a formal grievance with Dean Debra Fiser within ten (10) working days of your receipt of this letter. The Dean will assume you have received this letter in three business days;

**EXHIBIT  B-6**

DEF 0370

Re:     Initial Attempt of Resolution at Grievance
April 19, 2010
Page 2

thus, your formal grievance to the Dean under Step II of Policy No. 1.410 will be due on
or before May 7, 2010.  I have enclosed a copy of Policy No. 1.410 for your review.

Sincerely,

Charles A. Napolitano, MD, PhD
Professor and Program Director of Anesthesiology
Director, Division of Cardiothoracic Anesthesiology
College of Medicine
UAMS

Cc:     (w/o enclosure)
        Dr. Muhammad Jaffar
        Dr. Timothy Martin
        Jeff Bell
        Dr. Debra Fiser
        Mark A. Hagemeier
        Dr. James Clardy

DEF 0371



ATTENDING'S EVALUATION OF ANESTHESIOLOGY PGY-1 INTERN
**Evaluator:** Sachdeva, Rajesh   **Subject:** Schwab, Brian Richard
Evaluation Dates: 2/1/2010 to 2/28/2010

1 = Consistent significant deficits. 2 = Below standard & inconsistent more than 30% of time. 3 = Clearly satisfactory; meets standard at training level. 4 = Exceed standard more than 50% time. 5 = Consistently & significantly superior. Please rank the intern, using the above scale. Please mark "N/A" if you are unable to evaluate.

---

*PATIENT CARE*

1) Demonstrates caring behavior toward patients and their families

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
|   |   | ● |   |   |     |

2) Collects clinical data resulting in a diagnosis reflects patient's clinical condition

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
|   | ● |   |   |   |     |

3) Performs procedures competently and safely.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
|   |   |   |   |   | ●   |

*MEDICAL KNOWLEDGE*

4) Demonstrates appropriate medical knowledge when caring for patients.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
|   | ● |   |   |   |     |

5) Demonstrates ability to apply medical knowledge to solve clinical problems.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
|   | ● |   |   |   |     |

*PRACTICE-BASED LEARNING AND IMPROVEMENT*

6) Seeks and incorporates feed back to improve clinical skills.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
|   |   | ● |   |   |     |

7) Facilitates the learning of students and colleagues.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
|   |   | ● |   |   |     |

*INTERPERSONAL AND COMMUNICATION SKILLS*

8) Listens and communicates effectively with patients and other health care professionals.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
|   | ● |   |   |   |     |

9) Works as an effective member of the health care team.

**EXHIBIT B-7**

|   | 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|-----|
|   | ○ | ◉ | ○ | ○ | ○ | ○ |

*PROFESSIONALISM*

10) Available, punctual, and willingly accepts patient care responsibilities.

|   | 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|-----|
|   | ○ | ○ | ◉ | ○ | ○ | ○ |

11) Demonstrates respectful, ethical, and culturally sensitive clinical practice.

|   | 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|-----|
|   | ○ | ○ | ○ | ○ | ○ | ◉ |

*SYSTEMS-BASED PRACTICE*

12) Practice cost-effective health care in coordination with other health care providers.

|   | 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|-----|
|   | ○ | ○ | ○ | ○ | ○ | ◉ |

13) Provides quality care in a timely and effective manner.

|   | 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|-----|
|   | ○ | ○ | ○ | ○ | ○ | ◉ |

14) Can effectively organize transfer of patient care to other medical services

|   | 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|-----|
|   | ○ | ○ | ○ | ○ | ○ | ◉ |

*GENERAL*

15) Do you wish to speak with the Anesthesiology Residency Director about this resident?

|   | YES | NO | N/A |
|---|-----|----|----|
|   | ◉ | ○ | ○ |

Overall Comments:
Brian was present in majority of the morning rounds in CCU. One time he left at 5pm without presenting the consults he had seen as I was busy in the cath lab. From the start on this rotation, there was something unusal about him. During rounds, even though he was there but I somehow felt that he was never attentative enough. When asked a question, he will be lost. This was very different from other residents and I had instructed my fellow to make sure that he supervises all of his consults and checks the facts with the patients prior to presentation. I had a chance to discuss with the Program Director and somehow sensed that he was not the star. After the consults are discussed, he wrote notes and in those notes at times he will write verbage that will reflect some degree of rudeness from a consultant even though nothing will be expressed from my side. I had decided really very early in the rotation that my note should be in the chart regrading recommendation, so no issues would be raised from the other hospital services.

Evaluation Submitted on 3/11/2010 10:26:45 PM EST.