

EPISCOPAL HEALTH SERVICES INC.
ST. JOHN'S EPISCOPAL HOSPITAL *SOUTH SHORE*
327 Beach 19th Street, Far Rockaway, New York 11691 • (718) 869-7815

**INTERN CONTRACT**
Program No. 125953
Resident's AOA No. 167817
Year of Training 1
City & State: Far Rockaway, New York

This Contract, is executed between
St. John's Episcopal Hospital, South Shore
(hereafter called the "Institution" and

**Brian Richard Schwab, DO**
(hereafter called the "Intern").

**WITNESSETH:**

WHEREAS, the Institution has been approved by the American Osteopathic Association (hereafter called the "AOA") for a postdoctoral training program of interns and has, as a condition for the continued maintenance of such approval, agreed to abide by the intern training standards, rules and regulations, of the AOA, and

WHEREAS, the Intern has made application to the Institution for appointment to serve as an intern in an AOA-approved intern-training program, and said application has been accepted by the Institution's governing board,

NOW, THEREFORE, in consideration of the above and of their mutual promises contained herein, the Institution and the Intern agree as follows:

A. THE INSTITUTION AGREES:

1. To appoint the Intern into its intern training program for a period of time not less than twelve (12) months, beginning **July 1, 2010, and ending on June 30, 2011.**

2. To provide training for the Intern by providing an educational program in accordance with AOA standards for internship training.

3. To define the duties of the Intern.

4. To clearly delineate policies and procedures for evaluation of intern performance, including provisions for promotion, demotion, retention, and dismissal. Such defined procedures shall allow for due process. Such policies shall also include requirements concerning work hour limits in clinical activity and a notice that moonlighting for interns is strictly prohibited.

5. To pay the Intern a stipend of $ 52,697.00/YR

6. To furnish the Intern with a letter listing all benefits that will be provided by the Institution to the Intern including, but not limited to, health insurance and professional liability insurance.

7. To furnish the Intern with a written copy of the Institution's education program which will serve as a guide for intern training.

**EXHIBIT A-1** DEF0153

8. To present or cause to be presented to the Intern a certificate of intern training upon satisfactory completion of the Institution's internship educational program.

9. To refrain from asking or otherwise requiring the Intern to sign a non-competition agreement.

10. To have a written policy that addresses closure of the training program and reduction in approved internship and/or residency positions.

11. To immediately notify the Intern, the AOA, and the OPTI, of a decision or need to close a program or reduce the number of approved positions, and, if the Intern is enrolled in the program, to make every attempt to permit the Intern to complete his or her training prior to such an action.

12. To provide the Intern with two months severance in the event that the Institution is unable to permit the Intern to complete his or her training prior to the closure of the program.

B. THE INTERN AGREES:

1. To serve as an Intern during the entire period specified in Paragraph A.1. of this contract.

2. To perform all duties assigned by the Institution to him/her of his/her ability, to maintain standards of professional competence as determined by the Institution, and to conduct himself/herself in a professional manner at all times.

3. To observe all rules and regulations of the institution pertaining to interns.

4. To engage during the entire term of the internship only in such activities of a professional nature as are approved by the Institution and the AOA. Such activities shall include compliance with institutional and AOA work hour policies to include all policies prohibiting moonlighting.

5. To refrain during the entire term of the internship from engaging or participating in any nonprofessional activities which would interfere with the Intern's effective performance of this contract.

C. THE PARTIES FURTHER AGREE:

1. That the Intern and the Institution are the only parties to this agreement.

2. That this contract may be terminated at any time by a Written Release by Mutual Consent. In the event of such termination, the Institution shall determine the amount of credit, if any, toward satisfying AOA intern education requirements to be awarded the Intern.

3. That upon successful completion of the Internship year, the institution shall appoint the Intern and Intern shall accept a position in its residency program in the field of **Not known at this time.**

4. That if the Intern by action or inaction commits or allows to occur any action or course of action, which the Institution reasonably believes involved moral turpitude or is contrary to the interests or patient care or the general welfare of the Institution, the Institution may terminate the Intern's service without prior notice, and the Intern will not be issued another AOA Internship Contract for a program approved by the AOA for a period of one year from the date of termination, unless sooner exonerated.

5. That if the Intern fails to pursue satisfactorily the Institution's educational and clinical program, the Program Director/Director of Medical Education shall provide the Intern with no less than thirty (30) days prior written notice that the Intern will be placed on probationary status. Thereafter, if the identified deficiencies are not corrected, the Institution may terminate its relationship with the Intern.

6. That if the Institution loses its approval for intern training during the period of this contract, on the effective date of loss of such approval, the Intern shall have the option to be released from this contract and shall not be prohibited from immediately entering another Institution approved by the AOA for intern training. Also, effective on the date of loss of approval, the Institution shall terminate the internship training program, at which time the Intern shall be granted credit for that portion of the internship completed and released there from.

7. That, an intern who unilaterally breaches this contract may not participate in another AOA program from a period of one year from the date of contract termination.

8. That the Institution and the Intern shall immediately notify the Council on Postdoctoral Training of the AOA in writing in the event of a breach or unilateral termination of this contract by either party or of the termination of this agreement by written release by mutual consent. In the event of mutual release, it shall be the duty of the Institution to send a signed copy of the release to the Council on Postdoctoral Training of the AOA.

9. That this contract incorporates by reference "Policies and Procedures for Intern Training" of the AOA to the extent that the "Policies and Procedures for Intern Training" relate to the obligations of the parties hereto and do not conflict with the terms of this contract.

IN WITNESS WHEREOF, this agreement has been executed by the parties hereto, to be effective as of the date of execution by the Institution.

**Institution:** St. John's Episcopal, South Shore

Brian Richard Schwab, DO — By: Sheldon Sirota, Director of Medical Education

Date: 4/1/10 — Date: 4/8/10

Date: 4/8/10 — By: John Gupta, Chief Executive Officer

**ADDENDUM:**
Dr. Schwab's primary interest is in Anesthesia. After he has completed the 2010-2011 Traditional Internship y[redacted] he will be considered for the Family Practice Residency Program, if he requests.

## Written Release by Mutual Consent.

(This proviso to be filled in only in the case of a Written Release by Mutual Consent)

Effective Date: ____________________, 20 ____.

Intern: ____________________ (Signature) ____________________ (Date Signed)

Institution: By ____________________ (Signature) ____________________ (Date Signed)

Name of Institution: ____________________

Witness: ____________________ (Signature)

NOTE: Please keep original signed Copy of contract in your institution files. DO NOT RETURN TO AOA.

*Contract Intern SJEH*

DEF0156

# ST. JOHN'S EPISCOPAL HOSPITAL, SOUTH SHORE

## Osteopathic Programs

### ATTENDING CORE COMPETENCY EVALUATION OF INTERN
(To be completed by Attending)

Intern Name: Brian Schwab   Rotation Dates: 7/1 - 7/30/10

Evaluators Name: Allan Oetner W   Service: Ambulatory clinic
Please Print Name

Site of Evaluation: 342 Beach 54th St Arverne NY 11692

| Exceptional | Very Good | Average | Below Average | Unsatisfactory | Not Observed |
|---|---|---|---|---|---|
| 5 | 4 | 3 | 2 | 1 | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **I. ATTITUDES/PROFESSIONALISM** | | | | | | |
| 1. Well-groomed and professional appearance. | 5 | 4 | 3 | 2 | 1 | 0 |
| 2. Punctual. | 5 | 4 | 3 | 2 | 1 | 0 |
| 3. Observant of established protocol, yet flexible and adaptable. | 5 | 4 | 3 | 2 | 1 | 0 |
| 4. Cooperates with professionals and staff. | 5 | 4 | 3 | 2 | 1 | 0 |
| **II. PROGRAM STRUCTURE** | | | | | | |
| 5. Longitudinal care supplied. | 5 | 4 | 3 | 2 | 1 | 0 |
| 6. Assigned responsibility performed. | 5 | 4 | 3 | 2 | 1 | 0 |
| 7. Complete follow-up of patient. | 5 | 4 | 3 | 2 | 1 | 0 |
| 8. Educational assignments performed. | 5 | 4 | 3 | 2 | 1 | 0 |
| **III. MEDICAL KNOWLEDGE / EDUCATION ACTIVITIES** | | | | | | |
| 9. Demonstrates competency in his/her understanding and application of clinical medicine to patient care. | 5 | 4 | 3 | 2 | 1 | 0 |
| 10. Understands and applies the foundations of clinical and behavioral medicine appropriate to his/her discipline. | 5 | 4 | 3 | 2 | 1 | 0 |
| 11. Demonstrates knowledge of the disorders relevant to this service. | 5 | 4 | 3 | 2 | 1 | 0 |
| 12. Demonstrates adequate knowledge of the pathophysiology of related disorders. | 5 | 4 | 3 | 2 | 1 | 0 |
| 13. Understands the principles of pharmacology related to acute and chronic diseases. | 5 | 4 | 3 | 2 | 1 | 0 |
| 14. Demonstrates initiative for self-learning (e.g., through readings, professional contacts, audiovisual). | 5 | 4 | 3 | 2 | 1 | 0 |
| 15. Attends available educational presentations. | 5 | 4 | 3 | 2 | 1 | 0 |
| 16. Demonstrates understanding of various testing modalities related to the diagnosis of the patient. | 5 | 4 | 3 | 2 | 1 | 0 |

**EXHIBIT A-2**

DEF0069

| IV. CLINICAL SKILLS | | | | | | |
|---|---|---|---|---|---|---|
| 17. Formulates appropriate differential diagnosis. | 5 | 4 | 3 | 2 | 1 | 0 |
| 18. Delivers a clear and well-structured case presentation. | 5 | 4 | 3 | 2 | 1 | 0 |
| 19. Writes a clear history and physical. | 5 | 4 | 3 | 2 | 1 | 0 |
| 20. Writes clear progress notes. | 5 | 4 | 3 | 2 | 1 | 0 |
| 21. Formulates and writes clear, concise orders. | 5 | 4 | 3 | 2 | 1 | 0 |
| 22. Applies Osteopathic principles and practices when appropriate. | 5 | 4 | 3 | 2 | 1 | 0 |
| **V. PATIENT CARE** | | | | | | |
| 23. Considers a wide range of factors in assessing patients' problems and concerns (including h & p, existing patient records). | 5 | 4 | 3 | 2 | 1 | 0 |
| 24. Requests appropriate diagnostic tests and consultative services. | 5 | 4 | 3 | 2 | 1 | 0 |
| 25. Adequately assesses pertinent risk factors and implements interventions to minimize risk. | 5 | 4 | 3 | 2 | 1 | 0 |
| 26. Efficiently arrives at an appropriate diagnosis. | 5 | 4 | 3 | 2 | 1 | 0 |
| 27. Develops and implements and effective treatment plan. | 5 | 4 | 3 | 2 | 1 | 0 |
| 28. Provides health care services consistent with osteopathic philosophy including preventative medicine and health promotion in accordance with current scientific evidence. | 5 | 4 | 3 | 2 | 1 | 0 |
| **VI. INTERPERSONAL AND COMMUNICATION SKILLS** | | | | | | |
| 29. Skillful at interviewing patients. | 5 | 4 | 3 | 2 | 1 | 0 |
| 30. Demonstrates awareness of patients' feelings and problems. | 5 | 4 | 3 | 2 | 1 | 0 |
| 31. Demonstrates cultural competency in his/her patient interactions. | 5 | 4 | 3 | 2 | 1 | 0 |
| 32. Demonstrates ability to involve patients and families in decision-making process. | 5 | 4 | 3 | 2 | 1 | 0 |
| 33. Provides proper emotional support to patients and families. | 5 | 4 | 3 | 2 | 1 | 0 |
| 34. Communicates effectively with other professionals. | 5 | 4 | 3 | 2 | 1 | 0 |
| 35. Elicits medical information effectively. | 5 | 4 | 3 | 2 | 1 | 0 |
| 36. Provides clear instructions to patients. | 5 | 4 | 3 | 2 | 1 | 0 |
| **VII. PROFESSIONALISM** | | | | | | |
| 37. Demonstrates respect for his/her patients and families. | 5 | 4 | 3 | 2 | 1 | 0 |
| 38. Advocates for the primacy of his/her patient's welfare and autonomy. | 5 | 4 | 3 | 2 | 1 | 0 |
| 39. Adheres to ethical principles in the practice of Medicine. | 5 | 4 | 3 | 2 | 1 | 0 |
| 40. Demonstrates the ability to relate and accept patients with a variety of values, lifestyles and disabilities. | 5 | 4 | 3 | 2 | 1 | 0 |
| **VIII. PRACTICE-BASED LEARNING AND IMPROVEMENT** | | | | | | |
| 41. Actively seeks opportunities to learn. | 5 | 4 | 3 | 2 | 1 | 0 |
| 42. Utilizes reliable and current information in diagnosis and treatment of patients. | 5 | 4 | 3 | 2 | 1 | 0 |
| 43. Applies the principles of evidence-based medicine in the diagnosis and treatment of patients. | 5 | 4 | 3 | 2 | 1 | 0 |

| | | 5 | 4 | 3 | 2 | 1 | 0 |
|---|---|---|---|---|---|---|---|
| 44. | Understands research methods, medical informatics and the application of technology as applied to medicine. | (5) | 4 | 3 | 2 | 1 | 0 |
| **IX.** | **SYSTEM-BASED PRACTICE** | | | | | | |
| 45. | Understands national and local health care delivery systems and their effect on patient care and professional practice. | (5) | 4 | 3 | 2 | 1 | 0 |
| 46. | Directs patients to the appropriate level of care across the continuum. | (5) | 4 | 3 | 2 | 1 | 0 |
| 47. | Advocates for quality health care on behalf of his/her patients. | (5) | 4 | 3 | 2 | 1 | 0 |
| **X.** | **OSTEOPATHIC PHILOSOPHY AND OMM** | | | | | | |
| 48. | Demonstrates competency in his/her understanding and application of OMT. | (5) | 4 | 3 | 2 | 1 | 0 |
| 49. | Integrates Osteopathic concepts and OMT into the medical care he/she provides to patients as appropriate. | (5) | 4 | 3 | 2 | 1 | 0 |
| 50. | Understands and integrates Osteopathic Principles and Philosophy into all clinical and patient care activities. | (5) | 4 | 3 | 2 | 1 | 0 |
| 51. | Treats each person as a whole person integrating mind, body and spirit. | (5) | 4 | 3 | 2 | 1 | 0 |
| 52. | Utilizes the relationship between structure and function in his/her treatment of patients to enhance wellness. | (5) | 4 | 3 | 2 | 1 | 0 |
| **XI.** | **OVERALL** | | | | | | |
| 53. | Overall rating of Resident's professional growth. | (5) | 4 | 3 | 2 | 1 | 0 |
| 54. | Has this evaluation been reviewed with the Resident? (Circle one)<br>a. Yes<br>(b. No) | | | | | | |

**ADDITIONAL COMMENTS:**

A Team Player and Leader – Shows Confidence & trust. – Great People Skills – Excellent basic science skills.

Signatures: [signature]
Evaluator

Date 7/28/10.

[signature]
Resident

Date 7/30/10

DEF0071

# ST. JOHN'S EPISCOPAL HOSPITAL, SOUTH SHORE

## Osteopathic Residency Programs

### EVALUATION OF ROTATION
(To be completed by Intern)

At the close of each rotation, please complete this form and submit it to the Department of Medical Education.

Resident Name: Brten Schwied Rotation Dates: 7/1 - 7/30/10

Preceptor Name:: Allan Detreitler Service: Ambulatory Medicine
Print Name

INSTRUCTIONS:

Please circle the most appropriate number which corresponds to your perception of each item using the rating scale below.

| Strongly Agree | Agree | Neutral or N/A | Disagree | Strongly Disagree |
|---|---|---|---|---|
| 5 | 4 | 3 | 2 | 1 |

| Item | | | | | |
|---|---|---|---|---|---|
| 1. Clinical instructor was creative and/or innovative with respect to teaching style. | (5) | 4 | 3 | 2 | 1 |
| 2. Clinical instructor was clear and easy to understand. | (5) | 4 | 3 | 2 | 1 |
| 3. If I was confused about a topic or issue, I felt no hesitation to approach this instructor with my questions. | (5) | 4 | 3 | 2 | 1 |
| 4. I felt free to express my disagreements with the clinical instructor. | (5) | 4 | 3 | 2 | 1 |
| 5. The instructor provided on-going, timely, constructive feedback on my performance of clinical skills. | (5) | 4 | 3 | 2 | 1 |
| 6. The clinical instructor showed competence in either effectively managing or effectively referring patients with psychological problems. | (5) | 4 | 3 | 2 | 1 |
| 7. The clinical instructor showed competence in patient management or effectively referring patients for specialty consultation. | (5) | 4 | 3 | 2 | 1 |
| 8. The clinical instructor showed competence in requesting appropriate diagnostic studies. | (5) | 4 | 3 | 2 | 1 |
| 9. The clinical instructor showed awareness of cost consciousness with regard to patient care. | (5) | 4 | 3 | 2 | 1 |
| 10. I had ample opportunity to observe the clinical instructor in patient management. | 5 | (4) | 3 | 2 | 1 |
| 11. The clinical instructor was a role model as an effective interviewer. | (5) | 4 | 3 | 2 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 12. The clinical instructor observed me conduct patient interviews. | 5 | 4 | 3 | 2 | 1 |
| 13. The clinical instructor observed me in total patient management. | 5 | 4 | 3 | 2 | 1 |
| 14. The clinical instructor provided constructive feedback on my interviewing, communication, and problem solving skills. | 5 | 4 | 3 | 2 | 1 |

**COMMENTS:** (On any aspect of the program, specify faculty, etc.)

This was a great rotation. I was allowed independence and was trusted to help form patient management decisions. Great to work with. This was the first time I felt like I was allowed to be a physician. I was also provided insight on billing practices and insurance reimbursement which I had not known before. Again, great rotation.

Signature of DMB Date 10/12/10

DEF0073

# Intern Log – Ambulatory Rotations

Name: Brian Schul Date: 7/ /10 Rotation: Ambulatory Medic
Location: 54th Beach

| | Date | Medical Record # | Seen Before? | Diagnosis | Procedure(s) |
|---|---|---|---|---|---|
| 1 | 7/23 | RG | N | HTN, Hyperlipidemia | |
| 2 | 7/23 | GS | N | Hypothyroidism | |
| 3 | 7/26 | SS | N | Pharyngitis | |
| 4 | 7/26 | KS | N | Asthma | |
| 5 | 7/26 | NM | N | Asthma, DM2 | |
| 6 | 7/26 | HM | N | Sinusitis | |
| 7 | 7/27 | MS | N | Back pain | |
| 8 | 7/27 | HV | N | Back pain | |
| 9 | 7/27 | SR | N | Dyspnea | |
| 10 | 7/27 | BM | N | Hypothyroidism | |
| 11 | 7/28 | JB | N | HTN, Hyperlipidemia | |
| 12 | 7/28 | AN | N | b/L ankle rash | |
| 13 | 7/28 | SN | N | Pharyngitis | |
| 14 | 7/28 | SM | N | Asthma, HTN | |
| 15 | 7/29 | AN | N | Asthma | |
| 16 | 7/29 | KW | N | Skin rash | |
| 17 | 7/29 | KW | N | Asthma | |
| 18 | 7/29 | SA | N | Bed Rest | |
| 19 | 7/29 | QM | N | New [illegible] | |
| 20 | 7/30 | DB | N | Herpes type 1 | |
| 21 | 7/30 | YR | N | HTN, Hyperlipidemia | |
| 22 | 7/30 | BF | N | Fatigue | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |

Supervisor: SOUTH SHORE FAMILY MEDICAL ASSOC., P.C. DR. ALLAN S. DETWEILER 342 BEACH 54TH STREET ARVERNE, N.Y. 11692 (718) 634-5448 [signature] Date: 7-30-10

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O. VS. UAMS

11

DEPOSITION EXHIBIT 4

Episcopal Health Services, Inc.

Information Services Rules & Regulations

(4 pages)

**EXHIBIT A-3**

HENDRIX REPORTING SERVICE
501-372-2748

77772826-742e-453f-8af3-bf00fe6550d6



EPISCOPAL HEALTH SERVICES INC.
700 Hicksville Road, Ste. 210, Bethpage, NY 11714
(516)349-4600

## INFORMATION SERVICES RULES & REGULATIONS

I, the undersigned, acknowledge receipt of these Information Services (IS) rules and regulations and understand that:

1. My IS User Login Name and Password is the equivalent of my signature.
2. I will not disclose any of my IS User Login Names and/or Passwords to anyone.
3. I will not attempt to learn another user's IS User Login Name and Password.
4. I will not attempt to access information by using an IS User Login Name and Password other than my own.
5. I will not attempt to access any unauthorized information via my IS User Login Name and Password.
6. If I have reason to believe that the confidentiality of my IS User Login Name and Password has been compromised, I will contact the Information Services HelpDesk at (516)349-4629 immediately so that the password can be deleted and a temporary password assigned to me, which I will then reset immediately.
7. My IS User Login Name and Password will be deleted from the system as soon as I terminate my employment or association with Episcopal Health Services. * Access is deactivated when employee is On Leave.
8. I understand that all hardware, software, and computer-related equipment are the property of EHS and are accessible by any EHS IS personnel at any time.
9. Per HIPAA regulations, I will not use my computer to violate any person's privacy, confidential information of any type, or information that compromises internal business.
10. I acknowledge receipt of instructions and/or equipment for HIPAA compliance appropriate to my job description and will conform to EHS policy regarding the use of such instructions and/or equipment.
11. Per HIPAA regulations, I will not jeopardize the physical security of any patient information, either deliberately or through negligence.

Accessing any information without authorization and without a professional need for such information is a breach of the person's rights of confidentiality. Such activity is also deemed to be professional misconduct which could result in the revocation of a license to practice.

Duplication of software without authorization of the manufacturer is a violation of state and federal laws punishable by fine or imprisonment. Installation of any software or changes to configuration on PC's is only to be done by EHS IS personnel in accordance with HIPAA regulations and EHS policies and procedures.

➢ **I understand that if I violate any of the above statements I will be subject to disciplinary action in accordance with Human Resources policy.**

DStepdwr
DEPARTMENT/SITE

6/18/10
DATE

6/18/10
DATE

Brian Schuel
EMPLOYEE NAME (please print)

[signature]
*SIGNATURE OF EMPLOYEE

3

C. BasCombie
HR REPRESENTATIVE SIGNATURE

St. John's Episcopal Hospital
327 Beach 19th Street, Far Rockaway, NY 11691 • 718 869-7000

I HAVE RECEIVED A COPY OF THE FOLLOWING LETTER:

AIG CLAIM SERVICES, INC. AND METRACOMP, INC.
EMPLOYEE GUIDE TO THE NEW YORK
WORKERS' COMPENSATION PREFERRED PROVIDER ORGANIZATION (PPO) ARRANGEMENT

6-18-10
DATE

[signature]
SIGNATURE

[handwritten name]
PRINT NAME

# EPISCOPAL HEALTH SERVICES INC.
# ST. JOHN'S EPISCOPAL HOSPITAL, SOUTH SHORE

## Language Roster

St. John's Episcopal Hospital, South Shore Division, is committed to providing quality care to all our patients regardless of their race, national origin or handicap status. To assist us in our goal, employees who speak a foreign language or who sign (for the hearing impaired) may be asked to assist by interpreting for patients and/or visitors who do not speak English or who are deaf.

If you are willing to volunteer as an interpreter, please indicate below the foreign language(s) you speak ***fluently*** or if you sign:

**FOREIGN LANGUAGES:** None

**SIGN LANGUAGE:** ______ **Yes** X **No**

Your signature below indicates your willingness to be listed in our Language Roster.

Brian Schmidt
**EMPLOYEE NAME**
**(Please Print)**

[signature]
**SIGNATURE**

6-18-10
**DATE**

DEF0151

# CO..SUMER AUTHORIZATIC..

. I understand that an investigative report may be generated on me that may include information as to my character, general reputation, personal haracteristics, or mode of living; work habits, performance or experience, along with reasons for termination of past employment/professional license or re-ntials; education; financial/credit history; or criminal/civil/driving record history. I understand that General Information Services, Inc., on behalf of S may be requesting information from public and private sources about any of the information noted earlier in this paragraph in connection with HS consideration of me for employment, promotion or position re-assignment or contract now, or at any time during my tenure with EHS, and give my full consent for this information to be obtained.

. IF APPLICABLE, medical and worker's compensation information will only be requested in compliance with the Federal Americans with Disabilities ct (ADA) and/or any other applicable state laws. According to the Fair Credit Reporting Act (FCRA, Public Law 91-508, Title VI), I am entitled to now if the considerations for which I am applying are denied because of information obtained from a consumer reporting agency. If so, I will be notified nd be given the name of the agency providing that report.

I. I acknowledge that a telephonic facsimile (FAX) or photographic copy of this release shall be as valid as the original. This release is valid for most ederal, state and county agencies.

/. I understand that if I am a resident of Minnesota/Oklahoma (only) I may obtain a copy of the report ordered, and now indicate my desire to do so y checking this box ☐.

. I hereby authorize, without reservation, any financial institution, law enforcement agency, information service bureau, school, employer or insurance ompany contacted by General Information Services, Inc. to furnish the information described in Section I.

I. Communications with General Information Services, Inc. should be directed to PO Box 353, Chapin SC 29036 or (877) 590-4012.

**CANDIDATE COMPLETE THE FOLLOWING:**

[signature] — Signature

6/18/0 — Today's Date

Brian Schul — Please print full name

e following information is required by law enforcement agencies and other entities for positive identification purposes when checking public records. It confidential and will not be used for any other purposes.

12/29/1982 — Month, Day and Year of Birth

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 — Social Security Number

154 Municipal Rd — Home Address

Lehighton — City; PA — State; 18235 — Zip

26 271 356 — Driver's License Number and State

Brian C Schul — Name as it appears on License

ve you ever been convicted of a crime? X No __ Yes If yes, please provide city and ate of conviction and details of conviction.

**R CREDIT REPORTING ACT NOTICE:**
ccordance with the Fair Credit Reporting Act (FCRA, Public Law 91-508, Title VI), this information may only be used to verify a statement(s) made by an individual in connection with legitimate business needs. The th of information available varies from state to state. Status of updates are available on request. Although every effort has been made to assure accuracy, General Information Services, Inc. cannot act as guarantor of rmation accuracy or completeness. Final verification of an individual's identity and proper use of report contents are the user's responsibility. General Information Services, Inc.'s policy requires purchasers of these nts to have signed a Service Agreement. This assures General Information Services, Inc. that users are familiar with and will abide by their obligations, as stated in the FCRA, to the individuals named in these reports. If rmation contained in this report is responsible for the suspension or termination of an employee or the application process, have the Candidate/employee contact General Information Services, Inc.

## NOTICE TO CALIFORNIA CANDIDATES

ou have a right to obtain a copy of any consumer report or investigative consumer report obtained by (INSERT COMPANY NAME) by checking the ox provided below. The report will be provided to you within three (3) business days after we receive the requested reports related to the matter nvestigated.

☒ I request to receive a free copy of this report by checking this box.

nder section 1786.22 of the California Civil Code, you may view the file maintained on you by GIS during normal business hours. You ma also obtain a copy of this file upon submitting proper identification and paying the costs of duplication services, by appearing at GIS in n or by mail. You may also receive a summary of the file by telephone. The agency is required to have personnel available to explain ... file to you and the agency must explain to you any coded information appearing in your file. If you appear in person, a person of your hoice may accompany you, provided that this person furnishes proper identification.

DEF0152

Brian [illegible] 09 (24) 209-82

11-7-07- chronic [illegible] attention, avoids classes - [illegible]
hyperactivity chronic - [illegible] [illegible] [illegible]
[illegible] [illegible]
some [illegible] more difficult because of [illegible]
↓ concentration
[illegible] issues PSL not [illegible] [illegible] "[illegible] [illegible]"
ASRS 25 + 24.
Strattera 40 - 61 [illegible]

11-14-07 [illegible] [illegible] [illegible] on Strattera [illegible] [illegible]
[illegible] - while on it did [illegible] ↓ [illegible] [illegible]
+ ↓ [illegible]
will Rx Ritalin 11 mg AM + pm if tolerated

1-9-08- doing [illegible] - [illegible] [illegible] -
improved [illegible] [illegible] - [illegible] [illegible] - AM
quick wears off
will Rx Ritalin SR 20 mg

5-14-08 off meds is more [illegible] - [illegible]
[illegible] [illegible] [illegible] [illegible] [illegible] SR
- can try Adderall XR 10 mg

7-30-08 [illegible] [illegible] [illegible] Adderall ↑ attention
"less [illegible]" less hyperactive -
interested in [illegible]

[illegible] on [illegible] [illegible] out [illegible]
addressed will be continued

10-8-08 doing well - applying for [illegible] [illegible] -
does well with [illegible] - this will be continued

1-14-09 doing well on probation - [illegible] [illegible]
[illegible] needs to be continued
4-15-09 accepted [illegible] - [illegible] [illegible] Arkansas

11-05-26 08:42

Brian Schwart 1-9-08

Ritalin SR 20
#30
i Am

Brian Schwart 11-14-07

Ritalin 10 mg
#60
i BID

BM 8583141

Brian Schwart 7-30-08

adderall XR 10 mg
#30
i Am

BM 8583141

Brian Schwart 5-14-08

adderall XR 10 mg
#30
i Am

11-05-26 08:42

Brian Schwab 11-8-08

adderall XR 10 mg
#30
↑ Rx

[signature]

Brian Schwab 10-8-08

adderall XR 10 mg
#30
↑ Rx

[signature]

BM 8583141

Brian Schwab 4-15-09

adderall extended release 10 mg
#30
↑ Rx

[signature]

BM 8583141

Brian Schwab 1-14-09

adderall tab 10 mg
#30
↑ Rx

[signature]

University of Arkansas for Medical Sciences
*Practitioner Health Questionnaire*
(to be completed by resident physician)

**THIS IS A CONFIDENTIAL QUESTIONNAIRE**

Name (print): Brian Schmidt

Department: Anesthes.

**Check the appropriate response:**

| | Question | Yes | No |
|---|---|---|---|
| 1. | Are you aware of, or have there been any health impairments that might affect your ability to perform professional and staff duties fully? | ___ | X |
| 2. | Have you ever had an alcohol, drug or other substance use of abuse problem? | ___ | X |
| 3. | Has your license to practice medicine in any jurisdiction ever been limited, suspended, or revoked; or your employment suspended or terminated due to any substance use or abuse problems? | ___ | X |
| 4. | Has your DEA number to prescribe controlled substances ever been limited, suspended, or revoked? | ___ | X |
| 5. | Have you ever been arrested for DWI or DUI? | ___ | X |
| 6. | Have you ever been charged with any other infraction involving alcohol, drugs, or other substances: on how many occasions? ______ | ___ | X |
| 7. | Have you ever been treated for alcohol, drug or substance abuse problems? Give name of the institution(s), date and length of stay. ______ | ___ | X |
| 8. | Are you currently being or have you ever been monitored by a Medical Staff Health Committee (or any similar body) in any state? If yes, give state and dates ______ | ___ | X |

If you answered yes to any of the questions on this page, please provide a detailed explanation in the space below. This form will be forwarded in strictest confidence to the chair of the Medical Staff Health Committee and to your program director.

The answers and explanations I have provided are accurate and complete to the best of my knowledge and belief.

________________ Signature

4/13/09 Date

***Place in the envelope marked "Confidential", seal and return.***

H:\GME\GME\POLICY\Physicians Health Committee\Medquest.doc

**EXHIBIT A-5**

DEF 0329

University of Arkansas for Medical Sciences
Little Rock, Arkansas

**RESIDENT AGREEMENT of APPOINTMENT**

Agreement made this 24th day of March, 2009 by and between the University of Arkansas for the University of Arkansas for Medical Sciences ("UAMS") and Dr. Brian Schwab. ("Resident").

In consideration of the promises, conditions, and undertakings hereinafter contained, the parties agree as follows;

I. Resident is hereby appointed to a position as Resident in Anesthesiology for a period beginning July 1, 2009 and ending June 30, 2010. UAMS, through this appointment, agrees to provide:

1. Supervised instruction and experience in keeping with the standards established by the Accreditation Council for Graduate Medical Education and the American Board of Medical Specialties with the understanding that the hours of duty and the content of the educational phase of the residency, including the duration and sequence of assignments to clinical, laboratory or ambulatory care facilities are determined by the Program Director. In addition, the Program Director will determine the length and scheduling of vacation periods. Information concerning vacation time will be made available to the resident at the beginning of the academic year.

2. A total of five (5) laboratory coats during the entire training period; no laundry services are provided.

3. Food and call rooms while performing in-house call;

4. Professional liability insurance coverage and legal defense protection against awards, including "tail coverage", will be provided in an amount and with coverage to be determined by UAMS for acts or omissions of the Resident in the scope and course of his or her duties hereunder and the provisions applicable to such coverage are contained in the insurance contract;

5. A stipend of $45,356 for the year of this contract; For returning residents, failure to complete Annual GME Survey and/or web based courses could revert stipend to last year's value.

6. A. Medical, Dental, Basic Life, and Basic Long Term Disability insurance coverage as described in the UAMS Office of Human Resources Benefits for Housestaff document included with this agreement. Medical Insurance takes effect the first day of the training program, provided the Resident submits the required enrollment forms to Human Resources within their first 31 days of initial appointment to the training program.

   B. Basic Housestaff Long Term Disability insurance coverage. The Resident shall participate and shall enroll at the time of registration and appointment to the training program.

7. Professional, parental, and sick leave as specified in the policies of the Graduate Medical Education Committee and contained in the College of Medicine Resident Handbook;

8. Access to counseling, medical, and psychological support services in accordance with the provisions of, and subject to the limitations of, the UAMS Medical Benefit Plan, the UAMS Employee Assistance Program, and the UAMS Employee Health/Student Preventive Health Services. Questions concerning such services should be directed to the Program Director, the Associate Dean for Graduate Medical Education of the College of Medicine or the UAMS Office of Human Resources.

9. A certificate for the appropriate period of satisfactory Residency performance;

10. The Resident will be accorded due process consistent with applicable policies and procedures of UAMS, the College of Medicine and the Department in which the Resident is appointed. These policies and procedures include: grievance, promotion/non-promotion, work environment, and harassment are included with this agreement.

II. The Resident, through this appointment, agrees or understands:

1. That this appointment is conditioned upon successfully passing a pre-employment drug screen in accordance with the UAMS Drug Testing Policy (Policy 3.1.14). Further, initial appointments are conditioned upon completion of a satisfactory criminal background check and authorization by the relevant residency program. In cases where employment may have been initiated prior to the criminal background check, the University reserves the right to determine the residents' suitability for continued employment.

2. To accept the provisions described above and set forth hereinafter;

3. To complete and return all forms in the registration packet <u>prior to</u> the appointment period;

**EXHIBIT A-6** DEF 0880

4. To comply with all terms and conditions of appointment and all policies of UAMS, the College of Medicine, the Graduate Medical Education Committee and any facility or department to which Resident is assigned or in which Resident is working. All policies of the Graduate Medical Education Committee contained in the College of Medicine Resident Handbook, including the policies on physician impairment and substance abuse, evaluation and promotion, duty hours, moonlighting, other professional activities outside the program, sick leave, vacation, parental leave, accommodation for disabilities, are included with this agreement;

5. To comply with the College of Medicine's and the program's duty hour policies and accurately report duty hours;

6. To complete all medical records according to the Rules and Regulations of the participating hospitals;

7. To complete the Annual Graduate Medical Education Survey and assigned web-based educational modules;

8. To participate in providing appropriate medical care for all assigned patients;

9. Not to accept fees from patients;

10. Not to engage in employment outside the residency program without the written approval of the Program Director.

11. That this agreement may be terminated for cause in accordance with the procedures set out in the policies of the Graduate Medical Education Committee of the College of Medicine as may be changed or supplemented from time to time by the Graduate Medical Education Committee. Any such changes or supplements during the period of this agreement shall become effective when promulgated or adopted by the Graduate Medical Education Committee and when notice thereof has been furnished the Resident;

12. That he/she is free of any conflicting obligation(s) during the period of appointment;

13. That the appointment herein is for the period indicated and on the terms and conditions set forth hereinabove and any subsequent appointment for additional periods of residency education are wholly within the discretion of the Program Director and/or the Chairman of the resident's program. In the event Resident is not to be appointed for a subsequent period, Resident will be furnished written notice of non-reappointment at least four (4) months prior to the expiration of the period of this appointment, provided, however, that in no event shall the failure to furnish such notice operate to extend this appointment or to confer any rights upon the resident to a subsequent appointment.

14. To conduct himself/herself in accordance with the laws and regulations that applies to compliance matters and to report any information of possible wrongdoings, errors or violations of the law to the FGP compliance Officer.

III. Licensure. Resident represents that he or she has been awarded the M.D. degree and has completed, or will complete, the requirements for licensure in Arkansas. If Resident is unable to affirm the foregoing, reasons therefore are stated in a written attachment to this Agreement.

IV. Entire Agreement – Arkansas Law Controls. This Agreement is executed in the State of Arkansas and shall be interpreted in accordance with Arkansas law. This agreement shall not be amended, changed or modified except by an Agreement in writing signed by all parties.

IN WITNESS WHEREOF, the parties have executed this agreement on the date and year first above written.

UNIVERSITY OF ARKANSAS FOR THE UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

[signature] MD
Dean for Graduate Medical Education
Date: 7-1-09

[signature]
Residency Program Director
Date: 3/24/09

RESIDENT

[signature]
Resident
Date: 5/12/09

# UAMS HOUSESTAFF MEDICAL HISTORY

Employee name: ____________________________________________

Social Security Number ________ - ________ - ________ Date of Birth ____________

Sex: ______ Female ______ Male ________ Race ____________

Home Address: ____________________________________________

City ________________________ State ________ Zip ____________

Home Phone ____________________ Work Phone ____________________

Department ____________________________________________

**The following is required for employment. All required testing and vaccinations will be provided for you free of charge if needed by Student Employee Health.**

1. **PPD Skin Test: Tuberculin Purified Protein Derivative**

   Have you ever had a positive tuberculin skin test? __________
   (If yes, send documentation, reaction, follow-up and the results of any chest x-rays along with this form)
   Where you born in the United States ________ (If no list the Country) __________

   Have you had a TB skin test in the past 12 months? _______
   (If yes, please send date placed, date read, results and the signature of the person that read the test)

2. **Measles (Rubeola) and Rubella:** Have you had an MMR (Measles, Mumps, Rubella) 2 MMR'S as a child or 1 as an adult? ____________ if yes, send documentation.
3. **Varicella (Chicken Pox)** Have you had the disease: _______
   Have you had the vaccine or titer? _________ if yes, send documentation.

   Have you taken care of, or been in close contact with anyone with the disease?

**The following is recommended but not required for employment. Services will be provided by Student Employee Health.**

1. **Tetanus:** Date of last vaccination ________________
2. **Hep B: Have you had the series or titers in the past? 1_____ 2_____ 3_____**

**EXHIBIT A-7**

# UAMS HOUSESTAFF SCREENING FORM

Date of Exam________________

Name______________________________________ DOB____________________

IMMUNIZATIONS AND VARICELLA HISTORY

(Check if needed or record date if proof provided)

- MMR Vaccination date:__________ Titer Date/results_______
- Tetanus or Tdap date:____________
- Hep B: 1________ 2__________3__________
- Hep B: Titer dates/results_______________
- Varicella: History of Disease: Yes/no (Circle)
- Varicella: Titer dates/results__________
- Varicella: Vaccination date____________________

---

Yes/no (circle one) Does employee know the essential physical requirements of the job for which they have been hired? ________________

Yes/no (circle one) Does employee have any concerns regarding their ability to perform the essential duties? ____________________

Yes/no does the employee need any special accommodations to perform their job? _______

If yes, explain____________________________________________________________

Does the Employee Smoke? ________________

Any known allergies to drugs, food or latex? ___________________

**ORDERS**

| | | |
|---|---|---|
| **MMR** | Site_____________________ | Date____________________ |
| **Hep B** | Site_____________________ | Date____________________ |
| **Tdap** | Site_____________________ | Date____________________ |
| **PPD/Health Card** | Site____________________ | Date____________________ |

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

**BRIAN SCHWAB, D.O.,** **PLAINTIFF,**

**V.** **CASE NO. 4:11-cv-00011-BSM**

**UNIVERSITY OF ARKANSAS, ET AL.,** **DEFENDANTS.**

# DECLARATION OF CHARLES NAPOLITANO, M.D.

1. My name is Charles Napolitano. I am a Professor in Anesthesiology at the University of Arkansas for Medical Sciences. I received my undergraduate degree from Brown University in Biomedical Sciences, a Ph.D. in Physiology from Wake Forest Bowman Gray School of Medicine. I received my medical degree from Bowman Gray in 1990. I became an assistant professor at UAMS in 1996. I was promoted to an associate professor in 2002 and a full professor in 2008. My specialty is Cardiac Anesthesiology.

2. In 2001, I became the Co-Residency Program Director along with Dr. Muhammad Jaffar. Thus, I have been involved in resident education since 2001.

3. UAMS is the State's only teaching hospital. One of the Graduate Medical Education Residency Programs offered at UAMS is in Anesthesiology. An Anesthesiology residency includes four years of post-medical school education. The first year of an Anesthesiology residency, or the intern year, is designated the PGY-1 year. The final year is designated as the PGY-4 year.

4. Medical students who wish to apply for the UAMS Anesthesiology Residency Program do so through a national matching system that is conducted in March of each year.

Generally, UAMS accepts 14 new PGY-1/intern students each year. These interns enter the Anesthesiology Residency Program each summer. All incoming Anesthesiology residents that begin a normal Graduate Medical Education cycle begin their training at UAMS in the summer of each year. In late June of each year, a three-day orientation program is conducted at UAMS.

5.    The first year of the Anesthesiology Residency Program consists of 12 one-month rotations through a variety of specialties in which Anesthesiologists are utilized. These one-month rotations include, but are not limited to, general surgery, family medicine, cardiology, etc. At the end of each one-month rotation, the intern is evaluated by his attending physician or physicians in that rotation. During the next three years, residents receive core training in the specialty of Anesthesiology, starting with those aspects of General Anesthesia and progressing to the subspecialty areas of Anesthesiology which build upon those skills and knowledge obtained in earlier resident experiences.

6.    I do not recall specifically interviewing Dr. Schwab, and I do not recall meeting him with specificity during the summer orientation sessions.

7.    My first clear recollection of meeting Dr. Schwab was on January 15, 2010. During this meeting, Dr. Jaffar and I conducted our semi-annual PGY-1 evaluation with Dr. Schwab. I have attached to this Declaration as Exhibit B-1, a true and correct copy of the semi-annual PGY-1 evaluation form that Dr. Jaffar completed and which I signed on January 15, 2010 at the conclusion of the evaluation. The only concern noted on the form is that Dr. Schwab's surgical service rotation at the V.A., which he was currently serving during the month of January, 2010, was very busy. The comments also state that the "work hours are OK." During this semi-annual evaluation, Dr. Schwab asked for help, but I

took this request to be help in an academic sense with regard to his surgical service rotation. At no time during our semi-annual evaluation did Dr. Schwab indicate to me or Dr. Jaffar that he had been diagnosed with ADHD, and Dr. Schwab did not ask for any form of accommodation for his ADHD.

8. In late February 2010, I spoke with Dr. Lawrence Kim, one of the surgeons that worked with Dr. Schwab during his V.A. surgical rotation in January. Dr. Kim indicated he was concerned about Dr. Schwab's attitude, disinterest, knowledge and apathy. After Dr. Kim visited me, on or about February 22 and 23, 2010, I spoke with other doctors who had worked with Dr. Schwab on the V.A. surgical service, specifically Drs. Mancino, Parnell, and Copeland.[1]

9. I have attached to this Declaration as Exhibit B-4, a true and correct copy of my notes made at the time I spoke with these physicians. The telephone notes indicate:

Mancino: "only resident I have failed . . ." _____ No reaction to hearing this information info.

Parnell: "I have never witnessed a resident with such disregard for a rotation . . .."

Chief Resident: ". . . disregard for attendings . . . (was given hints as to attending's favorite pimp topics . . . but he never took advantage of them)

After speaking with the surgeons involved in Dr. Schwab's January V.A. surgery rotation, Dr. Jaffar and I received a copy of Schwab's January surgery evaluation. (Exhibit G-1.) The evaluation raised such concerns that Dr. Jaffar and I wanted to talk to Dr. Schwab; we also wanted to discuss this situation with the Anesthesiology Clinical

[1] Dr. Daniel Copeland was the Chief Resident.

Competency Committee, an oversight group of anesthesiologist educators.  We also

received at this time information on Schwab's February rotation in cardiology under Dr.

Rajesh Sachdeva, a cardiologist with the John L. McClellan V.A. Hospital in Little Rock.

Dr. Sachdeva's evaluation of Dr. Schwab is attached to this Declaration as Exhibit B-7.

This document is made and kept in the ordinary course and scope of business at UAMS.

10. Dr. Jaffar and I met with Dr. Schwab on March 10, 2010.  We notified Dr. Schwab of his

failure on general surgery.  (Exhibit B-4, page 4.)  I relayed my discussions with Drs.

Kim, Parnell, Mancino and Copeland.  I proposed an immediate remediation plan of zero

tolerance or Dr. Schwab would be dropped from the program.  I also indicated that Dr.

Jaffar and I would present the situation to the Clinical Competency Committee later that

day.  I asked Dr. Schwab at this time if there were any personal issues that needed to be

addressed or did he desire to leave Arkansas, and he denied this.  During the March 10,

2010 meeting, Dr. Schwab neither indicated that he had an ADHD diagnosis, nor did he

request a reasonable accommodation for ADHD.

11. On March 10, 2010, Dr. Jaffar and I met with the Clinical Competency Committee.

(Exhibit F-1.)  Those Minutes indicate that ten Anesthesiologists were present at the

meeting, either in person or via telephone.  The Committee discussed possible action

plans, but the Committee voted unanimously to terminate Schwab's position

immediately.

12. On March 18, 2010, Dr. Jaffar and I informed Dr. Schwab through a letter that his

residency was terminated based upon the decision of the Clinical Competency Committee

and their review of the evaluations from V.A. general surgery and V.A. cardiology  I

have attached to this Declaration as Exhibit B-2, a true and correct copy of the letter

given to Dr. Schwab at the time of his termination.

13.     Under UAMS Graduate Medical Education Policy 1.420, a resident may be immediately

dismissed without prior notification in instances of "patient endangerment."  Based upon

the information received from the V.A. surgery rotation and the V.A. cardiology rotation,

it was under this provision that the Clinical Competency Committee, Dr. Jaffar, and I

made the decision to terminate Dr. Schwab.  ( Exhibit E-2.)

14.     On April 7, 2010, I received a letter from Dr. Schwab's attorney that he was appealing

his dismissal.  I have attached to this Declaration as Exhibit B-3, a true and correct copy

of the letter I received from Denise Hoggard on April 7, 2010.  Nowhere in that letter

does Schwab's counsel indicate that Schwab has ADHD or is requesting an

accommodation for ADHD.

15.     Pursuant to GME Policy 1.410, Dr. Martin, Dr. Jaffar, and I met with Dr. Schwab on

April 15, 2010 as an initial attempt to resolve his grievance.  I have attached to this

Declaration as Exhibit B-5, a true and correct copy of these notes of our April 15, 2010

meeting with Dr. Schwab.  At no time during the meeting did Dr. Schwab indicate that he

had a diagnosis of ADHD, nor did he request an accommodation for ADHD.

16.     After our meeting with Dr. Schwab on April 15, 2010, I sent Dr. Schwab a letter on April

20, 2010.  I have attached to this Declaration as Exhibit B-6, a true and correct copy of

the certified letter of April 20, 2010 that I sent Dr. Schwab.  Dr. Schwab then appealed

his dismissal to Dr. Fiser. (Exhibit D-1.)

17.    I participated in the grievance hearing and presented the evidence for Dr. Schwab's
       termination at the June 16, 2010 grievance hearing.  During the hearing, I heard for the
       first time that Dr. Schwab had a diagnosis of ADHD.

18.    The grievance panel decided by a vote of 4 to 2 that we had not followed GME Policy
       1.420.  (Exhibit D-6.)  Dr. Fiser upheld the grievance panel's decision.  (Exhibit D-7.)

19.    I called Dr. Schwab upon the receipt of Dr. Fiser's decision and pursuant to a
       conversation I had with Dr. Clardy to determine whether or not Dr. Schwab intended to
       return to the Anesthesiology Program at UAMS.  I do not recall the date of this telephone
       conversation.  Based upon Dean Fiser's June 30, 2010, letter I indicated to Dr. Schwab
       that we would allow him to return on probation to finish the required amount of training
       to receive credit for his PGY-1 year.  At that time, I did not know under what conditions,
       if any, Dr. Schwab might advance to the PGY-2 year, as that issue was not addressed in
       Dr. Fiser's June 30 letter.

20.    On July 6, 2010, I became aware that Dr. Schwab, through his lawyer, requested a
       reasonable accommodation for his disability during his completion of his PGY-1 year.
       (Exhibit E-6.)

21.    On July 6, 2010, I also became aware of an e-mail that Hoggard sent to Hagemeier with
       some specific questions regarding Schwab's return to his PGY-1 year.  (Exhibit E-7.)
       Due to the receipt of Hoggard's July 2 letter and her July 6 e-mail, Drs. Clardy, Jaffar and
       I conducted a telephone conversation with Dr. Schwab and his counsel on July 6, 2010.
       UAMS counsel, Mark Hagemeier, recapitulated that telephone conversation in a July 7,
       2010 letter.  (Exhibit E-3.)  On July 26, 2010, I received information that Dr. Schwab
       decided to not return to the UAMS Anesthesiology Program. (Exhibits D-10; D-11.)

22. I hereby declare that the preceding is true and correct to the best of my knowledge.

FURTHER SAYETH THE DECLARANT NOT.

Charles Napolitano, M.D. 04/23/2012
Date

**UAMS Anesthesiology Residency Program**
**SEMIANNUAL PGY1 EVALUATION FORM**

Every 6 months, each resident is required to meet with her/his faculty advisor ("preceptor") for a semiannual evaluation, to review the resident's progress in the program.
After meeting with your advisee in your semiannual meeting please return this form to the Residency Office (Slot # 515) by January 15th and June 15th.
Thank you.

**Resident:** Brian Schwab, D.O. **Period:** 1st 6 months (June –December 2009)

**Faculty Advisor/Preceptor:** Charles Napolitano, M.D. and Muhammad Jaffar, M.D.
Please check all that apply:

✓ I have met with Dr. Schwab. during this period for his/her semiannual evaluation, to discuss her/his progress in the program.
_____ I have reviewed the evaluations and other documentation sent to me by the Residency Office.

Concerns/comments: only on Surgical Service that have been very busy. but work hours are ok.

_____ I have reviewed the educational goals and objectives for this resident's PGY-level.

This resident:
_____ has met these educational goals and objectives
_____ is making good progress toward meeting these goals and objectives
_____ is having difficulty meeting these goals and objectives
_____ Specific goals as yet unmet:

_______________

_______________

_______________

NO This resident needs remediation and/or extra assistance in the following areas:

Has Taken Step III in December and waiting for results. No Issue of Concern except one episode.

**Resident Signature:** [signature] **Date:** 1/15/10
**Faculty Signature:** [signature] [signature] **Date:** 1/15/10

**EXHIBIT B-1**

DEF 0373



UAMS
COLLEGE OF MEDICINE
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

March 18, 2010

Brian Schwab, DO
PGY-1 House Staff

Dear Dr. Schwab:

On Wednesday March 10, 2010, Dr. Jaffar and I met with you to discuss performance-related issues that had occurred during your most recent General Surgery rotation at CAVHS. Following that meeting, further documentation was received from the General Surgery staff as well as the VA Cardiology staff. The Clinical Competence Committee of the Department of Anesthesiology met to review evaluations from your VA General Surgery rotation, evaluations from your VA Cardiology rotation, as well as evaluations from previous rotations. Although Dr. Jaffar and I presented a possible remediation program to the Clinical Competence Committee, the Committee decided, based upon further discussion and review of your academic performance during the 2009-2010 year to date, to terminate your appointment. The Committee's decision stems from your behavior noted by attending staff and physicians: a display of disinterest in learning, a lack of empathy for patients and their families, and a disrespectful attitude toward faculty attending physicians. All of these demonstrable behaviors fail to meet the ACGME Competencies of professionalism, patient care, and medical knowledge. Based upon the Clinical Competence Committee's review, its decision to terminate your appointment for cause is effective immediately.

Under the UAMS's institutional policy for "dismissal," the condition under which a resident leaves a program dictates whether or not academic credit may be awarded upon dismissal. As the Committee is terminating your residency for poor academic performance reasons, I can award you no credit for your academic work here at UAMS during the past year.

We regret to inform you of this decision by the Committee, but the decision was made in the interests of the Department of Anesthesiology, the medical profession and patient care.

Sincerely,

Charles A. Napolitano, MD, PhD
Professor and Program Director
Department of Anesthesiology

Muhammad Jaffar, MD, FACC
Professor and Residency Director
Chairman, Clinical Competence Committee
Department of Anesthesiology

Received by: Brian Schwab, DO

Date

**EXHIBIT B-2**

DEF 0289

April 7, 2009

*Via Hand-Delivery*
Dr. Napolitano
UAMS

**Re: Dr. Brian Schwab**

Dear Dr. Napolitano:

I am writing to you on behalf of Dr. Brian Schwab regarding his recent dismissal from the UAMS Residency Program in Anesthesiology pursuant to Step I under the University Grievance Policy, 1.410. Dr. Schwab's record does not merit the Clinical Competency Committee's immediate dismissal of Dr. Schwab from the program. Instead, in dismissing Dr. Schwab for insufficient academic performance, the Committee failed to follow the procedures mandated for dismissal in the University's policies. As a result of the Committee's actions, Dr. Schwab faces irreparable harm to his educational development and his career. I ask that you revisit this decision and reinstate Dr. Schwab to his position in the program.

The Committee's immediate dismissal of Dr. Schwab without the required dismissal procedures is not supported by the record in this case. According to Policy No. 1.420 of the Graduate Medical Education Committee, immediate dismissal is only warranted in very limited circumstances of "gross misconduct" including theft of money or property, physical violence, or being under the influence of alcohol or controlled substances while on duty. GME Policy 1.420. Dr. Schwab committed none of these violations. Instead, the Committee's stated reason for dismissal was poor academic performance in the surgery and cardiology rotations.

The Committee's dismissal of Dr. Schwab for unsatisfactory academic performance violates the University's mandatory policy and cannot stand. According to GME Policy 1.420, where dismissal is based on unsatisfactory performance, the Committee is required to first inform the resident of the unsatisfactory performance and a timeframe within which the resident will be given a chance to resolve the issue before dismissal will be instated:

**EXHIBIT B-3**

---

> When performance or conduct is considered sufficiently unsatisfactory that dismissal is being considered, the Program Director shall notify the resident with a written statement to include:
>
> a. reasons for the proposed action,
> b. the appropriate measures and timeframe for satisfactory resolution of the problem(s).

GME Policy 1.420 (emphasis in original). Notably, the requirement that the Committee provide the resident with written notification and an opportunity to improve his performance *before* dismissal is mandatory and is not subject to the Committee's discretion.

In this case, Dr. Schwab was not provided with the requisite written notification nor was he given any opportunity for improvement before the Committee dismissed him from the program. Indeed, the Committee's letter to Dr. Schwab identifies that he was first informed that his academic performance was in question on March 10, 2010, a mere eight days before the Committee sent the letter of formal dismissal. No written statement resulted from the March 10, 2010 meeting and no measures or timeframe for resolution of the problem was offered to Dr. Schwab. The Committee's failure to provide Dr. Schwab with notice and an opportunity to respond to the charges before terminating him from his contractual position with UAMS violated his due process rights.

Furthermore, Dr. Schwab's academic performance did not merit dismissal. According to the Committee, Dr. Schwab's termination was based on "a display of disinterest in learning, a lack of empathy for patients and their families, and a disrespectful attitude toward faculty-attending physicians." However, these comments all came from one evaluation of Dr. Schwab from his Surgery rotation. Prior to the surgery rotation, Dr. Schwab had received numerous favorable reviews from his other rotations, including, "Pleasant, cooperative, interested in learning" from the August MICU rotation, "clearly an intelligent and caring physician" from Dr. Ezell's September rotation, "Kind caring willing member of the healthcare team" from his October evaluation, and "Dr. Schwab quickly learned the terminology of the subspecialty and expanded his focused clinical histories and examinations as to pulmonary diseases from his November rotation. Furthermore, the Committee did not solicit any information from Dr. Schwab's current attending physician to inquire as to his performance on this rotation. The Committee's failure to give Dr. Schwab appropriate notice and opportunity to respond or improve his performance is in violation of University policies, UAMS's contractual rights, UAMS's academic responsibilities and Dr. Schwab's due process rights.

---

Finally, as a result of the Committee's decision, Dr. Schwab faces severe and irreparable harm to his educational development and his career. In addition to the loss of his compensation for his residency work, Dr. Schwab may not be able to resume his medical training for over a year's time. The timing of the Committee's decision ensures that Dr. Schwab will not be able to transfer to another anesthesiology without spending a significant period of time out of the medical profession. Dr. Schwab had already been offered and accepted a renewal on his contract, less than two months before the Committee's dismissal. As a result of his renewal, Dr. Schwab had not investigated the possibility of transferring to any other medical program and was relying on the University's representations that it would continue his employment in the UAMS residency program. Furthermore, because the Committee's dismissal occurred after the cutoff date for matching with other residency programs, Dr. Schwab was denied the opportunity to transfer to another program to minimize the damage to his educational development and medical career. Consequently, as a result of the Committee's dismissal of Dr. Schwab, Dr. Schwab faces the prospect of spending over a year outside of a residency program.

Because the Committee violated Dr. Schwab's rights to notice and an opportunity to respond to and correct any perceived insufficiencies in his academic performance, and as a result of the Committee's summary dismissal of Dr. Schwab, Dr. Schwab now faces significant economic and educational harm.

In compliance with the UAMS grievance procedure, please accept this letter as Step I to appeal the dismissal. Further, if you deem this letter inadequate to meet the UAMS appeal procedure, please let me know so I can timely and properly address any deficiency. Finally, if you would benefit from additional information or statements, please let me know and I will be happy to comply with your requests if possible to do so.

Sincerely,

CHISENHALL, NESTRUD & JULIAN, P.A.

COPY

Denise Reid Hoggard

DRH/hgm
cc: Dr. Brian Schwab

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu

UAMS
COLLEGE OF MEDICINE
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

1/15/10 – Brian met with Jaffar & me... for Bi-annual PGY-1 review
• Brian noted slow start in Surgery rotation.

**University of Arkansas for Medical Sciences**
4301 W. Markham St., #515
Little Rock, Arkansas 72205

**EXHIBIT B-4**

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu

UAMS
COLLEGE OF MEDICINE
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

2010

Following visit by Dr. Larry Kim concern my PGY-1 (Brian Schwab) c/o attitude, disinterest, knowledge... apathy ("I will look it up" — std answer)
I spoke to Drs. Mancuso, Parnell & Chief Residents:

(2/22-23 "interviews)
Mancuso: "only resident I have fail..." noted no reaction to hearing this info.

Parnell: "I have never witnessed a resident with such disregard for a rotation..."

Chief Residents: ... disregard for attendings...
(... was given hints as to attendings favorite pimp topics ... but he never took advantage of them.)

**University of Arkansas for Medical Sciences**
4301 W. Markham St., #515
Little Rock, Arkansas 72205

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu

UAMS
COLLEGE OF MEDICINE
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

3/10/10 @ 12:10 hr

- Dr. Jaffar & I met with Brian Schub
- notified him of the GS eval for VA per [illegible] content of us
  - told of the failure

- discussed my f/u [illegible] with GS faculty (Kim, Powell, Mesa & ? chief resident), relayed specific incidents (e.g., Powell SOT [illegible]) which Dr. Schub did not remember!

- proposed an immediate remediation plan of zero-tolerance else dismissal that I would present to the CCC later today
  - he apologized for embarrassing the department & me and promised that no further negative comments would follow

- (told him he should have come to us if worry) need for help
- We asked if there were issues (personal) or desire to leave AR — denied

- (stated that it was a busy month & that he) had complaints toward GS

**University of Arkansas for Medical Sciences**
4301 W. Markham St., #515
Little Rock, Arkansas 72205

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu

3/3/10 –
Met with Mark Hagemeier
"clear cut"
· failed rotation (outside objective)
· unprofessional behavior
[Do Not Renew]

* will meet with departmental CCC
next week (3/10/10).

**University of Arkansas for Medical Sciences**
4301 W. Markham St., #515
Little Rock, Arkansas 72205

**Charles A. Napolitano, M.D., Ph.D.**
Professor & Program Director
Director, Division of Cardiothoracic Anesthesia

501-686-6141
501-688-2775 (pager)
501-686-7059 (fax)
napolitanocharlesa@uams.edu

**UAMS**
COLLEGE OF MEDICINE
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

3/18/10 @ 1330

Call Eric Delgiacco
(VA MSO [illegible])
to inform him of Brian Schultz
our decision to terminate
for cause

Delgiacco stated that Brian was
having a good [illegible] ([illegible]),
was told by Brian that he was
on "secret probation",
noted that he appeared "disheveled"
at times "like he had ETOH on"
(no smell of ETOH noted)

I told him that Monday coverage
would occur; Eric said today &
rest of week was ok.

April 16, 2010

My "bullet point" account of the April 15th meeting with Brian Schwab, DO:

- I had a relaxed conversation with Brian prior to the arrival of Drs. Martin and Jaffar. We spoke about the pollen/weather in LR, his travels home to Pennsylvania (outside Philadelphia), my home town in RI and the recent floods...
- At the start of the meeting I asked Brian what were his goals for this meeting since he has grieved our decision of termination. He stated that he wanted reinstatement and a chance to prove himself...given he was not given due process ("only knew of a problem on March 8th when Jaffar and I met with him").
- I explained that following a review of his evaluations/ interviews with the evaluators who confirmed their assessments/appraisals that we had decided to offer him the option of resigning; an option that would give him better opportunity for future employment; and that his resignation letter (dated March 18, 2010) would replace the March 18th letter of termination.
- Brian stated that such a letter would be no better than the other..."it would still lose my year of eligibility...and that other Program Directors had told him that this type of action was unprecedented...no due process."
- The conversation by me and Jaffar then revolved around the fact that he had been told of issues since the Fall either via evaluation/rotation feedback...and that Jaffar's meeting with him in the fall, our January mid-year meeting addressed the issues of his lack of interest. I admitted that at those times we did not appreciate the magnitude of the problem but that he did not tell us of the ongoing problems he was still having during his month in Surgery....
- Brian tried to dismiss the January Surgery events as non-events, weigh any issue with Cardiology to being sick one day, and...
- I repeated somewhere that the behavior displayed during the Surgery rotation despite the feedback given to him by the attending/upper level residents was disturbing, "unprecedented" in our 10 years as residency directors, and not in line with that of a physician and anesthesiologist....that we are receiving "second hand" information as opposed to working with him directly as a CA-1 in our service but that he still is a physician ...and we need to protect our patients, him, and or profession/department. Brian acknowledged our issues...
- At the end of the meeting time I asked Dr. Martin if he wanted to add anything and he said that as one of 5 members of the CCC residing at ACH who were read his evaluations over speaker phone all saw "red flags" and issues for immediate termination for the sake of patient care and the profession; he stated that medical education, especially for anesthesia training is expensive and that we need to identify those who are not appropriate as early as possible.
- Brian seemed to agree with all our points except that none were applicable to him (he clearly does not see a problem in himself).
- I closed the meeting confirming that he refuses our offer and that the grieving process will continue....Brian agreed.
- I shook Brian's hand (his hand was very warm compared to mine) and he left.

Charles A. Napolitano, MD, PhD
Professor and Program Director of Anesthesiology

**EXHIBIT B-5**

Domestic Mail Only; No Insurance Coverage Provided
For delivery information visit our website at www.usps.com
OFFICIAL USE

| | |
|---|---|
| Postage | $ .61 |
| Certified Fee | 2.80 |
| Return Receipt Fee (Endorsement Required) | 2.30 |
| Restricted Delivery Fee (Endorsement Required) | 4.50 |
| Total Postage & Fees | $ 10.21 |

Postmark Here

Sent To Brian Schwab D.O.
Street, Apt. No.; or PO Box No. 820 N. Spruce, Apt #A
City, State, ZIP+4 L.R. AR 72205

PS Form 3800, August 2006 See Reverse for Instructions

7009 0820 0000 2213 6844

UAMS
COLLEGE OF M
DEPARTMENT OF ANES
UNIVERSITY OF ARKANSAS FOR MED

7009 0820 0000 2213 6844

April 20, 2010
**Via USPS-Restricted Delivery**

Brian Schwab, D.O.
820 N. Spruce
Apt A
Little Rock, AR 72205

Re: Initial Attempt of Resolution at Grievance

Dear Dr. Schwab:

I am writing this letter to confirm your position following the meeting between you, me, ~~Dr. Muhammad Jaffar and Dr. Timothy Martin on Thursday, April 15, 2010. The~~ meeting was held pursuant to GMEC Policy No. 1.410, Adjudication of Resident Grievances. Specifically, the meeting was our initial attempt to resolve your grievance filed under Step I of Policy 1.410.

At our meeting, I reviewed the chronology of events and meetings that led up to your most recent evaluations from your January surgery rotation at the Veteran's Administration. Drs. Jaffar, Martin and I offered to have you submit a letter of resignation, post-dated March 18, 2010, to submit in lieu of your letter of termination presented to you by me on that date. You rejected our offer to submit a letter of resignation and indicated that you would continue the grievance process with the desired outcome of reinstatement into the Anesthesiology Residency Program with a trial/probationary period. Should my understanding of your rejection of our offer to submit a resignation letter be in error, please notify me immediately by either email or letter.

As we have failed to resolve your grievance at Step I of Policy No. 1.410, you may file a formal grievance with Dean Debra Fiser within ten (10) working days of your receipt of this letter. The Dean will assume you have received this letter in three business days;

**EXHIBIT B-6**

thus, your formal grievance to the Dean under Step II of Policy No. 1.410 will be due on or before May 7, 2010. I have enclosed a copy of Policy No. 1.410 for your review.

Sincerely,

Charles A. Napolitano, MD, PhD
Professor and Program Director of Anesthesiology
Director, Division of Cardiothoracic Anesthesiology
College of Medicine
UAMS

Cc: (w/o enclosure)
Dr. Muhammad Jaffar
Dr. Timothy Martin
Jeff Bell
Dr. Debra Fiser
Mark A. Hagemeier
Dr. James Clardy



ATTENDING'S EVALUATION OF ANESTHESIOLOGY PGY-1 INTERN

**Evaluator:** Sachdeva, Rajesh **Subject:** Schwab, Brian Richard

Evaluation Dates: 2/1/2010 to 2/28/2010

1 = Consistent significant deficits. 2 = Below standard & inconsistent more than 30% of time. 3 = Clearly satisfactory; meets standard at training level. 4 = Exceed standard more than 50% time. 5 = Consistently & significantly superior. Please rank the intern, using the above scale. Please mark "N/A" if you are unable to evaluate.

---

*PATIENT CARE*

1) Demonstrates caring behavior toward patients and their families

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ○ | ● | ○ | ○ | ○ |

2) Collects clinical data resulting in a diagnosis reflects patient's clinical condition

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ● | ○ | ○ | ○ | ○ |

3) Performs procedures competently and safely.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ● |

*MEDICAL KNOWLEDGE*

4) Demonstrates appropriate medical knowledge when caring for patients.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ● | ○ | ○ | ○ | ○ |

5) Demonstrates ability to apply medical knowledge to solve clinical problems.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ● | ○ | ○ | ○ | ○ |

*PRACTICE-BASED LEARNING AND IMPROVEMENT*

6) Seeks and incorporates feed back to improve clinical skills.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ○ | ● | ○ | ○ | ○ |

7) Facilitates the learning of students and colleagues.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ○ | ● | ○ | ○ | ○ |

*INTERPERSONAL AND COMMUNICATION SKILLS*

8) Listens and communicates effectively with patients and other health care professionals.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ● | ○ | ○ | ○ | ○ |

EXHIBIT B-7

9) Works as an effective member of the health care team.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ● | ○ | ○ | ○ | ○ |

***PROFESSIONALISM***

10) Available, punctual, and willingly accepts patient care responsibilities.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ○ | ● | ○ | ○ | ○ |

11) Demonstrates respectful, ethical, and culturally sensitive clinical practice.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ● |

***SYSTEMS-BASED PRACTICE***

12) Practice cost-effective health care in coordination with other health care providers.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ● |

13) Provides quality care in a timely and effective manner.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ● |

14) Can effectively organize transfer of patient care to other medical services

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|---|
| ○ | ○ | ○ | ○ | ○ | ● |

***GENERAL***

15) Do you wish to speak with the Anesthesiology Residency Director about this resident?

| YES | NO | N/A |
|---|---|---|
| ● | ○ | ○ |

Overall Comments:
Brian was present in majority of the morning rounds in CCU. One time he left at 5pm without presenting the consults he had seen as I was busy in the cath lab. From the start on this rotation, there was something unusal about him. During rounds, even though he was there but I somehow felt that he was never attentative enough. When asked a question, he will be lost. This was very different from other residents and I had instructed my fellow to make sure that he supervises all of his consults and checks the facts with the patients prior to presentation. I had a chance to discuss with the Program Director and somehow sensed that he was not the star. After the consults are discussed, he wrote notes and in those notes at times he will write verbage that will reflect some degree of rudeness from a consultant even though nothing will be expressed from my side. I had decided really very early in the rotation that my note should be in the chart regrading recommendation, so no issues would be raised from the other hospital services.

Evaluation Submitted on 3/11/2010 10:26:45 PM EST.

New Innovations, Inc. ©1995-2010