IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION


BRIAN SCHWAB, D.O.,                                    PLAINTIFF,


V.                                    CASE NO. 4:11-cv-00011-BSM


UNIVERSITY OF ARKANSAS, ET AL.,                          DEFENDANTS.


DECLARATION OF MUHAMMAD JAFFAR, M.D.

1.      My name is Muhammad Jaffar.  I am a professor in Anesthesiology at the University of

        Arkansas for Medical Sciences.  I received my undergraduate degree from Formen

        Christian College, Lahore, Pakistan in 1982. I received my medical degree from UTESA

        University, Santo Domingo, D.R in 1986.  I became an assistant professor at UAMS in

        1998.  I was promoted to an associate professor in 2004 and a full professor in 2009. My

        specialty is Advanced and Trauma anesthesiology and Critical Care Anesthesiology.

2.      In 2001, I became the Co-Residency Program Director along with Dr. Charles

        Napolitano.  Thus, I have been involved in resident education since 1998.

3.      I do not recall specifically interviewing Dr. Schwab, and I do not recall meeting him with

        specificity during the summer orientation sessions.

4.      I met with Brian Schwab after our office received an evaluation from Dr. Ezell on

        November 16, 2009.  I have attached to this Declaration as Exhibit C-2, a true and correct

        copy of Dr. Ezell's evaluation that we received on November 16, 2009.  This document is

        kept in the ordinary course and scope of business at UAMS and is utilized in resident

        evaluation and training.  Based upon the comments of Dr. Ezell, I had a meeting with Dr.

Schwab that same day, that is, November 16, 2009. We discussed the evaluation that Dr. Ezell submitted to Anesthesiology, as well as other matters. During our November 16, 2009 meeting, Dr. Schwab did not tell me that he had a diagnosis of ADHD, and he did not ask for any type of accommodation related to an ADHD diagnosis.

5.    I also met with Dr. Schwab on January 15, 2010. During this meeting, Dr. Napolitano and I conducted our semi-annual PGY-1 evaluation with Dr. Schwab. Attached to Dr. Napolitano's Declaration as Exhibit B-1, is a true and correct copy of the semi-annual PGY-1 evaluation form that I completed and which I signed on January 15, 2010 at the conclusion of the evaluation. The only concern noted on the form is that Dr. Schwab's surgical service rotation at the V.A., which he was currently serving during the month of January, 2010, was very busy. The comments also state that the "work hours are OK." During this semi-annual evaluation, Dr. Schwab asked for help, but I took this request to be help in an academic sense with regard to his surgical service rotation. At no time during our semi-annual evaluation did Dr. Schwab indicate to me or Dr. Napolitano that he had been diagnosed with ADHD, and Dr. Schwab did not ask for any form of accommodation for his ADHD.

6.    Dr. Napolitano and I met with Dr. Schwab on March 10, 2010. We notified Dr. Schwab of his failure on general surgery and poor performance during cardiology rotation. We proposed an immediate remediation plan with internal probation of zero tolerance and if he did not improve he would be dropped from the program. We also indicated that Dr. Napolitano and I would present his evaluations to the Clinical Competency Committee later that day. We asked Dr. Schwab at this time if there were any personal issues that needed to be addressed or did he desire to leave Arkansas, and he denied this. During the

March 10, 2010 meeting, Dr. Schwab neither indicated that he had an ADHD diagnosis, nor did he request a reasonable accommodation for ADHD.

7. On March 10, 2010, Dr. Napolitano and I met with the Clinical Competency Committee. ( Exhibit F-1.) Those Minutes indicate that ten Anesthesiologists were present at the meeting, either in person or via telephone. The Committee discussed possible action plans, but the Committee voted unanimously to terminate Schwab's position immediately due to patient endangerment.

8. On March 18, 2010, Dr. Napolitano and I informed Dr. Schwab through a letter that his residency was terminated based upon the decision of the Clinical Competency Committee and their review of the evaluations from V.A. general surgery and V.A. cardiology. Attached to Dr. Napolitano's Declaration as Exhibit B-2, is a true and correct copy of the letter given to Dr. Schwab at the time of his termination. Dr. Napolitano and I met with Dr. Schwab and gave him this termination letter along with the post-termination grievance policy. (Exhibit E-2.)

9. Under UAMS Graduate Medical Education Policy 1.420, a resident may be immediately dismissed without prior notification in instances of "patient endangerment." Based upon the information received from the V.A. surgery rotation and the V.A. cardiology rotation, it was under this provision that the Clinical Competency Committee, Dr. Napolitano, and I made the decision to terminate Dr. Schwab. (Exhibit E-2.)

10. Pursuant to GME Policy 1.410, Dr. Martin, Dr. Napolitano, and I met with Dr. Schwab on April 15, 2010 as an initial attempt to resolve his grievance. At no time during the meeting did Dr. Schwab indicate that he had a diagnosis of ADHD, or did he request an accommodation for ADHD.

11. After our meeting with Dr. Schwab on April 15, 2010, Dr. Napolitano sent Dr. Schwab a letter on April 20, 2010. (Exhibit B-6.) Dr. Schwab then appealed his dismissal to Dr. Fiser. (Exhibit D-1.)

12. I participated in the grievance hearing by testifying as to what I knew of the situation. At this hearing was the first time I heard Dr. Schwab state that he had an ADHD diagnosis.

13. The grievance panel decided by a vote of 4 to 2 that we had not followed GME Policy 1.420. Dr. Fiser upheld the grievance panel's decision. (Exhibit D-7.)

14. On July 6, 2010, I became aware that Dr. Schwab, through his lawyer, requested a reasonable accommodation for his disability during his completion of his PGY-1 year. (Exhibit E-6.)

15. On July 6, 2010, I also became aware of an e-mail that Hoggard sent to Hagemeier with some specific questions regarding Schwab's return to his PGY-1 year. (Exhibit E-7.) Due to the receipt of Hoggard's July 2 letter and her July 6 e-mail, Drs. Clardy, Napolitano and I conducted a telephone conversation with Dr. Schwab and his counsel on July 6, 2010. UAMS counsel, Mark Hagemeier, recapitulated that telephone conversation in a July 7, 2010 letter. (Exhibit E-3.) On July 26, 2010, I received information that Dr. Schwab decided to not return to the UAMS Anesthesiology Program. (Exhibits D-10; D-11.)

16. I hereby declare that the preceding is true and correct to the best of my knowledge.


FURTHER SAYETH THE DECLARANT NOT.


_____         04-16-2012
Muhammad Jaffar, M.D.                          Date

**Muhammad Jaffar, M.D., FCCM, FCCP**
Professor & Residency Director

501-686-8548
501-686-7059 (fax)
jaffarmuhammad@uams.edu

**UAMS**

**COLLEGE OF MEDICINE**
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

November 16th 2009.

I met with Dr. Schwab at lunch time to discuss his evaluations especially regarding two issues
(1) Lack of interest in Speciality
(2) unprepared for rounds and unprofessional behavior.
He listened to me very Calmly and understood the concerns that other Services had.
His explanation was that he is not going to do this rest of his life as being anesthesia resident ( No Primary Care)
So he was not much interested in it.

But we discussed in detail for 30 minutes that it is required of the residency Program and all interns have to Complete a Successful intern year to be Promoted to next level. He Promised that he will be more interested in his work and will Change his attitude towards other Specialities

University of Arkansas for Medical Sciences
4301 W. Markham St., #515
Little Rock, Arkansas 72205

**EXHIBIT C-1**

DEF 0382

**Muhammad Jaffar, M.D., FCCM, FCCP**
Professor & Residency Director

**UAMS**

COLLEGE OF MEDICINE
DEPARTMENT OF ANESTHESIOLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

501-686-8548
501-686-7059 (fax)
jaffarmuhammad@uams.edu

and will be prepared for his
rounds as well as show
interest in his work.
With that note we adjourn
our meeting and will meet
again on as needed basis.

University of Arkansas for Medical Sciences
4301 W. Markham St., #515
Little Rock, Arkansas 72205



ATTENDING'S EVALUATION OF ANESTHESIOLOGY PGY-1 INTERN
**Evaluator:** Ezell, Gerry   **Subject:** Schwab, Brian Richard
Evaluation Dates: 9/1/2009 to 9/30/2009

1 = Consistent significant deficits. 2 = Below standard & inconsistent more than 30% of time. 3 = Clearly satisfactory; meets standard at training level. 4 = Exceed standard more than 50% time. 5 = Consistently & significantly superior. Please rank the intern, using the above scale. Please mark "N/A" if you are unable to evaluate.

*PATIENT CARE*

1) Demonstrates caring behavior toward patients and their families

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ○ | ○ | ● | ○ |

2) Collects clinical data resulting in a diagnosis reflects patient's clinical condition

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ● | ○ | ○ | ○ |

3) Performs procedures competently and safely.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ○ | ○ | ○ | ● |

*MEDICAL KNOWLEDGE*

4) Demonstrates appropriate medical knowledge when caring for patients.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ● | ○ | ○ | ○ |

5) Demonstrates ability to apply medical knowledge to solve clinical problems.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ● | ○ | ○ | ○ |

*PRACTICE-BASED LEARNING AND IMPROVEMENT*

6) Seeks and incorporates feed back to improve clinical skills.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ● | ○ | ○ | ○ | ○ |

7) Facilitates the learning of students and colleagues.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ● | ○ | ○ | ○ |

*INTERPERSONAL AND COMMUNICATION SKILLS*

8) Listens and communicates effectively with patients and other health care professionals.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ● | ○ | ○ | ○ | ○ |

9) Works as an effective member of the health care team.                    **EXHIBIT C-2**

https://rms1.newinnov.com/EvaluationForms/EvaluationFormsHost.aspx?Control=Question    4/2/2010

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ◉ | ○ | ○ | ○ |

*PROFESSIONALISM*

10) Available, punctual, and willingly accepts patient care responsibilities.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ○ | ○ | ◉ | ○ |

11) Demonstrates respectful, ethical, and culturally sensitive clinical practice.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ◉ | ○ | ○ | ○ |

*SYSTEMS-BASED PRACTICE*

12) Practice cost-effective health care in coordination with other health care providers.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ◉ | ○ | ○ | ○ |

13) Provides quality care in a timely and effective manner.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ |

14) Can effectively organize transfer of patient care to other medical services

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ○ | ◉ | ○ | ○ |

*GENERAL*

15) Do you wish to speak with the Anesthesiology Residency Director about this resident?

| YES | NO | N/A |
|-----|----|----|
| ○ | ◉ | ○ |

Overall Comments:
Dr. Schwab frankly had a disappointing month. He is clearly an intelligent and caring physician, but his major problem is his "know-it-all" attitude. He did the things he was instructed to do, for the most part, but his attitude over the month was one of clearly resenting being instructed. He has some very admirable attributes. He was always here early and stayed late without complaint. He worked hard, and seemed to learn a few things. He left the service on the final day before a formal checkout evaluation could be done.

Evaluation Submitted on 11/16/2009 10:52:10 AM EST.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

BRIAN SCHWAB, D.O.,                                    PLAINTIFF,

V.                              CASE NO. 4:11-cv-00011-BSM

UNIVERSITY OF ARKANSAS, ET AL.,                       DEFENDANTS.

---

## DECLARATION OF DEBRA H. FISER, M.D.

1.   My name is Debra H. Fiser.  I am the Dean of the College of Medicine at the University
     of Arkansas for Medical Sciences.  I have been the Dean of the College of Medicine and
     a Vice Chancellor at UAMS since September 2006.  Prior to becoming Dean of the
     College of Medicine at UAMS, I served for 11 years as a professor and Chair of the
     Department of Pediatrics at UAMS.

2.   I obtained my undergraduate degree from the University of Arkansas at Fayetteville and
     received my medical degree from UAMS College of Medicine in 1977.

3.   On or about April 28, 2010, I received Dr. Schwab's letter of appeal under UAMS GME
     Policy 1.410.  I have attached to this Declaration as Exhibit D-1, a true and correct copy
     of the letter I received.

4.   Via letter dated June 1, 2010, I informed Dr. Schwab that his grievance hearing would be
     scheduled for June 16, 2010.  I have attached to this Declaration as Exhibit D-2, a true
     and correct copy of that letter.  In this letter I indicated that all documents to be utilized at
     the hearing should be provided to my assistant, Carolyn Johnson, no later than June 8,
     2010.

---

Declaration of Debra H. Fiser, M.D.                **EXHIBIT D**                Page  1

5.      I did receive from Dr. Schwab documents that he wished to utilize at the grievance hearing. I have attached to this Declaration as Exhibit D-3, a true and correct copy of a Table of Contents of the documents that Dr. Schwab submitted for his grievance hearing.

6.      Among other document submitted by Dr. Schwab, he included a Help Guide on Adult ADD/ADHD and an EEOC Enforcement Guide. I have attached to this Declaration as Exhibit D-4, the Help Guide, and I have attached to this Declaration as Exhibit D-5, the EEOC Enforcement Guide. Based upon my personal knowledge of this situation, these two articles were the first time that Dr. Schwab ever indicated in any way that he had Adult ADHD. None of the materials submitted by Dr. Schwab to me contained a diagnosis of his ADHD, or made specific requests for accommodations with regard to his ADHD.

7.      Dr. Clardy, as my designee, assembled the grievance panel and conducted those proceedings pursuant to GME Policy 1.410. (Exhibit E-1.)

8.      Pursuant to GME Policy 1.410, the grievance panel rendered its decision by letter dated June 17, 2010. The grievance panel rendered a split decision of 4 to 2. Four panel members voted that the Department of Anesthesiology had not followed GME Policy 1.410 and two panel members voted that they felt that the policy was followed. I have attached to this Declaration as Exhibit D-6, a true and correct copy of the grievance panel's decision.

9.      Pursuant to GME Policy 1.410, I received the grievance panel's letter and recommendation, and I drafted my decision regarding Dr. Schwab's appeal. I have attached to this Declaration as Exhibit D-7, a true and correct copy of the letter I prepared

accepting the grievance panel's determination.   In that letter, I noted that the grievance

panel proposed two "potential" remediation options:

(1)      giving Dr. Schwab the option to resign from the program; or

(2)      allowing him to return on probation to finish the required amount of

training to receive credit for his PGY-1 year.

In my letter I directed that I expected "Dr. Napolitano and the Department of

Anesthesiology to create any reasonable supervision and remediation plant that they

believed would allow Dr. Schwab to finish his PGY-1 year and ensure patient safety."

10.     On July 9, 2010, I received a letter from Schwab's attorney, Denise Hoggard.   I have

attached to this Declaration as Exhibit D-8, a true and correct copy of this letter.  In sum,

Dr. Schwab was requesting a four-month remediation plan, as opposed to a six-month

remediation plan proposed by Dr. Napolitano and the Department of Anesthesiology.

11.     On July 13, 2010, I responded to Ms. Hoggard's July 9, 2010 letter.  I have attached to

this Declaration as Exhibit D-9, a true and correct copy of that letter.   In that letter, I

indicated that I had reviewed Mark Hagemeier's letter of July 7, 2010.  (Exhibit E-3.)  I

informed Ms. Hoggard that I understood the concerns that she raised, but that "those

concerns must be weighed against the need of Dr. Napolitano and Dr. Jaffar to ensure

patient safety, and weighed against the educational mission of the UAMS Department of

Anesthesiology."  I did not find the plan outlined by Drs. Napolitano and Jaffar to be

unreasonable.

12.     On Monday, July 26, 2010, I received a letter from Dr. Schwab.  I have attached to this

Declaration as Exhibit D-10, a true and correct copy of that letter.   This letter was faxed

to my office and I received it upon my return to work on Monday morning, July 26, 2010.

Dr. Schwab indicated that he would not be returning to the Anesthesiology Program here at UAMS.

13. On July 26, 2010, I wrote a letter to Dr. Schwab in response. I have attached to this Declaration as Exhibit D-11, a true and correct copy of my letter to Dr. Schwab. In preparing my letter to Dr. Schwab, I reviewed a letter from UAMS counsel, Mark Hagemeier, sent to Dr. Schwab's attorney, Denise Hoggard. (Exhibit E-5.)

14. Based upon my knowledge and review of the issues presented in Dr. Schwab's case, it is my understanding that Dr. Schwab never specifically told Dr. Napolitano or Dr. Jaffar, or any other attending physician, that he had a diagnosis of ADHD prior to his termination. It is my further understanding that Dr. Schwab never requested an accommodation based upon his ADHD diagnosis prior to his termination. It is my understanding that the first time Dr. Schwab indicated in any way his ADHD diagnosis was with his submissions to the grievance panel, and at this point in time Dr. Schwab had been terminated from the Anesthesiology Program.

15. I hereby declare that the preceding is true and correct to the best of my knowledge.

FURTHER SAYETH THE DECLARANT NOT.

_Debra H. Fiser_                                    4-16-12
Debra H. Fiser, M.D.                                Date
Dean, College of Medicine

April 28, 2010

*Via Facsimile 686-8160*

Debra H. Fiser, M.D.
Dean, College of Medicine
University of Arkansas for Medical Sciences

**Re:   Brian Schwab, M.D.**

Dear Dr. Fiser:

I am writing to you on behalf of Dr. Brian Schwab regarding his recent dismissal from the UAMS Residency Program in Anesthesiology pursuant to Step 2 under the University Grievance Policy, 1.410. Dr. Schwab met and conferred with Charles Napolitano, M.D., Tim Martin, M.D., and Muhammed Jaffar on April 15, 2010.  No resolution was reached in Step 1.

Enclosed please find the initial appeal letter addressed to Dr. Napolitano which I am submitting as part of Dr. Schwab's appeal under Step 2.

Sincerely,

CHISENHALL, NESTRUD & JULIAN, P.A.



Denise Reid Hoggard

Encl:   Letter to Dr. Napolitano, April 7, 2010
cc:     Dr. Brian Schwab
        Jeff Bell
        Mark Hagemeier

**EXHIBIT D-1**

**FROM :Brian R. Schwab, D.O.**
1154 Municipal Road
Lehighton, PA 18235

July 26, 2010

**TO :Debra H. Fiser, M.D.**
Dean, College of Medicine
University of Arkansas for Medical Sciences
4301 W. Markham St. #550
Little Rock, AR 72205-7199

Fax 501-686-8407

# FAX COVER SHEET

Re: See Attached Letter

<u>**EXHIBIT  D-10**</u>

**Brian R. Schwab, D.O.**
1154 Municipal Road
Lehighton, PA 18235

July 26, 2010

Debra H. Fiser, M.D.
Dean, College of Medicine
University of Arkansas for Medical Sciences
4301 W. Markham St. #550
Little Rock, AR 72205-7199

Via Certified Mail and Fax 501-686-8407

Dear Dr. Fiser:

Thank you your consideration of my attorney's requests in your letter of July 13, 2010, which she received on July 21, 2010. I recognize that you have agreed that I should receive six months credit for my first six months of PGY1, but otherwise agreed to the recommendations of my program directors in their entirety.

As you are aware, I suffer from AD/HD. I had requested as early as mid-January reasonable accommodations and assistance from my program directors during my surgery rotation when I perceived I had problems, but had received none. I believe my illness is what caused the problems during this rotation. Clearly my program directors did not do their job by waiting over two months to address the issue and then rather than address it, they terminated me. Prior to my remediation program's pronouncement by my program directors, I had even sought input into it so it might address my disability, but that request through my attorney to Mark Hagemeir was ignored by my program directors.

Regardless, since then through my attorney, I again asked informally and formally for accommodation by UAMS under the Americans for Disability Act, but as of this date the informal response to my attorney has indicated UAMS will only follow ACGME guidelines. It appears that UAMS will not make any accommodations other than what Dr. Napolitano outlined in his remediation program of excluding surgery rotations at the VA and meeting him monthly. I did not receive a formal response to my recent formal ADA request that Mr. Hagemeier promised by July 22, 2010, but yet I am supposed to start within a week. I see this as too little consideration is being given for any accommodation and this leads me to believe the plan proposed by my program directors and UAMS is not being proposed in good faith. Simply it ignores my underlying medical condition and treats me as any other failing student without looking at the underlying causation, my AD/HD , which UAMS has not addressed in any meaningful way since January. My condition will not go away. Why UAMS has refused to address it since January is puzzling--yet it wants me to come back without knowing about any accommodation.

I do not believe this is practical and to return to this program without reasonable accommodation, such as I proposed, with a mentor and fixed guidelines for hours and on-call similar to statutory law in New York state, I believe to do so would be only a course for my professional failure.

Accordingly, I will not return for those reasons.

Sincerely,

Brian R. Schwab, D.O.


BRS/

CC: Denise Hoggard, Esquire

4301 W. Markham St., #550
Little Rock, AR 72205

501-686-5350
501-686-8160 (fax)
FiserDebraH@uams.edu

www.uams.edu





COLLEGE OF MEDICINE

UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

July 26, 2010

Brian Schwab, M.D.
1154 Municipal Rd
Lehighton, PA  18235

Dear Dr. Schwab:

I received your faxed letter dated July 26, 2010.  As the body of your letter appears to contend that the Office of General Counsel did not respond with alacrity to your request(s) for reasonable accommodations under the ADA, I forwarded your letter on to Mark Hagemeier.  Mr. Hagemeier wrote a letter to your counsel, Denise Hoggard, in response, and I have enclosed his letter for your review.

In response to your letter, I note that my office has worked closely with the Office of General Counsel and Dr. Clardy, the Associate Dean for Graduate Medical Education at UAMS, since the receipt of the Grievance Panel's recommendations to fully reintegrate you into your PGY-1 year in the Anesthesiology Department.  Regardless, your letter of July 26, 2010 indicates you are not returning to the Anesthesiology Department residency program to complete your PGY-1 year, and I will notify Dr. Napolitano of your decision. I wish you the best as you continue your medical education in the future.

Very truly yours,

Debra H. Fiser, M.D.
Dean, College of Medicine
Vice Chancellor, UAMS

Enclosure

cc:     James A. Clardy, M.D.
        Charles A. Napolitano, M.D.
        Muhammad Jaffar, M.D.

**EXHIBIT  D-11**

DEF 0830

Debra H. Fiser, M.D.
Dean, College of Medicine
Vice Chancellor, UAMS

4301 W. Markham St., #550
Little Rock, AR 72205

501-686-5350
501-686-8160 (fax)
FiserDebraH@uams.edu

www.uams.edu

# UAMS
## COLLEGE OF MEDICINE
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

June 1, 2010

Brian Schwab, M.D.
1154 Municipal Rd
Lehighton, PA 18235

Dear Dr. Schwab:

The grievance hearing is scheduled for June 16th, 2010 at 8:00 AM in the College of Medicine Dean's office Caduceus Room.  Dr. James Clardy will assist you in the procedures per the GME Committee Policy 1.410 Adjudication of Resident grievances (Attached).  Please review the Attached Policy and provide the appropriate documentation and meet the deadlines. You may have one person, who may be an attorney (referred to as "representative" in the policy), to assist in the processing or hearing of the formal grievance (GME Committee Policy 1.410, D.3).

No later than 8:00 AM on June 8th, 2010 please provide to Carolyn Johnson, the dean's executive assistant:
1. all documents to be used and relied upon at the hearing and
2. the name, address and telephone (preferably cell phone or beeper) number of any representative and witnesses.

There will be a simultaneous exchange of this information between you and Dr. Napolitano on June 8th, 2010.  If you have concerns or questions, please contact me at 686-5350.

Sincerely,

Debra H. Fiser

Debra H. Fiser, M.D.
Vice Chancellor, UAMS
Dean, College of Medicine

Cc: James Clardy, M.D.

Enclosure

**EXHIBIT  D-2**

DEF 0343

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

30



DEPOSITION EXHIBIT 23

List of Documents Submitted on Behalf of Dr. Brian R. Schwab

(1 page)

**EXHIBIT  D-3**

77772826-742e-453f-8af3-bf00fe6550d6

DOCUMENTS SUBMITTED ON BEHALF OF DR. BRIAN R. SCHWAB

1.    Academic Documents
      a.    Comlex Level 3 Score Report
      b.    American Board of Anesthesiology In-Training Examination Performance Report
2.    Evaluations
      a.    7-1 to 7-31-09 UAMS Surgery Evaluation
      b.    8-1 to 8-31-09 VAH, MICU Evaluation
      c.    9-1 to 9-30-09 Ambulatory Care Evaluation
      d.    10-1 to 10-31-09 UAMS, Surgery Evaluation
      e.    11-1 to 11-30-09 Pulmonary Evaluation-Herron
      f.    11-1 to 11-30-09 Pulmonary Evaluation-Johnson
      g.    12-1 to 12-31-09 Emergency Medicine Evaluation
      h.    1-4 to 1-31-10 UAMS-Surgery Evaluation
      i.    1-4 to 1-31-10 Residents Evaluate Rotation With Timeline
      j.    2-1 to 2-28-10 Cardiology, VA Evaluation
      k.    3-1 to 3-18-10 Medicine Evaluation- REQUESTED TO BE PRODUCED BY UAMS
      l.    Summary of Evaluations
3.    Personal Information- REQUESTED TO BE PRODUCED BY UAMS
      a.    Medical Questionaire(s)
4.    UAMS Applicable Policies
      a.    Policy 1.420 Academic and Disciplinary Actions
      b.    UAMS Administrative Guide 3.1.12
      c.    UAMS Federal Laws & Executive Order Compliance
      d.    Policy 1.1410 Adjudication of Resident Grievances
5.    UAMS Correspondence
      a.    Letter 2-2-10 Reappointment Letter
      b.    Letter 3-18-10 Termination Letter
6.    Background Information
      a.    US EEOC Enforcement Guidance
      b.    HelpGuide
7.    Grievance Letter Documents
      4.28.10 Letter to Debra H. Fiser, M.D. from Denise Hoggard
      4.7.09 Letter to Dr. Napolitano from Denise Hoggard

**HELPGUIDE**.ORG    Understand, Prevent & Resolve Life's Challenges
A TRUSTED NON-PROFIT RESOURCE

Reprinted with permission for personal or non-profit use. Visit www.helpguide.org to see the article with links to related articles. © Helpguide.org. All rights reserved.

This material is for information and support; not a substitute for professional advice.

# Adult ADD / ADHD
## SIGNS, SYMPTOMS, EFFECTS, AND TREATMENT



Life can be a balancing act for any adult, but if you find yourself constantly late and disorganized, overly distracted and forgetful, and overwhelmed by your responsibilities, you may have adult ADD/ADHD. Attention deficit disorder impacts many adults, and its wide variety of frustrating symptoms may hinder everything from your relationships to your career.

Learning about the signs and effects of adult ADD/ADHD is the first step toward understanding the challenges and identifying your own symptoms. Once you understand the difficulties that come with ADD/ADHD, you can learn to compensate for areas of weakness and take advantage of your many strengths and talents.

**IN THIS ARTICLE:**
Understanding ADD / ADHD in adults
Signs and symptoms
Effects of adult ADD / ADHD
Self-help for adult ADD / ADHD
When to seek outside help
Treatment and therapy
Coaches and professional organizers
Related Links

Ⓐ Ⓐ Ⓐ TEXT SIZE

## Understanding ADD / ADHD in adults

Attention deficit disorder is not just a problem in children. If you were diagnosed with childhood ADD/ADHD, chances are, you've carried at least some of the symptoms into adulthood. But even if you were never diagnosed with ADD/ADHD as a child, that doesn't mean you can't be affected by it as an adult.

### ADD / ADHD: It's not just for kids



Attention deficit disorder often goes unrecognized throughout childhood. This was especially common in the past, when very few people were aware of ADD/ADHD. Instead or recognizing your symptoms and identifying the real issue, your family, teachers, or other parents may have labeled you a dreamer, a goof-off, a slacker, a troublemaker, or just a bad student.

Alternately, you may have been able to compensate for the symptoms of ADD/ADHD when you were young, only to run into problems as your responsibilities increase. The more balls you're trying to keep in the air—pursuing a career, raising a family, running a household—the greater the demand on your abilities to organize, focus, and remain calm. This can be challenging for anyone, but if you have ADD/ADHD, it can feel downright impossible.

The good news is that, no matter how it feels, the challenges of attention-deficit disorder *are* beatable. With

6/3/2010 8:17 PM
DEF 0280

**EXHIBIT D-4**

education, support, and a little creativity, you can learn to manage the symptoms of adult ADD/ADHD—even turning some of your weaknesses into strengths. It's never too late to turn the difficulties of adult ADD/ADHD around and start succeeding on your own terms.

### Myths and Facts about ADD / ADHD in Adults

**MYTH: ADD/ADHD is just a lack of willpower. Persons with ADD/ADHD focus well on things that interest them; they could focus on any other tasks if they really wanted to.**

**FACT:** ADD/ADHD looks very much like a willpower problem, but it isn't. It's essentially a chemical problem in the management systems of the brain.

**MYTH: Everybody has the symptoms of ADD/ADHD, and anyone with adequate intelligence can overcome these difficulties.**

**FACT:** ADD/ADHD affects persons of all levels of intelligence. And although everyone sometimes has symptoms of ADD/ADHD, only those with chronic impairments from these symptoms warrant an ADD/ADHD diagnosis.

**MYTH: Someone can't have ADD/ADHD and also have depression, anxiety, or other psychiatric problems.**

**FACT:** A person with ADD/ADHD is six times more likely to have another psychiatric or learning disorder than most other people. ADD/ADHD usually overlaps with other disorders.

**MYTH: Unless you have been diagnosed with ADD/ADHD as a child, you can't have it as an adult.**

**FACT:** Many adults struggle all their lives with unrecognized ADD/ADHD impairments. They haven't received help because they assumed that their chronic difficulties, like depression or anxiety, were caused by other impairments that did not respond to usual treatment.

**Source:** Dr. Thomas E. Brown, *Attention Deficit Disorder: The Unfocused Mind in Children and Adults*

## Signs and symptoms of adult ADD / ADHD

In adults, attention deficit disorder often looks quite different than it does in children—and its symptoms are unique for each individual. The following categories highlight common symptoms of adult ADD/ADHD. Do your best to identify the areas where you experience difficulty. Once you pinpoint your most problematic symptoms, you can start to work on strategies for dealing with them.

### Common adult ADD / ADHD symptoms: Trouble concentrating and staying focused

Adults with ADD/ADHD often have difficulty staying focused and attending to daily, mundane tasks. For example, you may be easily distracted by irrelevant sights and sounds, quickly bounce from one activity to another, or become bored quickly. Symptoms in this category are sometimes overlooked because they are less outwardly disruptive than the ADD/ADHD symptoms of hyperactivity and impulsivity—but they can be every bit as troublesome. The symptoms of inattention and concentration difficulties include:

- "zoning out" without realizing it, even in the middle of a conversation.
- extreme distractibility; wandering attention makes it hard to stay on track.
- difficulty paying attention or focusing, such as when reading or listening to others.
- struggling to complete tasks, even ones that seem simple.
- tendency to overlook details, leading to errors or incomplete work.
- poor listening skills; hard time remembering conversations and following directions.

### Common adult ADD / ADHD symptoms: Hyperfocus

While you're probably aware that people with ADD/ADHD have trouble focusing on tasks that aren't interesting

DEF 000118

to them, you may not know that there's another side: a tendency to become absorbed in tasks that are stimulating and rewarding. This paradoxical symptom is called hyperfocus.

Hyperfocus is actually a coping mechanism for distraction—a way of tuning out the chaos. It can be so strong that you become oblivious to everything going on around you. For example, you may be so engrossed in a book, a TV show, or your computer that you completely lose track of time and neglect the things you're supposed to be doing. Hyperfocus can be an asset when channeled into productive activities, but it can also lead to work and relationship problems if left unchecked.

## Common adult ADD / ADHD symptoms: Disorganization and forgetfulness



When you have adult ADD/ADHD, life often seems chaotic and out of control. Staying organized and on top of things can be extremely challenging—as is sorting out what information is relevant for the task at hand, prioritizing the things you need to do, keeping track of tasks and responsibilities, and managing your time. Common symptoms of disorganization and forgetfulness include:

- poor organizational skills (home, office, desk, or car is extremely messy and cluttered)
- tendency to procrastinate
- trouble starting and finishing projects
- chronic lateness
- frequently forgetting appointments, commitments, and deadlines
- constantly losing or misplacing things (keys, wallet, phone, documents, bills)
- underestimating the time it will take you to complete tasks

## Common adult ADD / ADHD symptoms: Impulsivity

If you suffer from symptoms in this category, you may have trouble inhibiting your behaviors, comments, and responses. You might act before thinking, or react without considering consequences. You may find yourself interrupting others, blurting out comments, and rushing through tasks without reading instructions. If you have impulse problems, being patient is extremely difficult. For better or for worse, you may go headlong into situations and find yourself in potentially risky circumstances. You may struggle with controlling impulses if you:

- frequently interrupt others or talk over them
- have poor self-control
- blurt out thoughts that are rude or inappropriate without thinking
- have addictive tendencies
- act recklessly or spontaneously without regard for consequences
- have trouble behaving in socially appropriate ways (such as sitting still during a long meeting)

## Common adult ADD / ADHD symptoms: Emotional difficulties

Many adults with ADD/ADHD have a hard time managing their feelings, especially when it comes to emotions like anger or frustration. Common emotional symptoms of adult ADD/ADHD include:



- sense of underachievement
- doesn't deal well with frustration
- easily flustered and stressed out
- irritability or mood swings
- trouble staying motivated
- hypersensitivity to criticism
- short, often explosive, temper
- low self-esteem and sense of insecurity

## Common adult ADD / ADHD symptoms: Hyperactivity or restlessness

Hyperactivity in adults with ADD/ADHD can look the same as it does in kids. You may be highly energetic and perpetually "on the go" as if driven by a motor. For many people with ADD/ADHD, however, the symptoms of hyperactivity become more subtle and internal as they grow older. Common symptoms of hyperactivity in adults include:

- feelings of inner restlessness, agitation
- tendency to take risks
- getting bored easily
- racing thoughts

- trouble sitting still; constant fidgeting
- craving for excitement
- talking excessively
- doing a million things at once

### You don't have to be hyperactive to have ADD / ADHD

Adults with ADD/ADHD are much less likely to be hyperactive than their younger counterparts. Only a small slice of adults with ADD/ADHD, in fact, suffer from prominent symptoms of hyperactivity. Remember that names can be deceiving and you may very well have ADD/ADHD if you have one or more of the symptoms above—even if you lack hyperactivity.

## Effects of adult ADD / ADHD

If you are just discovering you have adult ADD/ADHD, chances are you've suffered over the years for the unrecognized problem. People may have labeled you "lazy" or "stupid" because of your forgetfulness or difficulty completing tasks, and you may have begun to think of yourself in these negative terms as well.

### Untreated ADD/ADHD has wide-reaching effects

ADD/ADHD that is undiagnosed and untreated can cause problems in virtually every area of your life.

- **Physical and mental health problems.** The symptoms of ADD/ADHD can contribute to a variety of health problems, including compulsive eating, substance abuse, anxiety, chronic stress and tension, and low self-esteem. You may also run into trouble due to neglecting important check-ups, skipping doctor appointments, ignoring medical instructions, and forgetting to take vital medications.
- **Work and financial difficulties.** Adults with ADD/ADHD often experience career difficulties and feel a strong sense of underachievement. You may have trouble keeping a job, following corporate rules, meeting deadlines, and sticking to a 9-to-5 routine. Managing finances may also be a problem: you may struggle with unpaid bills, lost paperwork, late fees, or debt due to impulsive spending.
- **Relationship problems.** The symptoms of ADD/ADHD can put a strain on your work, love, and family relationships. You may be fed up with constant nagging from loved ones to tidy up, listen more closely, or get organized. Those close to you, on the other hand, may feel hurt and resentful over your perceived "irresponsibility" or "insensitivity."



The wide-reaching effects of ADD/ADHD can lead to embarrassment, frustration, hopelessness, disappointment, and loss of confidence. You may feel like you'll never be able to get your life under control. That's why a diagnosis of adult ADD/ADHD can be an enormous source of relief and hope. It helps you understand what you're up against for the first time and realize that you're not to blame. The difficulties you've had are symptoms of attention deficit disorder—not the result of personal weakness or a character flaw.

6/3/2010 8:17 PM

DEF 0285

**Adult ADD/ADHD doesn't have to hold you back**

When you have ADD/ADHD, it's easy to end up thinking that there's something wrong with you. But it's okay to be different. ADD/ADHD isn't an indicator of intelligence or capability. Certain things may be more difficult for you, but that doesn't mean you can't find your niche and achieve success. The key is to find out what your strengths are and capitalize on them.

It can be helpful to think about attention deficit disorder as a collection of traits that are both positive and negative—just like any other set of qualities you might possess. Along with the impulsivity and disorganization of ADD/ADHD, for example, often come incredible creativity, passion, energy, out-of-the-box thinking, and a constant flow of original ideas. Figure out what you're good at and set up your environment to support those strengths.

## Self-help for adult ADD / ADHD

Armed with an understanding of ADD/ADHD's challenges and the help of structured strategies, you can make real changes in your life. Many adults with attention deficit disorder have found meaningful ways to manage their symptoms, take advantage of their gifts, and lead productive and satisfying lives. You don't necessarily need outside intervention—at least not right away. There is a lot you can do to help yourself and get your symptoms under control.

- **Exercise and eat right.** Exercise vigorously and regularly—it helps work off excess energy and aggression in a positive way and soothes and calms the body. Eat a wide variety of healthy foods and limit sugary foods in order to even out mood swings.
- **Get plenty of sleep.** When you're tired, it's even more difficult to focus, manage stress, stay productive, and keep on top of your responsibilities. Support yourself by getting between 7-8 hours of sleep every night.
- **Practice better time management.** Set deadlines for everything, even for seemingly small tasks. Use timers and alarms to stay on track. Take breaks at regular intervals. Avoid piles of paperwork or procrastination by dealing with each item as it comes in. Prioritize time-sensitive tasks and write down every assignment, message, or important thought.
- **Work on your relationships.** Schedule activities with friends and keep your engagements. Be vigilant in conversation: listen when others are speaking and try not to speak too quickly yourself. Cultivate relationships with people who are sympathetic and understanding of your struggles with ADD/ADHD.
- **Create a supportive work environment.** Make frequent use of lists, color-coding, reminders, notes-to-self, rituals, and files. If possible, choose work that motivates and interests you. Notice how and when you work best and apply these conditions to your working environment as best you can. It can help to team up with less creative, more organized people—a partnership that can be mutually beneficial.

## Living with ADD / ADHD: How to Help Yourself

There's hope for adult ADD/ADHD—no matter how out of control your life is, no matter how frazzled and frustrated you feel. With structure, support, and a personalized toolkit of self-help strategies, you can learn how to get organized, efficiently manage your time, take control of your finances, improve job performance, and boost your social skills.

**Read:** Self-Help for Adult ADD / ADHD: Tips for Managing Symptoms and Getting Focused



6/3/2010 8:17 PM
DEF 0284

## When to seek outside help for adult ADD / ADHD

If the symptoms of ADD/ADHD are still getting in the way of your life, despite self-help efforts to manage them, it may be time to seek outside support. Adults with ADD/ADHD can benefit from a number of treatments, including behavioral coaching, individual therapy, self-help groups, vocational counseling, educational assistance, and medication.

Treatment for adults with attention deficit disorder, like treatment for kids, should involve a team of professionals, along with the person's family members and spouse.

### Professionals trained in ADD/ADHD can help you:

- control impulsive behaviors
- manage your time and money
- get and stay organized

- boost productivity at home and work
- manage stress and anger
- communicate more clearly

## Treatment and therapy for adult ADD / ADHD

Therapy for adults with ADD/ADHD can be helpful for both the emotional issues related to the disorder and practical, day-to-day issues.

- **Talk therapy** – Adults with ADD/ADHD often struggle with issues stemming from longstanding patterns of underachievement, failure, academic difficulties, job turnover, and relationship conflict. Individual talk therapy can help you deal with this emotional baggage, including low self-esteem, the feelings of embarrassment and shame you may have experienced as a child and teenager, and resentment at the nagging and criticism you receive from people close to you.
- **Marriage and family therapy** – Marriage and family therapy addresses the problems ADD/ADHD can create in your relationships and family life, such as conflicts over money problems, forgotten commitments, responsibilities in the home, and impulsive decisions. Therapy can help you and your loved ones explore these issues and focus on constructive ways of dealing with them and communicating with each other. Therapy can also improve your relationship by educating your partner about ADD/ADHD.
- **Cognitive-behavioral therapy** – Cognitive-behavioral therapy encourages you to identify and change the negative beliefs and behaviors that are causing problems in your life. Since many individuals with ADD/ADHD are demoralized from years of struggle and unmet expectations, one of the main goals of cognitive-behavioral therapy is to transform this negative outlook into a more hopeful, realistic view. Cognitive-behavioral therapy also focuses on the practical issues that often come with ADD/ADHD, such as disorganization, work performance problems, and poor time management.

### Support groups for adult ADD / ADHD

A support group not only gives you the human encouragement you need to keep working on your issues, but also gives you frank feedback on how you come across to others. A support group for ADD/ADHD:

- reduces the isolation of struggling with your disorder,
- gives you a place to express your feelings to others who truly understand, and
- lets you share strategies for success.

Usually a therapist or other mental health practitioner leads an ADD/ADHD support group, making sure that you feel supported and that others listen to your feelings and reactions.

## ADD / ADHD coaches and professional organizers

Behavioral coaches and professional organizers are not a replacement for therapy, but they can be a valuable supplement to an ADD/ADHD treatment plan.

### Behavioral coaching

In contrast to therapists, who help adults with attention deficit disorder work through emotional problems, coaches focus solely on practical solutions to problems in everyday life. Behavioral coaches teach you strategies for organizing your home and work environment, structuring your day, and managing your money.

ADD/ADHD coaches work with you on areas such as:

- prioritizing
- motivation
- time management
- procrastination

ADD/ADHD coaches may come to your home or talk with you on the phone rather than meet with you in an office; many coach-client relationships are long-distance.

### Professional organizers

A professional organizer can be very helpful if you have difficulty organizing your belongings or your time.

A professional organizer can help you:

- reduce the stress that clutter creates
- get and stay organized
- save time by organizing your belongings more efficiently.

- create a schedule and stick to it
- streamline your workflow
- set up a system for paperwork, filing, and bills

A professional organizer comes to your home or workplace, looks at your setup, and then suggests changes.

## Related articles



**Self-Help for Adult ADD/ADHD**
Tips for Managing Symptoms and Getting Focused



**ADD/ADHD Medications**
Are ADHD Drugs Right for You or Your Child?

### More Helpguide articles

- Quick Stress Relief: How to Manage and Relieve Stress in the Moment
- Relationship Help: Building Great Relationships Using Emotional Intelligence
- Stress Management: How to Reduce, Prevent, and Cope with Stress
- Improving Emotional Health: Strategies and Tips for Good Mental Health

## Related links for adult ADD / ADHD

### Symptoms and effects of ADD/ADHD in adults

Not Just a Childhood Disorder – Learn the symptoms of adult ADD/ADHD, how it's different from childhood attention deficit disorder, and how it's diagnosed and treated. (NetDoctor)

ADD/ADHD and the Adult – Overview of ADD/ADHD's symptoms and impact in adulthood. Includes diagnostic

and treatment information. (Learning Disabilities Association of Canada)

Top 10 Questions about ADD/ADHD – Ten questions and answers about attention deficit disorder from an expert in the field. (Dr. Hallowell)

What is it Like to Have ADD? – Describes the symptoms and effects of attention deficit disorder in adults. (Attention Deficit Disorder Association)

Social Skills in Adults with ADD/ADHD – Identifies some of the social challenges associated with ADD/ADHD and concrete tips on implementing change. (National Resource Center on ADD/ADHD)

## Diagnosis and treatment of adult ADD/ADHD

Diagnosis of ADD/ADHD in Adults – Learn about diagnostic criteria for attention deficit disorder, adult symptoms, and what to expect in an evaluation. (National Resource Center on ADD/ADHD)

CHADD Professional Directory – Once you accept the CHADD agreement, choose a type of professional from the dropdown menu beginning with *Any Category*. (Children and Adults with Attention-Deficit/Hyperactivity Disorder)

Attention Deficit Disorder Resources – A directory of providers for professional help with ADD / ADHD. Broaden your search if you don't get enough providers in your initial search. (Attention Deficit Disorder Resources)
Find Local CHADD Chapters – Searchable directory of support groups that focus on both children and adults with ADD/ADHD. (Children and Adults with Attention Deficit Hyperactivity Disorder)

## ADD / ADHD coaches

Coaching and ADHD in Adults – This article, reprinted from the National Resource Center on AD/HD, defines ADD / ADHD coaching and discusses how coaches are trained and how to select an ADD / ADHD coach. (ADDResources)

Therapy and ADD Coaching: Similarities, Differences, and Collaboration – Clear, detailed discussion of how coaching and psychotherapy work for people with ADD / ADHD. (Nancy Ratey)

*Melinda Smith, M.A. and Jocelyn Block, M.A. contributed to this article. Last reviewed: February 2010.*

DEF 0287

BRIAN SCHWAB, D.O.
BRIAN SCHWAB, D.O.  VS. UAMS

32

DEPOSITION EXHIBIT 25

EEOC Enforcement Guidance: Reasonable Accommodation and

Undue Hardship Under The Americans with Disabilities Act

(9 pages)

EXHIBIT  D-5

77772826-742e-453f-8af3-bf00fe6550d6

*The U.S. Equal Employment Opportunity Commission*

| EEOC | NOTICE | Number 915.002 |
|------|--------|----------------|
|      |        | October 17, 2002 |

1. **SUBJECT:** EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act

2. **PURPOSE:** This enforcement guidance supersedes the enforcement guidance issued by the Commission on 03/01/99. Most of the original guidance remains the same, but limited changes have been made as a result of: (1) the Supreme Court's decision in US Airways, Inc. v. Barnett, 535 U.S. , 122 S. Ct, 1516 (2002), and (2) the Commission's issuance of new regulations under section 501 of the Rehabilitation Act. The major changes in response to the Barnett decision are found on pages 4-5, 44-45, and 61-62. In addition, minor changes were made to certain footnotes and the Instructions for Investigators as a result of the Barnett decision and the new section 501 regulations.

3. **EFFECTIVE DATE:** Upon receipt.

4. **EXPIRATION DATE:** As an exception to EEOC Order 205.001, Appendix B, Attachment 4, . a(5), this Notice will remain in effect until rescinded or superseded.

5. **ORIGINATOR:** ADA Division, Office of Legal Counsel.

6. **INSTRUCTIONS:** File after Section 902 of Volume II of the Compliance Manual.

---

# Enforcement Guidance:
# Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act

## Table of Contents

INTRODUCTION

GENERAL PRINCIPLES

REQUESTING REASONABLE ACCOMMODATION

REASONABLE ACCOMMODATION AND JOB APPLICANTS

REASONABLE ACCOMMODATION RELATED TO THE BENEFITS AND PRIVILEGES OF EMPLOYMENT

TYPES OF REASONABLE ACCOMMODATIONS RELATED TO JOB PERFORMANCE

JOB RESTRUCTURING

LEAVE

MODIFIED OR PART-TIME SCHEDULE

MODIFIED WORKPLACE POLICIES

**Notice Concerning The Americans With Disabilities Act Amendments Act Of 2008**

The Americans with Disabilities Act (ADA) Amendments Act of 2008 was signed into law on September 25, 2008 and becomes effective January 1, 2009. Because this law makes several significant changes, including changes to the definition of the term "disability," the EEOC will be evaluating the impact of these changes on this document and other publications. See the list

REASSIGNMENT

OTHER REASONABLE ACCOMMODATION ISSUES

UNDUE HARDSHIP ISSUES

BURDENS OF PROOF

INSTRUCTIONS FOR INVESTIGATORS

APPENDIX: RESOURCES FOR LOCATING REASONABLE ACCOMMODATIONS

INDEX

of specific changes to the ADA made by the ADA Amendments Act.

# INTRODUCTION

This Enforcement Guidance clarifies the rights and responsibilities of employers and individuals with disabilities regarding reasonable accommodation and undue hardship. Title I of the ADA requires an employer to provide reasonable accommodation to qualified individuals with disabilities who are employees or applicants for employment, except when such accommodation would cause an undue hardship. This Guidance sets forth an employer's legal obligations regarding reasonable accommodation; however, employers may provide more than the law requires.

This Guidance examines what "reasonable accommodation" means and who is entitled to receive it. The Guidance addresses what constitutes a request for reasonable accommodation, the form and substance of the request, and an employer's ability to ask questions and seek documentation after a request has been made.

The Guidance discusses reasonable accommodations applicable to the hiring process and to the benefits and privileges of employment. The Guidance also covers different types of reasonable accommodations related to job performance, including job restructuring, leave, modified or part-time schedules, modified workplace policies, and reassignment. Questions concerning the relationship between the ADA and the Family and Medical Leave Act (FMLA) are examined as they affect leave and modified schedules. Reassignment issues addressed include who is entitled to reassignment and the extent to which an employer must search for a vacant position. The Guidance also examines issues concerning the interplay between reasonable accommodations and conduct rules.

The final section of this Guidance discusses undue hardship, including when requests for schedule modifications and leave may be denied.

# GENERAL PRINCIPLES

## Reasonable Accommodation

Title I of the Americans with Disabilities Act of 1990 (the "ADA")[1] requires an employer[2] to provide reasonable accommodation to qualified individuals with disabilities who are employees or applicants for employment, unless to do so would cause undue hardship. "In general, an accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities."[3] There are three categories of "reasonable accommodations":

"(i) modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable

a qualified individual with a disability to perform the essential functions of that position; or

(iii) modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities."(4)

The duty to provide reasonable accommodation is a fundamental statutory requirement because of the nature of discrimination faced by individuals with disabilities. Although many individuals with disabilities can apply for and perform jobs without any reasonable accommodations, there are workplace barriers that keep others from performing jobs which they could do with some form of accommodation. These barriers may be physical obstacles (such as inaccessible facilities or equipment), or they may be procedures or rules (such as rules concerning when work is performed, when breaks are taken, or how essential or marginal functions are performed). Reasonable accommodation removes workplace barriers for individuals with disabilities.

Reasonable accommodation is available to qualified applicants and employees with disabilities.(5) Reasonable accommodations must be provided to qualified employees regardless of whether they work part- time or full-time, or are considered "probationary." Generally, the individual with a disability must inform the employer that an accommodation is needed.(6)

There are a number of possible reasonable accommodations that an employer may have to provide in connection with modifications to the work environment or adjustments in how and when a job is performed. These include:

- making existing facilities accessible;
- job restructuring;
- part-time or modified work schedules;
- acquiring or modifying equipment;
- changing tests, training materials, or policies;
- providing qualified readers or interpreters; and
- reassignment to a vacant position.(7)

A modification or adjustment is "reasonable" if it "seems reasonable on its face, i.e., ordinarily or in the run of cases;"(8) this means it is "reasonable" if it appears to be "feasible" or "plausible."(9) An accommodation also must be effective in meeting the needs of the individual.(10) In the context of job performance, this means that a reasonable accommodation enables the individual to perform the essential functions of the position. Similarly, a reasonable accommodation enables an applicant with a disability to have an equal opportunity to participate in the application process and to be considered for a job. Finally, a reasonable accommodation allows an employee with a disability an equal opportunity to enjoy the benefits and privileges of employment that employees without disabilities enjoy.

Example A: An employee with a hearing disability must be able to contact the public by telephone. The employee proposes that he use a TTY(11) to call a relay service operator who can then place the telephone call and relay the conversation between the parties. This is "reasonable" because a TTY is a common device used to facilitate communication between hearing and hearing-impaired individuals. Moreover, it would be effective in enabling the employee to perform his job.

Example B: A cashier easily becomes fatigued because of lupus and, as a result, has difficulty making it through her shift. The employee requests a stool because sitting greatly reduces the fatigue. This accommodation is reasonable because it is a common-sense solution to remove a workplace barrier being required to stand when the job can be effectively performed sitting down. This "reasonable" accommodation is effective because it addresses the employee's fatigue and enables her to perform her job.

Example C: A cleaning company rotates its staff to different floors on a monthly basis. One crew member has a psychiatric disability. While his mental illness does not affect his ability to perform the various cleaning functions, it does make it difficult to adjust to alterations in his daily routine. The employee has

had significant difficulty adjusting to the monthly changes in floor assignments. He asks for a reasonable accommodation and proposes three options: staying on one floor permanently, staying on one floor for two months and then rotating, or allowing a transition period to adjust to a change in floor assignments. These accommodations are reasonable because they appear to be feasible solutions to this employee's problems dealing with changes to his routine. They also appear to be effective because they would enable him to perform his cleaning duties.

There are several modifications or adjustments that are not considered forms of reasonable accommodation.[12] An employer does not have to eliminate an essential function, i.e., a fundamental duty of the position. This is because a person with a disability who is unable to perform the essential functions, with or without reasonable accommodation,[13] is not a "qualified" individual with a disability within the meaning of the ADA. Nor is an employer required to lower production standards -- whether qualitative or quantitative[14] -- that are applied uniformly to employees with and without disabilities. However, an employer may have to provide reasonable accommodation to enable an employee with a disability to meet the production standard. While an employer is not required to eliminate an essential function or lower a production standard, it may do so if it wishes.

An employer does not have to provide as reasonable accommodations personal use items needed in accomplishing daily activities both on and off the job. Thus, an employer is not required to provide an employee with a prosthetic limb, a wheelchair, eyeglasses, hearing aids, or similar devices if they are also needed off the job. Furthermore, an employer is not required to provide personal use amenities, such as a hot pot or refrigerator, if those items are not provided to employees without disabilities. However, items that might otherwise be considered personal may be required as reasonable accommodations where they are specifically designed or required to meet job-related rather than personal needs.[15]

### Undue Hardship

The only statutory limitation on an employer's obligation to provide "reasonable accommodation" is that no such change or modification is required if it would cause "undue hardship" to the employer.[16] "Undue hardship" means significant difficulty or expense and focuses on the resources and circumstances of the particular employer in relationship to the cost or difficulty of providing a specific accommodation. Undue hardship refers not only to financial difficulty, but to reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business.[17] An employer must assess on a case-by-case basis whether a particular reasonable accommodation would cause undue hardship. The ADA's "undue hardship" standard is different from that applied by courts under Title VII of the Civil Rights Act of 1964 for religious accommodation.[18]

## REQUESTING REASONABLE ACCOMMODATION

1. How must an individual request a reasonable accommodation?

   When an individual decides to request accommodation, the individual or his/her representative must let the employer know that s/he needs an adjustment or change at work for a reason related to a medical condition. To request accommodation, an individual may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation."[19]

   Example A: An employee tells her supervisor, "I'm having trouble getting to work at my scheduled starting time because of medical treatments I'm undergoing." This is a request for a reasonable accommodation.

   Example B: An employee tells his supervisor, "I need six weeks off to get treatment for a back problem." This is a request for a reasonable accommodation.

   Example C: A new employee, who uses a wheelchair, informs the employer that her wheelchair cannot fit under the desk in her office. This is a request for reasonable accommodation.

   Example D: An employee tells his supervisor that he would like a new chair because his present one is uncomfortable. Although this is a request for a change at work, his statement is insufficient to put the employer on notice that he is requesting reasonable accommodation. He does not link

this need for the new chair with a medical condition.

While an individual with a disability may request a change due to a medical condition, this request does not necessarily mean that the employer is required to provide the change. A request for reasonable accommodation is the first step in an informal, interactive process between the individual and the employer. In some instances, before addressing the merits of the accommodation request, the employer needs to determine if the individual's medical condition meets the ADA definition of "disability,"[(20)] a prerequisite for the individual to be entitled to a reasonable accommodation.

2. May someone other than the individual with a disability request a reasonable accommodation on behalf of the individual?

Yes, a family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability.[(21)] Of course, the individual with a disability may refuse to accept an accommodation that is not needed.

Example A: An employee's spouse phones the employee's supervisor on Monday morning to inform her that the employee had a medical emergency due to multiple sclerosis, needed to be hospitalized, and thus requires time off. This discussion constitutes a request for reasonable accommodation.

Example B: An employee has been out of work for six months with a workers' compensation injury. The employee's doctor sends the employer a letter, stating that the employee is released to return to work, but with certain work restrictions. (Alternatively, the letter may state that the employee is released to return to a light duty position.) The letter constitutes a request for reasonable accommodation.

3. Do requests for reasonable accommodation need to be in writing?

No. Requests for reasonable accommodation do not need to be in writing. Individuals may request accommodations in conversation or may use any other mode of communication.[(22)] An employer may choose to write a memorandum or letter confirming the individual's request. Alternatively, an employer may ask the individual to fill out a form or submit the request in written form, but the employer cannot ignore the initial request. An employer also may request reasonable documentation that the individual has an ADA disability and needs a reasonable accommodation. (See Question 6).

4. When should an individual with a disability request a reasonable accommodation?

An individual with a disability may request a reasonable accommodation at any time during the application process or during the period of employment. The ADA does not preclude an employee with a disability from requesting a reasonable accommodation because s/he did not ask for one when applying for a job or after receiving a job offer. Rather, an individual with a disability should request a reasonable accommodation when s/he knows that there is a workplace barrier that is preventing him/her, due to a disability, from effectively competing for a position, performing a job, or gaining equal access to a benefit of employment.[(23)] As a practical matter, it may be in an employee's interest to request a reasonable accommodation before performance suffers or conduct problems occur.

5. What must an employer do after receiving a request for reasonable accommodation?

The employer and the individual with a disability should engage in an informal process to clarify what the individual needs and identify the appropriate reasonable accommodation.[(24)] The employer may ask the individual relevant questions that will enable it to make an informed decision about the request. This includes asking what type of reasonable accommodation is needed.[(25)]

The exact nature of the dialogue will vary. In many instances, both the disability and the type of accommodation required will be obvious, and thus there may be little or no need to engage in any discussion. In other situations, the employer may need to ask questions concerning the nature of

Case 4:11-cv-00011-BSM    Document 13-3    Filed 04/24/12    Page 35 of 93

the disability and the individual's functional limitations in order to identify an effective accommodation. While the individual with a disability does not have to be able to specify the precise accommodation, s/he does need to describe the problems posed by the workplace barrier. Additionally, suggestions from the individual with a disability may assist the employer in determining the type of reasonable accommodation to provide. Where the individual or the employer are not familiar with possible accommodations, there are extensive public and private resources to help the employer identify reasonable accommodations once the specific limitations and workplace barriers have been ascertained. [26]

6. May an employer ask an individual for documentation when the individual requests reasonable accommodation?

Yes. When the disability and/or the need for accommodation is not obvious, the employer may ask the individual for reasonable documentation about his/her disability and functional limitations. [27] The employer is entitled to know that the individual has a covered disability for which s/he needs a reasonable accommodation.

Reasonable documentation means that the employer may require only the documentation that is needed to establish that a person has an ADA disability, and that the disability necessitates a reasonable accommodation. Thus, an employer, in response to a request for reasonable accommodation, cannot ask for documentation that is unrelated to determining the existence of a disability and the necessity for an accommodation. This means that in most situations an employer cannot request a person's complete medical records because they are likely to contain information unrelated to the disability at issue and the need for accommodation. If an individual has more than one disability, an employer can request information pertaining only to the disability that requires a reasonable accommodation.

An employer may require that the documentation about the disability and the functional limitations come from an appropriate health care or rehabilitation professional. The appropriate professional in any particular situation will depend on the disability and the type of functional limitation it imposes. Appropriate professionals include, but are not limited to, doctors (including psychiatrists), psychologists, nurses, physical therapists, occupational therapists, speech therapists, vocational rehabilitation specialists, and licensed mental health professionals.

In requesting documentation, employers should specify what types of information they are seeking regarding the disability, its functional limitations, and the need for reasonable accommodation. The individual can be asked to sign a limited release allowing the employer to submit a list of specific questions to the health care or vocational professional. [28]

As an alternative to requesting documentation, an employer may simply discuss with the person the nature of his/her disability and functional limitations. It would be useful for the employer to make clear to the individual why it is requesting information, i.e., to verify the existence of an ADA disability and the need for a reasonable accommodation.

**Example A:** An employee says to an employer, "I'm having trouble reaching tools because of my shoulder injury." The employer may ask the employee for documentation describing the impairment; the nature, severity, and duration of the impairment; the activity or activities that the impairment limits; and the extent to which the impairment limits the employee's ability to perform the activity or activities (i.e., the employer is seeking information as to whether the employee has an ADA disability).

**Example B:** A marketing employee has a severe learning disability. He attends numerous meetings to plan marketing strategies. In order to remember what is discussed at these meetings he must take detailed notes but, due to his disability, he has great difficulty writing. The employee tells his supervisor about his disability and requests a laptop computer to use in the meetings. Since neither the disability nor the need for accommodation are obvious, the supervisor may ask the employee for reasonable documentation about his impairment; the nature, severity, and duration of the impairment; the activity or activities that the impairment limits; and the extent to which the impairment limits the employee's ability to perform the activity or activities. The employer also may ask why the disability necessitates use of a laptop computer (or any other type of reasonable accommodation, such as a tape recorder) to help the employee retain the information from the

meetings.[29]

Example C: An employee's spouse phones the employee's supervisor on Monday morning to inform her that the employee had a medical emergency due to multiple sclerosis, needed to be hospitalized, and thus requires time off. The supervisor can ask the spouse to send in documentation from the employee's treating physician that confirms that the hospitalization was related to the multiple sclerosis and provides information on how long an absence may be required from work.[30]

If an individual's disability or need for reasonable accommodation is not obvious, and s/he refuses to provide the reasonable documentation requested by the employer, then s/he is not entitled to reasonable accommodation.[31] On the other hand, failure by the employer to initiate or participate in an informal dialogue with the individual after receiving a request for reasonable accommodation could result in liability for failure to provide a reasonable accommodation.[32]

7. May an employer require an individual to go to a health care professional of the employer's (rather than the employee's) choice for purposes of documenting need for accommodation and disability?

The ADA does not prevent an employer from requiring an individual to go to an appropriate health professional of the employer's choice if the individual provides insufficient information from his/her treating physician (or other health care professional) to substantiate that s/he has an ADA disability and needs a reasonable accommodation. However, if an individual provides insufficient documentation in response to the employer's initial request, the employer should explain why the documentation is insufficient and allow the individual an opportunity to provide the missing information in a timely manner. Documentation is insufficient if it does not specify the existence of an ADA disability and explain the need for reasonable accommodation.[33]

Any medical examination conducted by the employer's health professional must be job-related and consistent with business necessity. This means that the examination must be limited to determining the existence of an ADA disability and the functional limitations that require reasonable accommodation.[34] If an employer requires an employee to go to a health professional of the employer's choice, the employer must pay all costs associated with the visit(s).

8. Are there situations in which an employer cannot ask for documentation in response to a request for reasonable accommodation?

Yes. An employer cannot ask for documentation when: (1) both the disability and the need for reasonable accommodation are obvious, or (2) the individual has already provided the employer with sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested.

Example A: An employee brings a note from her treating physician explaining that she has diabetes and that, as a result, she must test her blood sugar several times a day to ensure that her insulin level is safe in order to avoid a hyperglycemic reaction. The note explains that a hyperglycemic reaction can include extreme thirst, heavy breathing, drowsiness, and flushed skin, and eventually would result in unconsciousness. Depending on the results of the blood test, the employee might have to take insulin. The note requests that the employee be allowed three or four 10-minute breaks each day to test her blood, and if necessary, to take insulin. The doctor's note constitutes sufficient documentation that the person has an ADA disability because it describes a substantially limiting impairment and the reasonable accommodation needed as a result. The employer cannot ask for additional documentation.

Example B: One year ago, an employer learned that an employee had bipolar disorder after he requested a reasonable accommodation. The documentation provided at that time from the employee's psychiatrist indicated that this was a permanent condition which would always involve periods in which the disability would remit and then intensify. The psychiatrist's letter explained that during periods when the condition flared up, the person's manic moods or depressive episodes could be severe enough to create serious problems for the individual in caring for himself or working, and that medication controlled the frequency and severity of these episodes.

Now, one year later, the employee again requests a reasonable accommodation related to his

DEF 0296

bipolar disorder. Under these facts, the employer may ask for reasonable documentation on the need for the accommodation (if the need is not obvious), but it cannot ask for documentation that the person has an ADA disability. The medical information provided one year ago established the existence of a long-term impairment that substantially limits a major life activity.

*Example C:* An employee gives her employer a letter from her doctor, stating that the employee has asthma and needs the employer to provide her with an air filter. This letter contains insufficient information as to whether the asthma is an ADA disability because it does not provide any information as to its severity (i.e., whether it substantially limits a major life activity). Furthermore, the letter does not identify precisely what problem exists in the workplace that requires an air filter or any other reasonable accommodation. Therefore, the employer can request additional documentation.

9. Is an employer required to provide the reasonable accommodation that the individual wants?

The employer may choose among reasonable accommodations as long as the chosen accommodation is effective.[35] Thus, as part of the interactive process, the employer may offer alternative suggestions for reasonable accommodations and discuss their effectiveness in removing the workplace barrier that is impeding the individual with a disability.

If there are two possible reasonable accommodations, and one costs more or is more burdensome than the other, the employer may choose the less expensive or burdensome accommodation as long as it is effective (i.e., it would remove a workplace barrier, thereby providing the individual with an equal opportunity to apply for a position, to perform the essential functions of a position, or to gain equal access to a benefit or privilege of employment). Similarly, when there are two or more effective accommodations, the employer may choose the one that is easier to provide. In either situation, the employer does not have to show that it is an undue hardship to provide the more expensive or more difficult accommodation. If more than one accommodation is effective, "the preference of the individual with a disability should be given primary consideration. However, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations."[36]

*Example A:* An employee with a severe learning disability has great difficulty reading. His supervisor sends him many detailed memoranda which he often has trouble understanding. However, he has no difficulty understanding oral communication. The employee requests that the employer install a computer with speech output and that his supervisor send all memoranda through electronic mail which the computer can then read to him. The supervisor asks whether a tape recorded message would accomplish the same objective and the employee agrees that it would. Since both accommodations are effective, the employer may choose to provide the supervisor and employee with a tape recorder so that the supervisor can record her memoranda and the employee can listen to them.

*Example B:* An attorney with a severe vision disability requests that her employer provide someone to read printed materials that she needs to review daily. The attorney explains that a reader enables her to review substantial amounts of written materials in an efficient manner. Believing that this reasonable accommodation would be too costly, the employer instead provides the attorney with a device that allows her to magnify print so that she can read it herself. The attorney can read print using this device, but with such great difficulty it significantly slows down her ability to review written materials. The magnifying device is ineffective as a reasonable accommodation because it does not provide the attorney with an equal opportunity to attain the same level of performance as her colleagues. Without an equal opportunity to attain the same level of performance, this attorney is denied an equal opportunity to compete for promotions. In this instance, failure to provide the reader, absent undue hardship, would violate the ADA.

10. How quickly must an employer respond to a request for reasonable accommodation?

An employer should respond expeditiously to a request for reasonable accommodation. If the employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible.[37] Similarly, the employer should act promptly to provide the reasonable accommodation. Unnecessary delays can result in a violation of the ADA.[38]

DEF 0297

Case 4:11-cv-00011-BSM   Document 13-3   Filed 04/24/12   Page 38 of 93

Example A: An employer provides parking for all employees. An employee who uses a wheelchair requests from his supervisor an accessible parking space, explaining that the spaces are so narrow that there is insufficient room for his van to extend the ramp that allows him to get in and out. The supervisor does not act on the request and does not forward it to someone with authority to respond. The employee makes a second request to the supervisor. Yet, two months after the initial request, nothing has been done. Although the supervisor never definitively denies the request, the lack of action under these circumstances amounts to a denial, and thus violates the ADA.

Example B: An employee who is blind requests adaptive equipment for her computer as a reasonable accommodation. The employer must order this equipment and is informed that it will take three months to receive delivery. No other company sells the adaptive equipment the employee needs. The employer notifies the employee of the results of its investigation and that it has ordered the equipment. Although it will take three months to receive the equipment, the employer has moved as quickly as it can to obtain it and thus there is no ADA violation resulting from the delay. The employer and employee should determine what can be done so that the employee can perform his/her job as effectively as possible while waiting for the equipment.

11. May an employer require an individual with a disability to accept a reasonable accommodation that s/he does not want?

No. An employer may not require a qualified individual with a disability to accept an accommodation. If, however, an employee needs a reasonable accommodation to perform an essential function or to eliminate a direct threat, and refuses to accept an effective accommodation, s/he may not be qualified to remain in the job.[39]

## REASONABLE ACCOMMODATION AND JOB APPLICANTS

12. May an employer ask whether a reasonable accommodation is needed when an applicant has not asked for one?

An employer may tell applicants what the hiring process involves (e.g., an interview, timed written test, or job demonstration), and may ask applicants whether they will need a reasonable accommodation for this process.

During the hiring process and before a conditional offer is made, an employer generally may not ask an applicant whether s/he needs a reasonable accommodation for the job, except when the employer knows that an applicant has a disability -- either because it is obvious or the applicant has voluntarily disclosed the information -- and could reasonably believe that the applicant will need a reasonable accommodation to perform specific job functions. If the applicant replies that s/he needs a reasonable accommodation, the employer may inquire as to what type.[40]

After a conditional offer of employment is extended, an employer may inquire whether applicants will need reasonable accommodations related to anything connected with the job (i.e., job performance or access to benefits/privileges of the job) as long as all entering employees in the same job category are asked this question. Alternatively, an employer may ask a specific applicant if s/he needs a reasonable accommodation if the employer knows that this applicant has a disability -- either because it is obvious or the applicant has voluntarily disclosed the information -- and could reasonably believe that the applicant will need a reasonable accommodation. If the applicant replies that s/he needs a reasonable accommodation, the employer may inquire as to what type.[41]

13. Does an employer have to provide a reasonable accommodation to an applicant with a disability even if it believes that it will be unable to provide this individual with a reasonable accommodation on the job?

Yes. An employer must provide a reasonable accommodation to a qualified applicant with a disability that will enable the individual to have an equal opportunity to participate in the application process and to be considered for a job (unless it can show undue hardship). Thus, individuals with disabilities who meet initial requirements to be considered for a job should not be excluded from the application process because the employer speculates, based on a request for reasonable accommodation for the application process, that it will be unable to provide the

DEF 0298



**UAMS**

**COLLEGE OF MEDICINE**
DEPARTMENT OF NEUROLOGY
UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

4301 W. Markham St., #500
Little Rock, AR 72205-7199

501-686-5135
501-686-8689 (fax)

www.uams.edu/neurology

June 17, 2010

Debra H. Fiser, M.D.
Vice-Chancellor, UAMS
Dean, College of Medicine
UAMS Slot 558

Dear Dean Fiser,

The grievance hearing regarding Dr. Brian Schwab was held on June 16, 2010. The committee members included the following: Alan Bagley, M.D., Psychiatry Resident; David Hutchins, M.D., Department of Obstetrics and Gynecology; Ronald (Arlo) Kahn, M.D., Department of Family and Community Medicine; Aaron Gardner, M.D., Pediatric Resident; Robert Lorsbach, M.D., Department of Pathology; and myself. We heard testimony provided by witnesses for Dr. Brian Schwab and Dr. Charles Napolitano, Professor and Program Director for Anesthesia. Following the hearing, the Grievance Committee met. To quote from the GME Policy 1.420 regarding dismissal, Item 5 "Immediate dismissal can occur at anytime without prior notification in instances of gross misconduct, including, but not limited to, theft of money or property; physical violence directed at an employee, visitor or patient; use of or being under the influence of alcohol or controlled substances while on duty; patient endangerment; illegal conduct".

We addressed the question, "Was Dr. Schwab's dismissal in accordance with Policy 1.420 detailing grounds for immediate dismissal of a resident?" We voted as follows: 4 people voted that they did not feel the policy was followed and two people voted that they felt that the policy was followed.

For those who felt that the policy was followed, the following comments were made. The incidents described in which Dr. Schwab was to round on patients on the VA Surgery Service and failed to do so in a timely fashion and failed to stay to present patients he had seen on the Cardiology Consultation Service were felt to be indicative that he was endangering patients care. It was also noted that he had poor insight into his own problems and did not take responsibility for his actions.

For those who felt that the policy was not followed the following comments were noted as influencing their decision. They did not feel there was evidence of patient endangerment clearly demonstrated by the witnesses. They agreed that there was theoretical concern about patient endangerment given his actions, but no evidence of such endangerment was clearly provided. Also commented upon was testimony did not demonstrate gross misconduct had occurred. There was concern by committee members regarding the lack of timely communication between Anesthesia and Dr. Schwab

**EXHIBIT  D-6**



regarding his poor performance on the VA surgical rotation in January 2010 and that he would not receive credit for it.  There was also concern about the lack of documentation of all of the interactions between Dr. Schwab and the Program Director.

All members of the committee were concerned about Dr. Schwab's performance and agreed with the need for sanction.

Potential options at this point proposed by the committee are as follows:  He could once again be given the option of resigning from the program.  Alternatively, he could be given the option of being allowed to return on probation to finish the required amount of training he needs to get credit for his PGY-1 year.  This would require close supervision and a remediation plan discussed beforehand.  Failure to meet requirements of the remediation plan could potentially lead to his dismissal before he finished his PGY-1 year.

Respectively submitted,

Stacy A. Rudnicki, M.D.
for the Grievance Committee Members
Kathryn and J. Thomas May Professor of ALS
Director, MDA ALS Clinic
Department of Neurology

4301 W. Markham St., #550
Little Rock, AR 72205

501-686-5350
501-686-8160 (fax)
FiserDebraH@uams.edu

www.uams.edu

Debra H. Fiser, M.D.
Dean, College of Medicine
Vice Chancellor, UAMS



# UAMS

## COLLEGE OF MEDICINE

UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

June 30, 2010

Brian Schwab, M.D.
1154 Municipal Rd
Lehighton, PA  18235

Charles A. Napolitano, M.D., Ph.D.
Professor, Program Director
Division of Cardiothoracic Anesthesia
Slot # 515

Dear Drs. Napolitano and Schwab:

Pursuant to UAMS's Graduate medical Education Policy 1.410, I have received the recommendation of the Grievance Panel Dated June 17, 2010.  Under Policy 1/410, Step II, Section E.8, I received neither a timely appeal concerning the panel findings from the Grievant, Dr. Schwab, nor the Respondent, Dr. Napolitano.  The Grievance Panel concluded in a four to two vote that "patient endangerment" had not occurred; therefore, immediate dismissal was not warranted under UAMS policy.  I note that two members of the Grievance Panel felt that patient endangerment warranted immediate dismissal while four other members of the Grievance Panel "agreed that there was theoretical concern about patient endangerment given [Dr. Schwab's] actions."  As such, it appears to me that Dr. Napolitano's concerns over Dr. Schwab's performance were warranted.

However, based upon the Grievance Panel's conclusions, I will uphold the Grievance Panel's decision.  I noted that the entire Grievance Panel was "concerned about Dr. Schwab's performance and agreed with a need for sanctions."  The Grievance Panel proposed two "potential" remediation options: (1) giving Dr. Schwab the option to resign from the program, or (2) allowing him to return on probation to finish the required amount of training to receive credit for his PGY-1 year.  I accept the Grievance Panel's recommendations and would expect Dr. Napolitano and the Department of

**EXHIBIT D-7**

DEF 0816

Brian Schwab, M.D.
Charles A. Napolitano, M.D., Ph.D.
June 30th, 2010
Page 2

Anesthesiology to create any reasonable supervision and remediation plan that they believe would allow Dr. Schwab to finish his PGY-1 year and insure patient safety.

Sincerely,

*Debra H. Fiser*

Debra H. Fiser, M.D.
Dean, College of Medicine
Vice Chancellor, UAMS

DEF 0817

CHISENHALL, NESTRUD & JULIAN, P.A.
ATTORNEYS AT LAW
REGIONS CENTER
400 WEST CAPITOL, SUITE 2840
LITTLE ROCK, ARKANSAS 72201
TELEPHONE (501) 372-5800
FAX (501) 372-4941

www.onjlaw.com

July 9, 2010

VIA FACSIMILE 686-8160

Debra H. Fiser, MD
Dean College of Medicine
University of Arkansas for Medical Science
4301 W. Markham, Suite 550
Little Rock, AR  72205

Re:   Brian Schwab, M.D.

Dear Dean Fiser:

Thank you for your letter of June 30, 2010, and your decision to accept the Grievance Panel's recommendations.  An issue has arisen as to what is a reasonable remediation plan to allow Dr. Schwab to successfully complete his PGY-1 year.

Dr. Schwab successfully completed his cardiology rotation in February and was performing well in his March rotation in medicine under Dr. DelGiacco.  Dr. DelGiacco described Dr. Schwab as one of the best residents he had seen.  From the evaluations, Dr. Schwab's performance warrants credit towards his PGY-1 requirements.

Dr. Schwab appreciates that the VA surgical rotation was problematic and appreciates that he is not being required to return to the VA surgical rotation, under the Anesthesiology Department's remediation plan.  He also believes that his low marks in the VA surgical rotation were, at least in part, related to misperceptions about his attitude that are attributable to characteristics of his Attention Deficit, Hyperactivity Disorder.

This subjective assessment led to the evaluation that Dr. Schwab lacked medical knowledge.  His successful performance under the COMLEX is a more accurate measure of his medical knowledge and shows Dr. Schwab has a better than average level of medical knowledge when objectively assessed.

Dr. Schwab understands that Dr. Napolitano and Dr. Jaffar have expressed that they do not intend the remediation plan to be punitive in nature.  However, receiving no credit for his work in the cardiology rotation or the medicine rotation in 2010 appears to be punitive.  Dr. Schwab is hopeful that the remediation plan can also include additional resources, mentoring opportunity, coaching, instruction, study aids or direction on how to improve, as this is his sincere desire.

**EXHIBIT D-8**

DEF 0823

CHISENHALL, NESTRUD & JULIAN, P.A.

Dr. Schwab believes that a reasonable remediation plan would acknowledge credit for his work in the February and March rotations towards the six months remediation plan and that he has an additional four months of rotation to complete PGY-1.

Sincerely,

Denise Reid Hoggard

DEF 0824



# UAMS

## COLLEGE OF MEDICINE

UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES

**Debra H. Fiser, M.D.**
Dean, College of Medicine
Vice Chancellor, UAMS

**OFFICE OF THE DEAN**

4301 W. Markham St., #550
Little Rock, AR 72205-7199

501-686-5350
501-686-8407 (fax)
FiserDebraH@uams.edu

www.uams.edu/com

**COPY**

July 13, 2010

Ms. Denise Reid Hoggard
Chisenhall, Nestrud & Julian, P.A.
400 West Capitol, Suite 2840
Little Rock, AR 72201

Re:   Brian Schwab, M.D.

Dear Ms. Hoggard:

I am in receipt of your letter dated July 9, 2010. Your letter appears to make two specific requests:
(1) allow Dr. Schwab to obtain credit for his February and March rotations and (2) shorten Dr.
Napolitano's and Dr. Jaffar's remediation plan from four to six months. Before writing to you, I
reviewed a copy of Mark Hagemeier's letter to you dated July 7, 2010, as I understand this letter
confirmed the basic outline of the supervision and remediation plan that Dr. Napolitano, Dr. Jaffar,
and Dr. Clardy hoped to implement with Dr. Schwab upon his return. I also received input from Dr.
Clardy regarding the educational aspects of the remediation plan designed by Dr. Napolitano and Dr.
Jaffar.

Although I understand the issues you raise on behalf of Dr. Schwab in your letter, those concerns must
be weighed against the need of Dr. Napolitano and Dr. Jaffar to ensure patient safety, and weighed
against the educational mission of the UAMS Department of Anesthesiology. I do not find it
unreasonable that Dr. Napolitano and Dr. Jaffar wish to have Dr. Schwab repeat his PGY-1 year from
the point he began experiencing academic problems. Thus, a six-month remediation plan appears
reasonable to me. I also understand from Dr. Clardy that Dr. Schwab cannot receive credit for his
cardiology rotation in March under Dr. DelGiacco, as Dr. Schwab did not complete enough days for
such credit. Again, granting Dr. Schwab six months of academic credit for his work in the
Anesthesiology Department seems reasonable.

Further, I do not find any of the other points outlined in Mr. Hagemeier's letter to be unreasonable.
Specifically, I believe the plan allowing Dr. Schwab to meet with Dr. Napolitano and Dr. Jaffar in the
middle of each monthly rotation is an excellent one. This mid-month meeting will, I hope, lead to
better communication between all parties and the prevention of any misunderstanding regarding Dr.
Schwab's performance.

Finally, I believe it is reasonable for Dr. Schwab to begin his training again at the first of August,
2010.

**EXHIBIT  D-9**

DEF 0825

In summary, I find the plan set forth for Dr. Schwab's return to be reasonable and in compliance with my letter of June 30, 2010.  Thank you for seeking clarification on Dr. Schwab's behalf.

Sincerely,

Debra H. Fiser, M.D.
Dean, College of Medicine
UAMS

cc:     Dr. Charles A. Napolitano
        Dr. Muhammad Jaffar
        Dr. James A. Clardy
        Mr. Mark A. Hagemeier

DEF 0826

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

BRIAN SCHWAB, D.O.,                                         PLAINTIFF,

V.                                        CASE NO. 4:11-cv-00011-BSM

UNIVERSITY OF ARKANSAS, ET AL.,                           DEFENDANTS.

## DECLARATION OF JAMES CLARDY, M.D.

1.  My name is James Clardy. I currently serve as the Associate Dean for the Graduate
    Medical Education at UAMS. I attended college at Harding University and received a
    degree in Biology. I graduated in 1980. I went to medical school at UAMS and
    graduated in 1986. I then finished a five year residency and fellowship in psychiatry at
    UAMS and NIMH. I joined the staff of UAMS in 1993.

2.  UAMS is the State of Arkansas's only teaching hospital. Medical school is generally a
    four-year program of study. It is the first phase of medical education for a physician.
    Graduate Medical Education is the second phase of the continuum of education as
    students prepare for a career as a physician. Upon graduation and receiving an M.D.
    degree, most "students" enter graduate medical education in the form of residency
    programs. The UAMS College of Medicine sponsors 19 core residency programs and 39
    fellowship programs. Each of these programs is housed in a clinical department under
    the direction of a program director and the departmental chair, and the number of years in
    each residency varies by program. Anesthesiology is one of the residency programs
    provided at UAMS. The College of Medicine and each residency program is accredited
    by the Accreditation Counsel for Graduate Medical Education ("ACGME") through the
    Institutional Review Committee and the Residency Review Committees, both of which
    are physician groups that monitor programs for compliance with ACGME regulations.
    Most in-coming residents obtain positions at UAMS through the National Resident
    Matching Program. Osteopathic training is not accredited by the ACGME.

3.  No programs are on probation, and all programs are in good standing.

4.  As the Associate Dean for GME, it is my job to maintain institutional and program
    accreditation. One of my main functions as Associate Dean for GME is to make sure our
    Graduate Medical Education Policies and Procedures are followed. I have attached to
    this Declaration as Exhibit E-1 a true and correct copy of GME Policy 1.410,
    Adjudication of Resident Grievances.

5.    I have attached to this Declaration as Exhibit E-2 a true and correct copy of GME Policy 1.420, Academic and Other Disciplinary Actions (probation, suspension and dismissal).

6.    In late February or early March, 2010, Dr. Napolitano contacted me regarding Dr. Schwab's academic performance.  My role in any disciplinary action to be implemented by a department is to ensure that GME policies are followed.  In the case of the Department of Anesthesiology, their clinicians would have to make a determination of what constitutes "patient endangerment" as that term is defined in GME Policy 1.420 to warrant immediate dismissal under that Policy.

It is my understanding that at the Clinical Competency Committee meeting held on March 10, 2010, all ten Anesthesiologists in attendance determined that Dr. Schwab had endangered patients based upon the information that they were provided at the meeting, including but not limited to, the V.A. Surgery evaluation of January 2010.

Prior to his termination on March 18, 2010, I spoke with Dr. Schwab.  During that conversation he did not inform me that he suffered from ADHD, and he did not request an accommodation for ADHD.

7.    I served as Dean Fiser's designee in setting up the grievance hearing that was conducted on July 16, 2010 for Dr. Schwab.  Besides making some initial comments, I did not substantively participate in the rest of the grievance hearing.

8.    On July 6, 2010, I became aware that Schwab's counsel, Denise Hoggard, sent UAMS counsel, Mark Hagemeier, a letter requesting a "reasonable accommodation."  I have attached to this Declaration as Exhibit E-6, a copy of that letter.  I participated in a telephone conversation between Hoggard, Dr. Schwab, Dr. Napolitano, Dr. Jaffar, Mark Hagemeier and myself on July 6, 2010.  In preparation for that telephone conversation I reviewed an e-mail that Denise Hoggard had sent Mark Hagemeier on July 6, 2010.  I have attached to this Declaration as Exhibit E-7, a copy of that e-mail.  In that e-mail, Ms. Hoggard asked about the remediation plan, the timetable for Dr. Schwab's return, his pay, his eligibility to continue to the PGY-2 year if he successfully completed his PGY-1 year, and Dr. Schwab's options for completing his PGY-1 year here at UAMS in conjunction with the residence program he had begun on July 1, 2010 in Rockaway, New York.

9.    After the telephone conversation on July 6, 2010, I received a copy of Mark Hagemeier's letter to Denise Hoggard dated July 7, 2010.  I have attached to this Declaration as Exhibit E-8 a true and correct copy of that letter.  This July 7, 2010 letter attempted to address each point raised in Hoggard's July 6, 2010 e-mail, and to the best of my recollection, all these matters were discussed during the July 6 telephone conversation.

As to a remediation plan, Dr. Schwab would complete a 6-month program. Dr. Schwab would not repeat a general surgery rotation at the V.A., but he would participate in another surgery rotation.

As to a timetable, Dr. Schwab could choose to return on either July 12 or August 2, 2010. He was given a 'sooner and later' date in an attempt to suit his needs and allow a clinical schedule to be formulated.

As to his pay, Dr. Schwab would be paid upon his return to UAMS at the contract rate he was under previously.

As to his eligibility to proceed to his PGY-2 year, we indicated that he would be eligible to continue if he successfully completed his PGY-1 year and his performance level was adequate.

With regard to working in conjunction with his residency program in New York, we indicated that he could not continue to work in the Osteopathic Program or receive credit for that program if he chose to return to UAMS.

Further, by this letter, UAMS indicated that Drs. Jaffar and Napolitano would want Dr. Schwab to check with his attending physician in the middle of each monthly rotation to discuss how he was doing. We discussed this accommodation for Dr. Schwab so that he would get input halfway through a rotation to find out how he was doing, as opposed to waiting until the end, or until the evaluation was filed with the Anesthesiology Department. We further wanted Dr. Schwab to meet with either Dr. Jaffar or Dr. Napolitano after each month's rotation so that they could discuss any problems arising in that rotation. Thus, Drs. Jaffar and Napolitano would be meeting with Dr. Schwab on a monthly basis instead of on a semi-annual basis. Finally, this letter was intended to see if Dr. Schwab had any more specific accommodations that he was requesting.

10. On Friday, July 16, 2010, Denise Hoggard, Schwab's counsel, e-mailed Mark Hagemeier, UAMS's counsel, the first specific accommodations regarding this matter. I have attached to this Declaration as Exhibit E-9, a copy of that e-mail. I met with Mark Hagemeier to discuss these accommodations on Wednesday, July 21, 2010. My understanding of Dr. Schwab's request was that he wanted the Anesthesiology Department to now employ New York state law, instead of ACGME policy guidelines, for his work hours. Since patient safety always comes first, I did not believe that we could guarantee Dr. Schwab work hours mandated by New York state law, since all other residents in the UAMS Anesthesiology Department would not be working under those hours. Hence, we might not have been able to provide patient coverage, at least as I understood Dr. Schwab's request. We simply could not promise that he could leave after 85 hours in an acute patient situation. After speaking with me, Mark Hagemeier sent

Denise Hoggard an interim e-mail regarding Schwab's recent accommodation requests. I have attached to this Declaration as Exhibit E-4, a copy of that e-mail. On July 23, 2010, Mark Hagemeier sent me a copy of Denise Hoggard's July 16th e-mail (Exhibit E-9) with a draft response based upon our conversation. I responded to Mr. Hagemeier's e-mail on Friday, July 23, 2010, at 11:25 p.m. I have attached to this Declaration as Exhibit E-10, a copy of this e-mail string. Before any response could be finalized and sent to Denise Hoggard, Dr. Fiser received Dr. Schwab's letter of July 26, 2010 (Exhibit D-10) stating that he was not returning to the UAMS Anesthesiology Residency Program. Dr Schwab unilaterally decided not to return to UAMS. And to my knowledge, neither he nor his counsel indicated that UAMS was not participating in good faith in the reasonable accommodation process until his letter to Dean Fiser.

11.   I hereby declare under penalty of perjury, that the preceding is true and correct to the best of my knowledge.


FURTHER SAYETH THE DECLARANT NOT.


JAMES CLARDY, M.D.                                   4-16-12
                                                    DATE

Policy of the Graduate Medical Education Committee
Section: Educational Administration
Subject: Adjudication of Resident Grievances
Number: 1.410
Date Developed: 1/89
Last Review/Revision: 2/06, 2008
Replaces: Previous policy, Adjudication of Resident Grievances, dated 6/02
ACGME Requirement: Institutional II.D.4.d. & e.; Common II.A.4.h

## Purpose

To establish fair policies and procedures for adjudication of resident (includes fellows) grievances related to actions which could result in dismissal, non-renewal of agreement of appointment, or any other action that could threaten a resident's intended career development.

A grievance procedure shall not be used to question a rule, procedure, or policy established by an authorized faculty or administrative body.  Rather, it shall be used as due process by a resident who believes that a rule, procedure, or policy has not been followed or has been applied in an inequitable manner. An action may not form the basis of a grievance if the resident merely challenges the judgment of the faculty as medical educators in evaluating the performance of the resident.

## Definitions

**GME Appeals Board:** A group of faculty members and residents appointed by the Dean of the College of Medicine (COM) and assembled to hear formal resident grievances.

**Grievance:** An expression of dissatisfaction when a resident believes that any decision, act, or condition affecting his or her program of study is arbitrary, illegal, or creates unnecessary hardship. Such grievance may concern, but is not limited to, the following: duties assigned to a resident; application of hospital or college policies; questions regarding the non-reappointment, non-promotion, suspension, or dismissal of a resident; and discrimination because of race, national origin, gender, religion, age, disability, or status as a disabled or Vietnam-era veteran; subject to the exception that complaints of sexual harassment will be handled in accordance with the specific published policies of the University of Arkansas for Medical Sciences.

**Grievance Panel:** Those members of the Graduate Medical Education (GME) Appeals Board selected, by a drawing, to hear a grievance, in accordance with Step II of the grievance procedure.

**Grievant:** Any resident submitting a grievance as defined above.  For purposes of all GME Committee policies, the term "resident" applies to interns, residents, and fellows.

**Respondent:** A person or persons alleged to be responsible for the violation(s) alleged in a grievance.  The term may be used to designate persons with direct responsibility for a particular action or those persons with supervisory responsibility for procedures and policies in those areas covered in the grievance.

**Working Days:** Monday through Friday, excluding official UAMS holidays.

## Policy

EXHIBIT E-1

When an incident forming the basis for a grievance arises, the grievant must follow the procedure outlined below. Each grievance shall be handled promptly and impartially, without fear of coercion, discrimination, or reprisal. Each participant in a grievance shall do his or her part to protect this right.

No resident, faculty member, member of the Grievance Panel or GME Appeals Board, administrator, or witness shall suffer loss of compensation or leave time for the time spent in any step of this procedure.

Records shall be kept of each grievance process. These records shall be confidential to the extent allowed by law, and shall include, at a minimum: the written grievance complaint filed by the grievant, the written response filed by the respondent, the recording and documents of the hearing, the written recommendation of the Grievance Panel, the results of any appeal, the decision of the Dean, and any other material designated by the Dean or the Dean's designee. A file of these records shall be maintained in the office of the Associate Dean for GME.

For purposes of the dissemination of grievance precedents, separate records may be created and kept which indicate only the subject matter of each grievance, the resolution of each grievance, and the date of the resolution. These records shall not refer to any specific individuals, and they may be open to the public in accordance with the Arkansas Freedom of Information Act or pertinent Federal laws.

## Procedure
### Step I:  Initial Attempt of Resolution
A. The grievant must submit a written statement to the residency (fellowship) Program Director specifying the violation(s) alleged, the reason for the grievant's belief that he or she is aggrieved, and the remedy sought. This written statement must be received by the Program Director within fourteen (14) working days following the incident which forms the basis for the grievance.

B. Within ten (10) working days of receipt of the written statement, the Program Director and Departmental Chairperson will attempt to resolve the grievance by a discussion with the grievant. The Program Director and Departmental Chairperson have the discretion, after discussion with the grievant, to discuss the grievance with the respondent in an effort to resolve the grievance.

C. If the grievance is satisfactorily resolved by this discussion, the terms of the resolution shall be reduced to writing and shall be signed by the grievant, the Program Director, and the respondent (if the respondent has participated in any discussions with the Program Director in an effort to resolve the grievance and is affected by the resolution).

D. This initial attempt of resolution must conclude within ten (10) working days of the Program Director's initial discussion with the grievant. At the end of this ten-day period, if the grievance cannot be resolved, the grievant can immediately proceed to Step II, presentation of a formal grievance to the Dean of the COM.

### Step II: Formal Grievance to the Dean
A. Filing a grievance:
   1. Grievances submitted to the Dean of the COM shall be in writing and shall provide the following information: name and address of the grievant; nature, date, and description of the alleged violation(s); name(s) of person(s) responsible for the alleged violation(s); requested relief for corrective action; and any background information the grievant believes to be relevant.
   2. A grievance must be submitted to the Dean within ten (ten) working days of the completion of the initial attempt of resolution, outlined in Step I above.

B. Immediately upon receipt of a formal grievance, the Dean will give the respondent a copy of the grievance and will direct the respondent to submit to the Dean a written response to the charges within ten (10) working days. The respondent will be specifically warned not to retaliate against the grievant in any way. Retaliation

will subject the respondent to appropriate disciplinary action.

C. Following receipt of the written response, the Dean may elect to review and decide the issue, or the Dean may refer the issue to the Appeals Board for a hearing. If the Dean decides the issue, the decision shall be final, and there shall be no appeal. If the Dean refers the issue to the Appeals Board, the grievance will be heard pursuant to the Pre-Hearing Procedures and Hearing Procedures listed below.

D. Pre-Hearing Procedures:

1. Selection of Grievance Panel: When a grievance is referred to the GME Appeals Board, a Grievance Panel, composed of two (2) residents and four (4) faculty shall be selected as follows: The Dean, or the Dean's designee, and the grievant will review the membership of the GME Appeals Board. The Dean, or the Dean's designee, in that person's sole discretion, shall remove any member who may be considered inappropriate for the hearing (e.g., a resident or faculty member directly involved in the issue being appealed should not sit on the panel for that complaint). The names of the remaining members will then be written on tabs of paper, folded, and randomized by mixing. The grievant will draw names from the container. The first two residents and first four faculty names will constitute the Grievance Panel, provided they are available to attend the Hearing. The third resident name and the fifth faculty name drawn are the first resident and faculty alternates, respectively; the fourth resident name and the sixth faculty name drawn are the second resident and faculty alternates, respectively, etc., until all resident and faculty names are listed in a sequence of priority.

2. Scheduling of Hearing: The Hearing will be conducted no sooner than fifteen (15) working days and no later than twenty (20) working days after the drawing unless the Dean determines there is a specific reason why another time must be selected.

3. Representation: The grievant and the respondent may have one (1) person, who may be an attorney, to assist in the initiation, filing, processing, or hearing of the formal grievance. However, this person may not address the Grievance Panel, speak on behalf of the grievant or respondent, question witnesses, or otherwise actively participate in the hearing. The Grievance Panel may also be assisted and advised by University counsel at its discretion.

4. Evidence: No later than five (5) working days prior to the hearing, the grievant and the respondent shall provide the Dean, or the Dean's designee, with all documents to be used and relied upon at the hearing and, also, with the name, address, and telephone number of any representative and witnesses. There will be a simultaneous exchange of this information between the parties, which will be facilitated by the Dean, or the Dean's designee, five (5) working days before the date of the hearing.

5. Information to the Grievance Panel and Election of Chairperson: No later than three (3) working days prior to the Hearing, the Dean shall assemble the six members of the Grievance Panel. The Dean should provide the Grievance Panel with the documents and information submitted by the parties (as specified in paragraph 4 above), confirm the date of the Hearing, and withdraw from the room. The Grievance Panel should convene briefly for the sole purpose of electing a faculty member as chairperson and deciding whether the Grievance Panel requests the assistance of University counsel. The substance of the grievance shall not be discussed at this initial meeting, and neither the grievant, the respondent, nor their respective representatives are permitted to attend.

E. Hearing Procedures:

1. Record of the Hearing: The hearing will be recorded by recording devices supplied by UAMS. These recordings shall be maintained for a period of four (4) years after resolution of the grievance. The grievant or respondent may obtain a copy of the tapes from any recorded hearing, at the requesting party's expense. The deliberations of the Grievance Panel will not be recorded.

2. Dean's Announcement: At the beginning of the hearing, the Dean will announce the date, time, place, and purpose of the hearing, and will ask the members of the Grievance Panel to identify themselves by name and department. The grievant and the respondent will then identify themselves by name and department. Finally, any representative accompanying the grievant or the respondent shall identify himself or herself by name and title. The Dean will then give the Grievance Panel its charge. Following the charge, the Dean will withdraw from the room.

3. Private Hearing: The hearing shall be conducted in private. Witnesses shall not be present during the testimony of any party or other witness. Witnesses shall be admitted for testimony only and then asked to leave. The grievant and the respondent may hear and question all witnesses testifying before the Grievance Panel.

4. Presentation of Case: The grievant and respondent shall be afforded reasonable opportunity for oral opening statements, closing arguments, their own testimony, and presentation of witnesses and pertinent documentary evidence, including sworn, written statements.

5. Grievance Panel Rights: The Grievance Panel shall have the right to question any and all witnesses, to examine documentary evidence presented, and to summon other witnesses or review other documentation as the Grievance Panel deems necessary. The Grievance Panel has the right to limit testimony and presentation of other evidence to that which is relevant to the violation(s) alleged and to further limit testimony and other evidence that is cumulative and unnecessary.

6. Grievance Panel Deliberation: After the hearing is concluded, the Grievance Panel shall convene to deliberate in closed session and arrive at a majority recommendation. The Grievance Panel shall make its determination of whether or not a rule, procedure or policy was not followed or was applied in an inequitable manner based upon the evidence presented at the hearing, which is relevant to the issue(s) before the Grievance Panel. The Grievance Panel may make recommendations for resolution of the dispute. Neither the grievant, the respondent, nor their representatives may be present during the Grievance Panel deliberations.

7. Transmittal of the Recommendation: Within four (4) working days after the hearing is concluded, the Grievance Panel shall transmit a written copy of its recommendation to the Dean. The Dean will then mail, by certified mail, return receipt requested, a copy of the written document to the grievant and respondent at addresses previously provided by the grievant and the respondent.

8. Appeal of Recommendation of the Grievance Panel:

If either the grievant or the respondent wish to appeal the recommendation of the Grievance Panel, the grievant or respondent shall, within five (5) working days of the receipt of the recommendation, appeal the grievance recommendation to the Dean. The appeal shall be in writing, and it shall be based on one of the following: a substantial mistake of fact occurred, a fundamental misinterpretation of official policies is evident, or a significant procedural defect took place. These are the only grounds for contesting the determination of the Grievance Panel. Within five (5) working days of this appeal, the Grievance Panel will reconvene, in private, to consider whether there is merit to the appeal, review its previous determination, and revise it if appropriate. No new evidence or testimony shall be introduced at this time. Within two (2) working days of its having reconvened, the Grievance Panel will present its determination, revised or unchanged, in writing to the Dean. Within five (5) working days of receipt of the determination from the Panel, the Dean may accept it, amend it, reverse it, or refer it back to the Panel for reconsideration. The grievant and the respondent shall be notified in writing of the Dean's decision by certified mail, return receipt requested. The decision of the Dean shall be final, and there shall be no

appeal.

If the Dean receives no appeal, by either the grievant or the respondent, within the five (5) working day period described above, the Dean may consider the recommendation at the end of that time period. The Dean may accept the Grievance Panel recommendation, amend it, reverse it, or refer the grievance back to the Grievance Panel for reconsideration. The decision of the Dean shall be final, and there shall be no appeal.

G:\GME\GME\POLICY\1.410.DOC

Policy of the Graduate Medical Education Committee
Section: Educational Administration
Subject: Academic and Other Disciplinary Actions (Probation, Suspension and Dismissal)
Number: 1.420
Date Developed: 2/99
Last Review/Revision: 4/07, 1/2010
Replaces: previous policy of same name, dated 5/03
ACGME Requirement: Institutional IID.4.e. Common IIA.4.h

## Purpose

To define the circumstances which may result in probation, suspension or dismissal from the residency program (includes fellowship programs) and to establish fair policies and procedures for academic or other disciplinary actions taken against residents.

The position of resident (the term "resident" applies to interns, residents, and fellows) presents the dual aspects of a student in a post-graduate educational program and a participant in the delivery of patient care. A resident's continuation in the residency program is dependent upon satisfactory professional standards in the educational program and in the care of patients. Behavior that reflects poorly on professional standards, ethics, and collegiality are all components of a resident's academic evaluation.

## Definitions

**Probation:** a trial period in which a resident is permitted to redeem academic performance or behavioral conduct that does not meet the standard of the program.

**Suspension:** a period of time in which a resident is not allowed to take part in all or some of the activities of the program. Time spent on suspension may not be counted toward the completion of program requirements.

**Dismissal:** the condition in which a resident is directed to leave the residency program, with no award of credit for the current year, termination of the resident's Agreement of Appointment, and termination of all association the University of Arkansas for Medical Sciences College of Medicine and its participating teaching hospitals.

## Policy

Each Program Director, in consultation with the Departmental Chairperson and Departmental Education Committee, must implement written criteria and processes for academic and other disciplinary actions within the program including, but not limited to, probation, suspension and dismissal from the residency program. The specific actions of probation, suspension, and dismissal must follow the guidelines listed below. The particular administrative action imposed shall be based on individual circumstances and will not necessarily follow the sequential order in which they are described below. A resident involved in any of the actions of probation, suspension, dismissal has the right to appeal according to the GMEC Policy, 1.410, Adjudication of Resident Grievances.

**EXHIBIT E-2**

DEF 0225

**Procedure**

**Probation**

1. A resident may be placed on probation by a Program Director for reasons including, but not limited to any of the following:

    a. failure to meet the performance standards of an individual rotation;

    b. failure to meet the performance standards of the program;

    c. failure to comply with the policies and procedures of the GME Committee, the UAMS Medical Center, or the participating institutions;

    d. misconduct that infringes on the principles and guidelines set forth by the training program;

    e. documented and recurrent failure to complete medical records in a timely and appropriate manner;

    f. when reasonably documented professional misconduct or ethical charges are brought against a resident which bear on his/her fitness to participate in the training program.

2. When a resident is placed on probation, the Program Director shall <u>notify the resident in writing</u> in a timely manner, usually within a week of the notification of probation. The written statement of probation will include a length of time in which the resident must correct the deficiency or problem, the specific remedial steps and the consequences of non-compliance with the remediation.

3. Based upon a resident's compliance with the remedial steps and other performance during probation, a resident may be:

    a. continued on probation;

    b. removed from probation;

    c. placed on suspension; or

    d. dismissed from the residency program.

**Suspension**

1. A resident may be suspended from a residency program for reasons including, but not limited, to any of the following:

    a. failure to meet the requirements of probation;

    b. failure to meet the performance standards of the program;

    c. failure to comply with the policies and procedures of the GME Committee, the UAMS Medical Center, or the participating institutions;

    d. misconduct that infringes on the principles and guidelines set forth by the training program;

    e. documented and recurrent failure to complete medical records in a timely and appropriate manner;

    f. when reasonably documented professional misconduct or ethical charges are brought against a resident which bear on his/her fitness to participate in the training program;

    g. when reasonably documented legal charges have been brought against a resident which bear on his/her fitness to participate in the training program;

    h. if a resident is deemed an immediate danger to patients, himself or herself or to others;

DEF 0226

     i.  if a resident fails to comply with the medical licensure laws of the State of Arkansas.

2.  When a resident is suspended, the Program Director shall notify the resident with a <u>written statement of suspension</u> to include:

    a. reasons for the action;
    b. appropriate measures to assure satisfactory resolution of the problem(s);
    c. activities of the program in which the resident may and may not participate;
    d. the date the suspension becomes effective;
    e. consequences of non-compliance with the terms of the suspension;
    f. whether or not the resident is required to spend additional time in training to compensate for the period of suspension and be eligible for certification for a full training year.

A copy of the statement of suspension shall be forwarded to the Associate Dean for Graduate Medical Education and the Assistant Dean for Housestaff Affairs.

3.  During the suspension, the resident will be placed on "administrative leave", with or without pay as appropriate depending on the circumstances.

4.  At any time during or after the suspension, resident may be:

    a. reinstated with no qualifications;
    b. reinstated on probation;
    c. continued on suspension; or
    d. dismissed from the program.

## Dismissal

1.  Dismissal from a residency program may occur for reasons including, but not limited to, any of the following:

    a. failure to meet the performance standards of the program;
    b. failure to comply with the policies and procedures of the GME Committee, the UAMS Medical Center, or the participating institutions;
    c. illegal conduct;
    d. unethical conduct;
    e. performance and behavior which compromise the welfare and of patients,   self, or others;
    f. failure to comply with the medical licensure laws of the State of Arkansas;
    g. inability of the resident to pass the requisite examinations for licensure to practice medicine in the United States, if required by the individual residency program.
    h. misrepresentation of information in the residency appointment application.

2.  The Program Director shall contact the Associate Dean for GME and provide written documentation which led to the proposed action.

3.  When performance or conduct is considered sufficiently unsatisfactory that dismissal is being considered, the Program Director shall notify the resident with a <u>written statement</u> to include:

    a.  reasons for the proposed action,
    b.  the appropriate measures and timeframe for satisfactory resolution of the problem(s).

4.  If the situation is not improved within the timeframe, the resident will be dismissed.

DEF 0227

5.   Immediate dismissal can occur at any time without prior notification in instances of gross misconduct, including, but not limited to, theft of money or property; physical violence directed at an employee, visitor, or patient; use of, or being under the influence of, alcohol or controlled substances while on duty; patient endangerment; illegal conduct.

6.   When a resident is dismissed, the Program Director shall provide the resident with a written letter of dismissal stating the reason for the action and the date the dismissal becomes effective.  A copy of this letter shall be forwarded to the Associate Dean for GME and the Assistant Dean for Housestaff Affairs.

I:\GME\GME\POLICY\I.420.doc

DEF 0228

## Hagemeier, Mark

| | |
|---|---|
| From: | Hagemeier, Mark |
| Sent: | Thursday, July 22, 2010 12:36 PM |
| To: | 'Denise Hoggard' |
| Cc: | White, Jennifer B |
| Subject: | Dr. Schwab |

Denise:

I am working on a response to your accommodation email. I've spoken with Jim Clardy regarding same, and I'll get a lengthier response to you by COB today, I think. Basically, we will follow the ACGME guidelines. Obviously, there may be some need for schedule modifications, but we will try to keep this to a minimum.

More importantly, the Department needs to know if Dr. Schwab plans to return to a rotation in August or not. I spoke with Jennifer White in Anesthesiology just a moment ago, and she indicated that they have not heard from your client. If he plans to return, he should begin contacting Jennifer to work out a smooth transition. If he does not plan to return, would you please let me know that fact, too.

Thank you.

Mark A. Hagemeier
Associate General Counsel
University of Arkansas System, UAMS
4301 W. Markham, Slot #860
Little Rock, AR 72205
Phone: 501-686-7608
Fax:    501-686-7736
Email:  MHagemeier@uams.edu

**EXHIBIT E-4**

DEF 0829



**UAMS**
UNIVERSITY OF ARKANSAS
FOR MEDICAL SCIENCES

Mark Hagemeier
Associate General Counsel
501-686-7608 / Fax 501-686-7736

Office of General Counsel
4301 West Markham Street, #860
Little Rock, AR 72205-7199

July 26, 2010

Ms. Denise Reid Hoggard
Chisenhall, Nestrud & Julian, P.A.
400 West Capitol, Suite 2840
Little Rock, AR  72201

Re:   Dr. Schwab's Fax to Dr. Fiser dated July 26, 2010

Dear Denise:

At 8:00 A.M. on July 26, 2010, Dr. Fiser forwarded to me a faxed letter she received from Dr. Schwab earlier that morning.  I called you after receiving the letter from Dr. Fiser, and after our telephone conversation, I e-mailed you a copy of Dr. Schwab's letter, as you indicated you had not seen a copy of same.  I write to you in order to respond to several points raised by Dr. Schwab.

In the second paragraph of his letter, it appears Dr. Schwab contends that he requested an ADA accommodation in mid-January, 2010.  I recall the facts developed at his hearing to show that no one, neither the program directors nor the attending physicians, ever knew of Dr. Schwab's ADHD diagnosis prior to his termination.  Further, no one testified that Dr. Schwab requested an ADA accommodation prior to the grievance hearing.  As I recall the testimony, and I've checked this with Matt McCoy, too, Dr. Schwab testified that he filled out a form indicating he had an ADHD diagnosis, but he requested no accommodation.  This form was destroyed and was not located in Dr. Schwab's records.

In the second and third paragraphs of his letter, Dr. Schwab appears to contend that I have not been speedy enough in responding to his ADA accommodation request.  I would note the following facts:
- On July 2, 2010, you wrote me stating that "Dr. Schwab is requesting a reasonable accommodation for his disability during his completion of PGY-1 with the UAMS Anesthesiology Department."  My records indicate that I received that letter from you on July 6, 2010.  If you or your client possesses a written ADA accommodation request prior to that date, I would appreciate your forwarding same to me.

<u>**EXHIBIT E-5**</u>

DEF 0831

Ms. Denise Reid Hoggard
Re:     Dr. Schwab's Fax to Dr. Fiser dated July 26, 2010
July 26, 2010
Page 2

- On July 6, 2010, you and I had a conversation with Dr. Schwab, Dr. Jaffar, Dr. Napolitano, and Dr. Clardy regarding Dr. Schwab's remediation program. I followed this conversation up with a fax/letter dated July 7, 2010, and I stated, among other things, "that you would need to specifically address what issues you needed an accommodation for, and although we discussed some issues in the general sense [in our telephone conversation], I would need more specifics from you and Dr. Schwab in order to enter into a dialogue on reasonable accommodations [under the ADA]."

- On Friday, July 16, 2010, at 12:09 p.m., you sent me an e-mail in response to my July 7 letter/fax. This e-mail contained specific accommodation requests.

- I forwarded your e-mail on to Dr. Clardy for review that same day. He and I discussed same at a meeting late on Wednesday, July 21, 2010.

- On Thursday, July 22, 2010, at 12:36 p.m., I sent you an e-mail confirming that I spoke with Dr. Clardy and that we would follow the ACGME guidelines, which were in large part the contents of your July 16 e-mail to me.

- On Friday, July 23, 2010, I sent a point-by-point draft response of your July 16 e-mail to Dr. Clardy for review.

- After business hours, on Friday, July 23, 2010, at 11:25 p.m., Dr. Clardy responded to my earlier e-mail of that day.

- I read Dr. Clardy's e-mail some time on Saturday, July 24, 2010. Before I could forward specific responses on to you, I received Dr. Schwab's fax/letter to Dr. Fiser at 8:00 A.M. on Monday, July 26, 2010.

Thus, after I first received specific accommodation requests from Dr. Schwab about noon on Friday, July 16, 2010, I was ready to respond on Monday morning, July 26, 2010 with specific responses. I believe this is the reasonable accommodation process at work. Neither Dr. Clardy nor I delayed in any unreasonable way in working out a response to Dr. Schwab's specific requests for reasonable accommodations.

Finally, I note that Dr. Schwab began a residency program in New York shortly after his termination from his UAMS Anesthesiology residency. I noted in my July 7 letter to you that it was not possible for Dr. Schwab to continue to work in that New York residency program, or receive credit for that program, if he chose to return to his Anesthesiology residency program at UAMS. I do not know how these factors played in Dr. Schwab's decision not to return to UAMS, but I would note that my office has worked diligently with Drs. Fiser, Clardy, Napolitano, and Jaffer to make Dr. Schwab's

DEF 0832

Ms. Denise Reid Hoggard
Re:     Dr. Schwab's Fax to Dr. Fiser dated July 26, 2010
July 26, 2010
Page 3

reintegration into the Anesthesiology Department's residency program as seamless as possible.

If you believe I have misstated any of the facts in my timeline, I invite your response to same.

Sincerely,

Mark A. Hagemeier

cc:    Debra H. Fiser, M.D.
       James A. Clardy, M.D.
       Charles A. Napolitano, M.D.
       Muhammad Jaffar, M.D.

DEF 0833

CHISENHALL, NESTRUD & JULIAN, P.A.
ATTORNEYS AT LAW
REGIONS CENTER
400 WEST CAPITOL, SUITE 2840
LITTLE ROCK, ARKANSAS 72201
TELEPHONE (501) 372-5800
FAX (501) 372-4941

www.onjlaw.com

July 2, 2010

Mark Hagemeier
Associate General Counsel
University of Arkansas System, UAMS
4301 W. Markham, Slot #860
Little Rock, AR 72205

        RE:    Brian Schwab, D.O.

Dear Mark:

        Pursuant to the Americans with Disabilities Act Amendment Act, Dr. Schwab is requesting a reasonable accommodation for his disability during his completion of PGY-1 with the UAMS Anesthesiology Department.

        As we have discussed, Dr. Schwab's exercise of his federally protected right during the UAMS grievance procedures nor should his request for a reasonable accommodation adversely affect his successful completion of this program.

        Further, Dr. Schwab expects that having exercised rights under the UAMS grievance procedure will not subject him to adverse actions against him during the completion of his contract year.

                                Sincerely,

                                Denise Reid Hoggard

cc:    Brian Schwab

**EXHIBIT E-6**

DEF 0819

Hagemeier, Mark

From:       Denise Hoggard [DHoggard@cnjlaw.com]
Sent:       Tuesday, July 06, 2010 11:41 AM
To:         Hagemeier, Mark
Subject:    RE: Dr. Schwab

*RV 7/6/10*

Here are the questions I had asked:

What does UAMS see as the remediation plan, timetable, payment, eligibility to
continue for PGY-2 if he successfully completes PGY-1, and what are options for
completing his PGY-1 in conjunction with his current work in NY

Denise Reid Hoggard
*CHISENHALL, NESTRUD & JULIAN, P.A.*
400 West Capitol Avenue, Suite 2840
Little Rock, Arkansas 72201
Phone: (501) 372-5800
Facsimile: (501) 372-4941
Email: dhoggard@cnjlaw.com

From: Hagemeier, Mark [mailto:MHagemeier@uams.edu]
Sent: Tuesday, July 06, 2010 9:35 AM
To: Denise Hoggard
Subject: RE: Dr. Schwab

Thanks.

Mark A. Hagemeier
Associate General Counsel
University of Arkansas System, UAMS
4301 W. Markham, Slot #860
Little Rock, AR  72205
Phone: 501-686-7608
Fax:    501-686-7736
Email:  MHagemeier@uams.edu

From: Denise Hoggard [mailto:DHoggard@cnjlaw.com]
Sent: Tuesday, July 06, 2010 9:19 AM
To: Hagemeier, Mark
Subject: RE: Dr. Schwab

Here is the letter of which I spoke

Denise Reid Hoggard
*CHISENHALL, NESTRUD & JULIAN, P.A.*
400 West Capitol Avenue, Suite 2840
Little Rock, Arkansas 72201
Phone: (501) 372-5800
Facsimile: (501) 372-4941
Email: dhoggard@cnjlaw.com

1

DEF 0818

**EXHIBIT E-7**



**UNIVERSITY OF ARKANSAS
FOR MEDICAL SCIENCES**

Mark A. Hagemeier
Associate General Counsel
501-686-7608
501-686-7736 Fax

Office of General Counsel
4301 West Markham Street, #860
Little Rock, AR 72205-7199

July 7, 2010

**Via FAX Only: 501-372-4941**

Ms. Denise Reid Hoggard
Chisenhall, Nestrud & Julian, P.A.
400 West Capitol, Suite 2840
Little Rock, AR 72201

Re:    Brian Schwab, D.O.

Dear Denise:

This letter confirms yesterday's telephone conversation between you and Dr. Schwab and
me, Dr. Jaffar, Dr. Napolitano and Dr. Clardy.  Based upon Dr. Fiser's letter of June 30,
2010, which stated that Dr. Fiser "would expect Dr. Napolitano and the Department of
Anesthesiology to create any reasonable supervision and remediation plan that they
believe would allow Dr. Schwab to finish his PGY-1 year and ensure patient safety,"  we
discussed the basic plan for Dr. Schwab's re-entry into his PGY-1 year.  This plan
included the following:

- Dr. Schwab's return on July 12, or August 2.
  If Dr. Schwab began July 12, he could complete a July rotation.

- A six month program of remediation.
  Dr. Schwab would not repeat a general surgery rotation at the V.A., but he
  would participate in another surgery rotation(s).

- Dr. Schwab would be paid upon his return to UAMS at the contract rate he
  was under previously.

- Dr. Schwab would be eligible to continue as a PGY-2 if he successfully
  completed his PGY-1 year and if his performance level was adequate during
  his PGY-2 year.

**EXHIBIT E-8**

DEF 0820

Ms. Denise Reid Hoggard
July 7, 2010
Page 2

- Dr. Schwab could not continue to work in the osteopathic program in New York or receive credit for that program if he chose to return to his residency program here at UAMS.

Additionally, Drs. Jaffar and Napolitano would want Dr. Schwab to check with his attending physician in the middle of each of his rotations to discuss how he was doing. Dr. Schwab would then meet with either Dr. Jaffar or Dr. Napolitano thereafter so that he could discuss any problems that were arising in the middle of a rotation.

Further, we discussed your letter of July 2, 2010, in which you asked for a reasonable accommodation for Dr. Schwab's disability. I responded that you would need to specifically address what issues you needed an accommodation for, and although we discussed some issues in the general sense, I would need more specifics from you and Dr. Schwab in order to enter into a dialogue on reasonable accommodations.

Finally, it was my understanding Dr. Schwab disagreed with this six-month supervision and remediation plan. I certainly believe that this comports with both the spirit and the letter of Dr. Fiser's June 30, 2010 letter, and I will inform Dr. Fiser of this fact should you appeal to her for clarification of her June 30 letter.

Please give me a call if you have any questions or wish to discuss this matter.

Very truly yours,

Mark Hagemeier
Associate General Counsel

Cc:   Dr. Debra H. Fiser
       Dr. Charles A. Napolitano
       Dr. Muhammad Jaffar
       Dr. James A. Clardy

**Hagemeier, Mark**

| | |
|---|---|
| From: | Denise Hoggard [DHoggard@cnjlaw.com] |
| Sent: | Friday, July 16, 2010 12:09 PM |
| To: | Hagemeier, Mark |
| Cc: | Brschwab |
| Subject: | FW: Dr. Brian Schwab Requests for a Reasonable Accommodation |

As requested, I am making a written request for a reasonable accommodation on behalf of Dr. Schwab. In addition to the provisions of the remediation plan as proposed, Dr. Schwab is requesting the following to address his need for an accommodation:

ACGME policy provides that residents should work an average over a month of 80 hours per week and be on call once every three days. Dr. Schwab has become familiar with and is now working under New York state law which provides for residents to work a maximum 80 hours per week plus or minus 5 hours. ACGME policy provides that residents work a maximum of 24 hours continuously, plus five hours transitional time. New York state law provides for residents to work a maximum of 24 hours continuously, plus three hours transitional time.

Dr. Schwab is requesting as a reasonable accommodation that he be scheduled to work a maximum 80 hours per week plus or minus 5 hours; that he be scheduled to work a maximum of 24 hours continuously, plus three hours transitional time.

He is also requesting that he be scheduled with a minimum of 8 hours off between shifts; that he be scheduled for 24 hours off per week; and that no new patients be assigned after 24 hours of continuous duty.

Dr. Schwab requests the AGCME protocol of placing residents on call every third day for a 24 hours average day when on call be followed.

Because Dr. Schwab has a need for regular medication review with his treating physician, he will make every effort to schedule those appointments in the evenings. However, should he be unable schedule the appointments so as not to conflict with his work schedule, that he be allowed up to two hours during the workday, once per month, for a medical appointment.

As an accommodation to ensure that Dr. Schwab is meeting UAMS's reasonable expectations, he is requesting that he be provided a neutral mentor/reviewer who has full access to Dr. Schwab's evaluations and attendings whho would meet with him once a month or as needed. A suggestion for who might be able to serve in that role would include Jim McClarty or Dr. DelGiacco.

1

**EXHIBIT E-9**          DEF 0827

If you would like to discuss these requests, please let me know and I would be happy to do so, or alternatively will set up a call directly with Dr. Schwab, as you direct.

Denise Reid Hoggard
**CHISENHALL, NESTRUD & JULIAN, P.A.**
400 West Capitol Avenue, Suite 2840
Little Rock, Arkansas 72201
Phone:  (501) 372-5800
Facsimile:  (501) 372-4941
Email:  dhoggard@cnjlaw.com

DEF 0828

**Hagemeier, Mark**

| | |
|---|---|
| **From:** | Clardy, James A |
| **Sent:** | Friday, July 23, 2010 11:25 PM |
| **To:** | Hagemeier, Mark |
| **Cc:** | Clardy, James A |
| **Subject:** | RE: Dr. Schwab |

Here are my comments. I have a few more for Monday by phone or live. I have from mid-morning through the rest of the day open. Let me know when we can talk.

Jim

**From:** Hagemeier, Mark
**Sent:** Friday, July 23, 2010 10:21 AM
**To:** Clardy, James A
**Subject:** RE: Dr. Schwab

Jim: I know we discussed this. Does this look OK to you? (Please see the emails at the bottom, too.)

Denise:

Below in red is my initial response to your requests for accommodation.

As requested, I am making a written request for a reasonable accommodation on behalf of Dr. Schwab. In addition to the provisions of the remediation plan as proposed, Dr. Schwab is requesting the following to address his need for an accommodation:

ACGME policy provides that residents should work an average over a month of 80 hours per week and be on call once every three days. Dr. Schwab has become familiar with and is now working under New York state law which provides for residents to work a maximum 80 hours per week plus or minus 5 hours. ACGME policy provides that residents work a maximum of 24 hours continuously, plus five hours transitional time. New York state law provides for residents to work a maximum of 24 hours continuously, plus three hours transitional time.

UAMS will abide by the ACGME rules governing resident education and work hours. Obviously, New York law does not apply in Arkansas. Please note that the ACGME rules allow for an "average" of 80 hours per week. UAMS abides by this per week average, but any particular week may be somewhat greater or lesser.

Dr. Schwab is requesting as a reasonable accommodation that he be scheduled to work a maximum 80 hours per week plus or minus 5 hours; that he be scheduled to work a maximum of 24 hours continuously, plus three hours transitional time.

1

**EXHIBIT E-10**

See above, this seems reasonable.  This is the ACGME rule. The ACGME rule presently is 80 hours averaged, not plus/minus 5 hours. It could be 90+65+95+70. The 5 hour limit is something that Napolitano would have to judge.

He is also requesting that he be scheduled with a minimum of 8 hours off between shifts; that he be scheduled for 24 hours off per week; and that no new patients be assigned after 24 hours of continuous duty.

Jim? I'd say that the department strives to comply with all ACGME regulations. The resident must report any potential violations to the program director and take responsibility for helping with duty hours regulations. That is really true for all residents.

Dr. Schwab requests the AGCME protocol of placing residents on call every third day for a 24 hours average day when on call be followed.

See above. Same.

Because Dr. Schwab has a need for regular medication review with his treating physician, he will make every effort to schedule those appointments in the evenings. However, should he be unable schedule the appointments so as not to conflict with his work schedule, that he be allowed up to two hours during the workday, once per month, for a medical appointment.

This appears reasonable. Reasonable.

As an accommodation to ensure that Dr. Schwab is meeting UAMS's reasonable expectations, he is requesting that he be provided a neutral mentor/reviewer who has full access to Dr. Schwab's evaluations and attendings who would meet with him once a month or as needed.  A suggestion for who might be able to serve in that role would include Jim McClarty or Dr. DelGiacco.

Dr. Jim Clardy is open to meet with Dr. Schwab.  Dr. DelGiacco works for the VA, not UAMS, and he is neither in charge of resident education in general, nor anesthesiology residents in particular.  Thus, meetings with Dr. Clardy would be encouraged. Agree.

If you would like to discuss these requests, please let me know and I would be happy to do so, or alternatively will set up a call directly with Dr. Schwab, as you direct.

Mark A. Hagemeier
Associate General Counsel
University of Arkansas System, UAMS
4301 W. Markham, Slot #860
Little Rock, AR  72205

Phone: 501-686-7608
Fax:    501-686-7736
Email:  MHagemeier@uams.edu

---

**From:** Denise Hoggard [mailto:DHoggard@cnjlaw.com]
**Sent:** Thursday, July 22, 2010 7:11 PM
**To:** Hagemeier, Mark
**Subject:** RE: Dr. Schwab

## He would like to see the response to request for accommodations before he makes his final commitment.

Denise Reid Hoggard
**CHISENHALL, NESTRUD & JULIAN, P.A.**
400 West Capitol Avenue, Suite 2840
Little Rock, Arkansas 72201
Phone:  (501) 372-5800
Facsimile:  (501) 372-4941
Email:  dhoggard@cnjlaw.com

---

**From:** Hagemeier, Mark [mailto:MHagemeier@uams.edu]
**Sent:** Thursday, July 22, 2010 12:36 PM
**To:** Denise Hoggard
**Cc:** White, Jennifer B
**Subject:** Dr. Schwab

Denise:

I am working on a response to your accommodation email. I've spoken with Jim Clardy regarding same, and I'll get a lengthier response to you by COB today, I think.  Basically, we will follow the ACGME guidelines.  Obviously, there may be some need for schedule modifications, but we will try to keep this to a minimum.

More importantly, the Department needs to know if Dr. Schwab plans to return to a rotation in August or not.  I spoke with Jennifer White in Anesthesiology just a moment ago, and she indicated that they have not heard from your client. If he plans to return, he should begin contacting Jennifer to work out a smooth transition.  If he does not plan to return, would you please let me know that fact, too.

Thank you.

Mark A. Hagemeier
Associate General Counsel
University of Arkansas System, UAMS
4301 W. Markham, Slot #860
Little Rock, AR  72205
Phone: 501-686-7608
Fax:    501-686-7736
Email:  MHagemeier@uams.edu

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the

intended recipient, please contact the sender by reply
e-mail and destroy all copies of the original message..

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

BRIAN SCHWAB, D.O.,                                      PLAINTIFF,

V.                              CASE NO. 4:11-cv-00011-BSM


UNIVERSITY OF ARKANSAS, ET AL.,                         DEFENDANTS.


### DECLARATION OF TIMOTHY MARTIN, M.D.

1.  My name is Timothy Martin and I am the Chief of Pediatric Anesthesiology at Arkansas Children's Hospital.  I have held this position since 1996.

2.  I am a professor at the University of Arkansas for Medical Sciences, but I practice Pediatric Anesthesiology at Arkansas Children's Hospital.

3.  I received my medical degree from the University of Missouri at Kansas City School of Medicine in 1984.  Thereafter, I completed an Anesthesiology residency at Wilford Hall, U.S. Air Force Medical Center.  I joined the medical staff of Arkansas Children's Hospital in 1993 after practicing Anesthesiology for ten years on active duty with the U.S. Air Force.

4.  I first learned of the problems presented by Dr. Schwab at the Clinical Competency Committee meeting held on March 10, 2010.  In attendance at that meeting were ten practicing Anesthesiologists working at either Arkansas Children's Hospital or UAMS.  I have attached to this Declaration as Exhibit F-1 a true and correct copy of the Clinical Competency Meeting Minutes.  The Committee discussed possible action plans for Dr. Schwab, but ultimately, the Committee voted unanimously – all ten Anesthesiologists – that due to the fact that the demonstrable behaviors noted in the January 2010 V.A. Surgery evaluation failed to meet ACGME Competencies of Professionalism, Patient Care and Medical Knowledge, any of which could ultimately lead to patient endangerment, Dr. Schwab's position should be terminated immediately.

5.  I met with Dr. Schwab, along with Drs. Napolitano and Jaffar, on April 15, 2010.  At no time during that meeting did Dr. Schwab indicate that he had ADHD or that he was requesting a reasonable accommodation for his ADHD.

6.  I hereby declare under penalty of perjury that the proceeding is true and correct to the best of my knowledge.

Declaration of Timothy Martin, M.D.                **EXHIBIT F**              Page  1

FURTHER SAYETH THE DECLARANT NOT.

_____        _____
Timothy Martin, M.D.                                    DATE

April 9, 2012

Clinical Competence Committee Mtg. Minutes
March 10, 2010

Present: Charles Napolitano, M.D., Muhammad Jaffar, M.D., Carmelita Pablo, M.D., Timothy
Martin, M.D. (via phone, ACH), Brooks Gentry, M.D., Mike Vollers, M.D. (via phone, ACH),
Saif Siddiqui, M.D. (via phone, ACH ), Juan Firnhaber, M.D., Danny Wilkerson, M.D., Sushma
Thapa, M.D., Anna Moses, Mary Beth Gresham, and Jennifer White

Not Present: Ahmed Ghaleb, M.D., Mike Schmitz, M.D., Mark Reed, M.D., Rob Baker, M.D.,
Majid Saleem, M.D., and Jorge M. Palacios, M.D.

An urgent meeting was called to discuss performance-related issues that surfaced regarding one
of our PGY1 residents, Brian Schwab, D.O.  The following areas of concern were discussed:

Dr. Napolitano was contacted by surgery in February regarding Dr. Schwab's January rotation at
the VA.  Dr. Mancino stated that Dr. Schwab displayed disinterest in learning, a lack of empathy
for patients and their families, and a disrespectful attitude toward faculty-attending physicians.
Dr. Schwab was counseled on several occasions, although his performance did not improve.
Because of his poor performance on this rotation, Dr. Schwab failed this rotation and was told so
by Dr. Mancino.  Although Dr. Schwab had multiple opportunities to discuss this with Dr.
Napolitano or Dr. Jaffar, he failed to do so.

Dr. Schwab's February rotation with VA Cardiology was not improved.  Dr. Jaffar was contacted
by Dr. Sachdeva regarding Dr. Schwab's performance.  Dr. Sachdeva voiced concerns regarding
Dr. Schwab's lack of attention, deficiencies in medical knowledge, and rude/disrespectful
attitude.  Again, Dr. Schwab did not attempt to contact Dr. Napolitano or Dr. Jaffar regarding his
struggles.

Copies of Dr. Schwab's surgery evaluation (received on March 10, just prior to this meeting)
were reviewed by the committee.  The committee discussed possible action plans, although the
committee voted unanimously, due to the fact that all of these demonstrable behaviors fail to meet
the ACGME Competencies of professionalism, patient care, and medical knowledge,   Dr.
Schwab's position should be terminated immediately.

**EXHIBIT  F-1**

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

BRIAN SCHWAB, D.O.,                                          PLAINTIFF,

V.                                    CASE NO. 4:11-cv-00011-BSM

UNIVERSITY OF ARKANSAS, ET AL.,                             DEFENDANTS.

### DECLARATION OF ANNE MANCINO, M.D.

1. My name is Anne Mancino. I am an Associate Professor of surgery at UAMS and the chief of general surgery at the John L. McClellan Memorial Veteran's Hospital in Little Rock, Arkansas. I have been employed at UAMS since 1998.

2. I have been a practicing surgeon out of residency for over twenty years. I have been involved in graduate medical education for over twenty years.

3. In January, 2010, Dr. Brian Schwab rotated through the V.A. Surgery Department as an intern studying with the UAMS Anesthesiology Department. Attached to my Declaration as Exhibit G-1 is a true and correct copy of the evaluation form that I helped complete along with Drs. Kimberly Moseley and Clifton Parnell. This evaluation correctly reflects the unacceptable performance of Dr. Schwab during this month-long rotation.

---

4.      During Dr. Schwab's month-long rotation with the V.A. Surgery Department, he neither

     told me that he had a diagnosis of ADHD nor did he request a reasonable accommodation

     for ADHD.

5.      I hereby declare that the preceding is true and correct to the best of my knowledge.

     FURTHER SAYETH THE DECLARANT NOT.

ANNE MANCINO, M.D.                4/9/12

                                             DATE



ATTENDING'S EVALUATION OF ANESTHESIOLOGY PGY-1 INTERN
**Evaluator:** UAMS, Surgery   **Subject:** Schwab, Brian Richard
Evaluation Dates: 1/4/2010 to 1/31/2010

*aw*
*3-11-80*

1 = Consistent significant deficits. 2 = Below standard & inconsistent more than 30% of time. 3 = Clearly satisfactory; meets standard at training level. 4 = Exceed standard more than 50% time. 5 = Consistently & significantly superior. Please rank the Intern, using the above scale. Please mark "N/A" if you are unable to evaluate.

**PATIENT CARE**

1) Demonstrates caring behavior toward patients and their families

   1       2       3       4       5      N/A

*Multiple complaints from pts + families re: bedside manner.*

2) Collects clinical data resulting in a diagnosis reflects patient's clinical condition

   1       2       3       4       5      N/A

*No initiative to round/perform pt care, even when instructed to do so.*

3) Performs procedures competently and safely.

   1       2       3       4       5      N/A

**MEDICAL KNOWLEDGE**

4) Demonstrates appropriate medical knowledge when caring for patients.

   1       2       3       4       5      N/A

*Consistently unable to answer any questions on rounds*

5) Demonstrates ability to apply medical knowledge to solve clinical problems.

   1       2       3       4       5      N/A

*Lacks medical knowledge; No initiative to improve.*

**PRACTICE-BASED LEARNING AND IMPROVEMENT**

6) Seeks and incorporates feed back to improve clinical skills.

   1       2       3       4       5      N/A

*No improvement after counselling by residents + attendings.*

7) Facilitates the learning of students and colleagues.

   1       2       3       4       5      N/A

**INTERPERSONAL AND COMMUNICATION SKILLS**

8) Listens and communicates effectively with patients and other health care professionals.

   1       2       3       4       5      N/A

*Doesn't listen at all.*

9) Works as an effective member of the health care team.

**EXHIBIT G-1**

DEF 0837

*Ineffective at best. Expressed no interest in pt. care.*

**PROFESSIONALISM**

10) Available, punctual, and willingly accepts patient care responsibilities.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ● | ○ | ○ | ○ | ○ | ○ |

11) Demonstrates respectful, ethical, and culturally sensitive clinical practice.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|

*Was corrected by Social Worker re: inappropriate comments regarding VA & Surgical Svc.*

**SYSTEMS-BASED PRACTICE**

12) Practice cost-effective health care in coordination with other health care providers.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ○ | ○ | ○ | ○ | ● |

13) Provides quality care in a timely and effective manner.

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ● | ○ | ○ | ○ | ○ | ○ |

*Did not appear interested in providing care at all.*

14) Can effectively organize transfer of patient care to other medical services

| 1 | 2 | 3 | 4 | 5 | N/A |
|---|---|---|---|---|-----|
| ○ | ● | ○ | ○ | ○ | ○ |

**GENERAL**

15) Do you wish to speak with the Anesthesiology Residency Director about this resident?

| YES | NO | N/A |
|-----|----|----|
| ● | ○ | ○ |

Overall Comments: _____ *Have already done so.* _____

New Innovations, Inc. ©1995-2010

*Although this resident was counselled on several occasions, he did not seem to want to make any improvement. Was not bothered by significant knowledge deficit. At the end of rotation, while surgery Residents took ABSITE on Saturday morning, he was responsible for rounding. The attending on call was in the hospital and saw Dr. Schwab around 6am. By 9:30 am, he had not rounded on any patients. and bo He said he did not plan to round until the residents returned in the afternoon, though he had been*

DEF 0838

instructed to round by the Chief Resident. He was asked to proceed with his rounds by the Attending; the attending rounded on ALL SICU AND floor patients before Dr. Schwab had seen any patients or written any notes.

Obviously disinterested on rounds.

3/10/10

3/10/10

3-10-2010

DEF 0839

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

BRIAN SCHWAB, D.O.,                                          PLAINTIFF,

V.                                    CASE NO. 4:11-cv-00011-BSM

UNIVERSITY OF ARKANSAS, ET AL.,                        DEFENDANTS.

### DECLARATION OF CLIFTON PARNELL

1.    My name is Clifton Parnell.  I am a surgeon at the John L. McClellan Memorial

      Veteran's Hospital in Little Rock, Arkansas.  I have had a teaching appointment with

      UAMS since 2005.

2.    I have been a practicing surgeon for 37 years.  I have been involved in graduate medical

      education for seven years.

3.    In January, 2010, Dr. Brian Schwab rotated through the V.A. Surgery Department as an

      intern studying with the UAMS Anesthesiology Department.  Attached to my Declaration

      as Exhibit G-1 is a true and correct copy of the evaluation form that I filled out along

      with Drs. Moseley and Mancino.  This evaluation correctly reflects the unacceptable

      performance of Dr. Schwab during this month-long rotation.

4.    During Dr. Schwab's month-long rotation with the V.A. Surgery Department, he neither

      told me that he had a diagnosis of ADHD nor did he request a reasonable accommodation

      for ADHD.

Declaration of Clifton Parnell, M.D.          **EXHIBIT H**                    Page   1

5.    I hereby declare that the preceding is true and correct to the best of my knowledge.

FURTHER SAYETH THE DECLARANT NOT.

_____        4-17-2012
Clifton Parnell, M.D.                              Date

_____

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

BRIAN SCHWAB, D.O.,                                        PLAINTIFF,

V.                                        CASE NO. 4:11-cv-00011-BSM

UNIVERSITY OF ARKANSAS, ET AL.,                          DEFENDANTS.

## <u>DECLARATION OF KIMBERLEY MOSELEY</u>

1.      My name is Kimberley Moseley.  I was an Associate Professor of surgery at UAMS and

a surgeon at the John L. McClellan Memorial Veteran's Hospital in Little Rock,

Arkansas.  I was appointed at UAMS from 7/2007 to 4/2012; I was employed by L.

McClellan Memorial Veteran's Hospital from 7/2007 to 4/2012.  I currently work for

Christus St. Vincent Regional Medical Center in New Mexico.

2.      I have been a practicing surgeon for 10 years.  I have been involved in graduate medical

education for 6 years.

3.      In January, 2010, Dr. Brian Schwab rotated through the V.A. Surgery Department as an

intern studying with the UAMS Anesthesiology Department.  Attached to my Declaration

as Exhibit G-1 is a true and correct copy of the evaluation form that I completed along

with Drs. Clifton Parnell and Anne Mancino.  This evaluation correctly reflects the

unacceptable performance of Dr. Schwab during this month-long rotation.

4.      During Dr. Schwab's month-long rotation with the V.A. Surgery Department, he neither

told me that he had a diagnosis of ADHD nor did he request a reasonable accommodation

for ADHD.

---

Declaration of Kimberley Moseley              **EXHIBIT I**                    Page 1

5.    I hereby declare that the preceding is true and correct to the best of my knowledge.

FURTHER SAYETH THE DECLARANT NOT.


_Kimberley Moseley, M.D._                    4/16/12
Kimberley Moseley, M.D.                      Date

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

BRIAN SCHWAB, D.O.,                                              PLAINTIFF,

V.                                        CASE NO. 4:11-cv-00011-BSM

UNIVERSITY OF ARKANSAS, ET AL.,                          DEFENDANTS.

### DECLARATION OF LAWRENCE KIM, M.D.

1.    My name is Lawrence Kim.  I am a surgeon at the John L. McClellan Memorial

      Veteran's Hospital in Little Rock, Arkansas, and a full professor of surgery at UAMS.

2.    I have been a practicing surgeon for 16 years.  I have also been involved in graduate

      medical education for 16 years.

3.    In January, 2010, Dr. Brian Schwab rotated through the V.A. Surgery Department as an

      intern studying with the UAMS Anesthesiology Department.  Attached to my Declaration

      as Exhibit G-1 is a true and correct copy of the evaluation form that Drs. Moseley,

      Parnell, and Manscino made regarding Dr. Schwab's surgical rotation.  This evaluation

      correctly reflects the unacceptable performance of Dr. Schwab during this month-long

      rotation.

4.    During Dr. Schwab's month-long rotation with the V.A. Surgery Department, he neither

      told me that he had a diagnosis of ADHD nor did he request a reasonable accommodation

      for ADHD.

5.    I spoke with Dr. Charles Napolitano in late February 2010 regarding Dr. Schwab's

      unacceptable performance on our service.

---

Declaration of Lawrence Kim, M.D.                **EXHIBIT J**                        Page  1

6.     I hereby declare that the preceding is true and correct to the best of my knowledge.

     FURTHER SAYETH THE DECLARANT NOT.


_____       4/18/12
LAWRENCE KIM, M.D.                             Date

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

BRIAN SCHWAB, D.O.,                                    PLAINTIFF,

CASE NO. 4:11-cv-00011-BSM

UNIVERSITY OF ARKANSAS, ET AL.,

                                                            DEFENDANTS.

## AFFIDAVIT OF MELANIE A. CLARK, L.P.N.

My name is Melanie A. Clark, and I have been duly sworn and state under oath as follows:

1.  This Affidavit is based upon my personal knowledge.

2   I am an employee at UAMS and I conduct medical screenings of new employees.

3.  As a nurse that performs the new employee screenings, I interview new employees to obtain information on, and provide as needed, required and recommended immunizations and a basic medical history questionnaire.  I see new employees in our clinic, and I see in-coming housestaff members (for example, in-coming resident students, pharmacy students, or nursing students) at mass registrations.

4.  Whether seeing employees in the clinic or housestaff at a mass registration, the information given to me is input into UAMS computer system.  Attached to my Affidavit as Exhibit 1-A is the computer input information given to me by Dr. Brian Schwab on June 23, 2009.  Dr. Schwab indicated in his medical information

AFFIDAVIT OF MELANIE A. CLARK, L.P.N.                **EXHIBIT K**

                                                             Page 1

to me that he did not need any physical accommodations.  Attached to my

Affidavit as Exhibit 1-B is the medical record dated July 2, 2009, which again

shows that Brian Schwab did not need any physical accommodations.

Subscribed and sworn this 21st day of June, 2011.

_Melanie A. Clark, LPN_
Melanie A. Clark, L.P.N.

STATE OF ARKANSAS        )
                         ) SS:
COUNTY OF PULASKI        )

Subscribed to and sworn before me, a notary public, this 21st day of June, 2011.

_Diane Radcliff_

My commission expires:

_1-9-19_

DIANE RADCLIFF
MY COMMISSION # 12369224
EXPIRES: January 9, 2019
Garland County

AFFIDAVIT OF MELANIE A. CLARK, L.P.N.                                    Page 2

**Mckay, Dwana S**

**Subject:**  FW: [secure] B. Schwab

sehs_demographic: Brian Schwab

Go  Actions  Options  Help

Desktop  Chart  Ap

**Brian Schwab**  UAM
28 Years Old Male DOB: 12/29/19

Find Pt.  Protocols  Graph  Hand

Summary  History

Doc ID:  7  Properties: ES
Summary: ument immunizations, titers

Inserted
sehs_demographic
[sehs_

Attachments

Favorites
Blank image

**Vital Signs**                                    Return to in

Systolic BP (mm Hg) [____]  Height (in) [____]          Tobacco use ○ Smoker  ○
Diastolic BP (mm Hg) [____]  Weight (lbs) [____]    Smoking cessation counselling [

Employee items in green, DLAM in red, student items in blue. For both - black text.

**New Employee/Student Exam**          **Previous entries:**
Country of birth ○ USA          ○ Foreign born    USA
History of latex sensitivity: ○ Yes    ○ No    No (06/23/2009 3:50:35 PM)
Color vision: ○ Pass    ○ Fail
NEMS billing category [_____]    Patient Care Area (06/23/2009 3:50:35 PM
Does employee need any ○ Yes    No (06/23/2009          Physical
physical accomodations? ○ No    3:50:35 PM)          accomodation
Employee ○ Yes    Yes (06/23/2009    Employee exam
exam ○ No    3:50:35 PM)    comments:
DLAM date [____]    [_____]    DLAM
                                       comments

**Animal Exposures**  **Previous entries:**   **Animal exposure screening questions:**  P
☐ Rodents                    ☐ Required immunizations up to date
☐ Rabbits                    ☐ No significant allergies
☐ Dogs                       ☐ Allergies to animals

Date student exam was done [_____]
Student pre-enrollment form completed: ○ Yes    ○ No

                    TB bloodtest [_____]    Facility where blood test v
Date TB bloodtest was done [_____]    Last TB b

**Vaccine Survey**  (Born after 1957, needs measles vacc)   Vaccine exemption: ☐ Age (n
                                                            ☐ Medica
                                                            ☐ Religio
                                                            ☐ Philoso

Hep B vaccine waived: [_____]    Hep B vac comments: [_____]
MMR vaccine declined: ○ Yes  ○ No    MMR comments: [_____]

[Prev Form (Ctrl+PgUp)]  [Next Form (Ctrl+PgDn)]

EXHIBIT 1-A to EX. K

start

1

**Student & Employee Health Services**

521 Jack Stephens Drive  Little Rock, AR 72204
501-686-6565  Fax: 501-296-1230

**Brian Schwab**  MedRec: E00032182  PCP: None  LOC: SEHS  Ins:
 28 Years Old Male (DOB: 12/29/1982)  Home: 5016031656    Work: 5016031656  eMail: **None**

**06/23/2009 - ESH Visit: Document immunizations, titers and job health status**
**Provider: Melanie A Clark, LPN**
**Location of Care: Student & Employee Health Services**
**This document contains confidential information**

## Vital Signs
**Tobacco use** No

## New Employee/Student Exam
 **Foreign born:** USA
**NEMS category** Patient Care Area
**History of latex sensitivity:** No
**Does employee need any physical accomodations?:** No
**Employee exam complete:** Yes

## TB Screen Results
**Date PPD given** 05/06/2009
**PPD dose** .1 ml
**Next PPD due** 06/23/2009
### TB Screen Follow Up
**BGG in past** No
 **PPD result (mm induration)** 0 05/08/2009
**Facility where PPD was placed:** Outside UAMS
**PPD interpretation** Negative
### Immune Status
**Hepatitis B immunity:** Had vaccine series
**Varicella immunity:** Had disease
**Measles immunity:** Had vaccine series
**Mumps immunity:** Had vaccine series
**Rubella immunity:** Had vaccine series
**If history of varicella, how documented?** Yes- doctor diagnosed

## TDAP
**TDAP** Given UAMS SEHS mass
**TDAP Manuf** Aventis Pasteur
**TDAP Route** IM
**TDAP Lot** c2377a
**TDAP Site** Left deltoid
**TDAP Consent:** Yes
**TDAP VIS date:** 11/18/2008
**TDAP  given by:** mc

**Signed by Melanie A Clark, LPN on 07/02/2009 at 3:55 PM**

**EXHIBIT  1-B to EX. K**

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

**BRIAN SCHWAB, D.O.,**                                   **PLAINTIFF,**

### CASE NO. 4:11-cv-00011-BSM

**UNIVERSITY OF ARKANSAS, ET AL.,**

                                                         **DEFENDANTS.**

### AFFIDAVIT OF LOUISE ALLISON

My name is Louise Allison, and I have been duly sworn and state under oath as follows:

1.      This Affidavit is based upon my personal knowledge.

2       I am an employee at UAMS and I am a Clinical Services Manager.

3.      I have reviewed the Affidavit of Melanie A. Clark, L.P.N. and it truthfully

indicates how new employees and housestaff have medical screenings conducted

at UAMS.

4.      I have reviewed Exhibits 1-A and 1-B and those are accurate records of UAMS

which indicate that Brian Schwab did not need a physical accommodation.

Subscribed and sworn this **2\** day of June, 2011.

_____
Louise Allison

---

**EXHIBIT  L**

AFFIDAVIT OF LOUSIE ALLISON          Page 1

STATE OF ARKANSAS     )
                            ) SS:

COUNTY OF PULASKI     )

     Subscribed to and sworn before me, a notary public, this 21st day of June, 2011.

My commission expires:

    1-9-19

DIANE RADCLIFF
MY COMMISSION # 12369224
EXPIRES: January 9, 2019
Garland County

AFFIDAVIT OF LOUSIE ALLISON      Page 2